# In the United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

### Case No. 24-1071

---

GRAND RIVER DAM AUTHORITY,
PETITIONER,
*v.*
FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT.

---

### PETITION FOR REVIEW

---

Pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure, Fed. R. App. P. 15(a), and Section 313(b) of the Federal Power Act, 16 U.S.C. 825*l*(b), Petitioner Grand River Dam Authority ("GRDA") hereby petitions this Court for review of the following orders issued by Respondent Federal Energy Regulatory Commission ("FERC") in Docket Nos. P-1494-455 and P-1494-468:

(1)  *Grand River Dam Auth.,* 186 FERC ¶ 61,045 (Jan. 18, 2024) ("Order on Remand") (attached as Attachment A); and

(2)  *Grand River Dam Auth.*, 186 FERC ¶ 62,124 (Mar. 18, 2024) ("Notice of Rehearing Denial") (attached as Attachment B).

FERC's orders relate to the Pensacola Hydroelectric Project, FERC Project No. 1494 ("Project"), which Project GRDA is the owner and licensee.

FERC issued its Order on Remand on January 18, 2024, following this Court's remand order in *City of Miami v. FERC*, 22 F.4th 1039 (D.C. Cir. 2022). Att.A at P 1. There, this Court addressed a 2018 complaint filed by the City of Miami, Oklahoma ("City"), alleging that GRDA was in violation of Standard Article 5 of the license for the Project. Att.A at P 1. Specifically, in the City's complaint, the City claimed that GRDA was in violation of Standard Article 5 of the Project license by not expending over $150 million (in the City's estimation) to acquire approximately 13,000 acres of non-Project properties, located outside of the FERC-approved Project boundary, for purposes of supporting the U.S. Army Corps of Engineers' ("Corps") flood control operations. Att.A at PP 1, 4 & 14. In its Order on Remand, FERC announced an entirely new interpretation of Standard Article 5 that is inconsistent with its prior rulings applicable to this Project and others across the nation and ruled that GRDA is obligated under this new interpretation to acquire these non-Project lands. Att.A at P 54. FERC reached this conclusion

despite its concession that the Corps—and not FERC—bears exclusive responsibility for flood control at the Project.  Att.A at PP 46, 50 n.105 & 54.

After GRDA timely petitioned FERC for rehearing of its Order on Remand on February 16, 2024, FERC issued its Notice of Rehearing Denial on March 18, 2024.  Att.B.

GRDA now files with this Court this Petition For Review of FERC's Order on Remand and Notice of Rehearing Denial.

This Court has subject-matter jurisdiction over this Petition under Section 313(b) of the Federal Power Act.  16 U.S.C. § 825*l*(b).  GRDA is the object of FERC's orders, including because it is the owner and licensee of the Project at issue in FERC's orders, and GRDA was a party to FERC's proceedings below.  Further, GRDA has timely filed this Petition For Review with this Court within 60 days of FERC's Notice of Rehearing Denial on March 18, 2024.  *See id.*  This Court is a proper venue to hear GRDA's Petition For Review under 16 U.S.C. § 825*l*(b) because this statute expressly states that "[a]ny party to a proceeding under this chapter aggrieved by an order issued by the Commission in such

proceeding may obtain a review of such order in . . . the United States Court of Appeals for the District of Columbia." *Id.*

Finally, GRDA has also attached to this Petition For Review the Corporate Disclosure Statement required by Rule 26.1 of the Federal Rules of Appellate Procedure, Fed. R. App. P. 26.1, and Circuit Rule 26.1, D.C. Cir. R. 26.1, (as Attachment C); and a Certificate of Service (as Attachment D).

Dated: March 19, 2024.

Respectfully Submitted,

CHARLES R. SENSIBA
ELIZABETH J. MCCORMICK
SAHARA D. SHRESTHA
TROUTMAN PEPPER HAMILTON
SANDERS LLP
401 9th St. NW
Suite 1000
Washington, DC 20004
(202) 274-2950
charles.sensiba@troutman.com
elizabeth.mccormick@
troutman.com
sahara.shrestha@troutman.com

ANDREA W. WORTZEL
DABNEY J. CARR
TROUTMAN PEPPER HAMILTON
SANDERS LLP
1001 Haxall Point
15th Floor
Richmond, VA 23219
(804) 697-1200
andrea.wortzel@troutman.com
dabney.carr@troutman.com

/s/ *Misha Tseytlin*
MISHA TSEYTLIN
*Counsel of Record*
KEVIN M. LEROY
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1939 (fax)
misha.tseytlin@troutman.com
kevin.leroy@troutman.com

*Counsel for Grand River Dam
Authority*

ATTACHMENT A

186 FERC ¶ 61,045
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Willie L. Phillips, Acting Chairman;
Allison Clements and Mark C. Christie.

| | |
|---|---|
| Grand River Dam Authority | Project No.    1494-455 |

ORDER ON REMAND

(Issued January 18, 2024)

1.     This case is before the Commission on remand from the United States Court of
Appeals for the District of Columbia Circuit (D.C. Circuit).[1]  At issue is the
Commission's consideration of a complaint filed by the City of Miami, Oklahoma (City)
alleging that the Grand River Dam Authority (GRDA), licensee for the Pensacola
Hydroelectric Project No. 1494 (Pensacola Project or project), is in violation of its license
for failing to acquire necessary flowage rights on lands flooded due to project operations
(2018 Complaint).[2]  The court remanded the Commission's orders denying the City's
2018 Complaint[3] and directed the Commission to:  (1) interpret section 7612 of the
National Defense Authorization Act for Fiscal Year 2020 (the Pensacola Act);[4] (2)
determine the role of the United States Army Corps of Engineers (Corps) with respect to
the flooding that is the subject of the City's complaint; (3) determine the responsibility of
GRDA if it caused flooding in the City; and (4) analyze the evidence that the City
provided in support of its complaint.

2.     As discussed below, on remand we conclude that section 28 of the Federal Power
Act (FPA) precludes the application of the Pensacola Act to the 2018 Complaint
proceeding, that the role of the Corps in this proceeding is limited to directing flood
operations at the project, that the project has increased flooding around the City of
Miami, and that Article 5 requires GRDA to acquire adequate property rights in

---

[1] *City of Miami, Okla. v. FERC*, 22 F.4th 1039 (2022).

[2] City December 26, 2018 Complaint (2018 Complaint).

[3] *Grand River Dam Auth.*, Project No. 1494-445 (Apr. 29, 2020) (delegated order)
(April 29 Letter Order), *order on reh'g*, 172 FERC ¶ 61,255 (2020) (Rehearing Order).

[4] National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92
§§ 7612(b)(3)(A), (b)(3)(B), 133 Stat. 1198, 2313 (2019) (Pensacola Act).

perpetuity to accomplish all project purposes, including flood control.  We direct GRDA to file additional information

## I.     Background

3.      In 1939, the Federal Power Commission issued an original license under the FPA authorizing GRDA to construct, operate, and maintain the Pensacola Project located on the Grand (Neosho) River[5] in Craig, Delaware, Mayes, and Ottawa Counties, Oklahoma. The City of Miami is located along the Neosho River upstream of the Pensacola Project. On April 24, 1992, the Commission issued a new 30-year license to GRDA for the continued operation and maintenance of the 105.18-megawatt project (License Order).[6] The license was set to expire on March 31, 2022, but in 2019 the Commission granted a 38-month extension of the license term to May 25, 2025, to allow GRDA more time to complete certain studies as part of the relicensing process for the project.[7]  GRDA filed an application to relicense the project on May 30, 2023, which is pending before the Commission.

4.      The City's 2018 Complaint alleges that GRDA has repeatedly flooded private lands outside the project boundary, exceeding the limits of existing flowage easements and that the project license requires GRDA to acquire flowage easements for those lands.

### A.     The Pensacola Project

5.      The project consists of a main dam, two auxiliary spillways, the Grand Lake O' the Cherokees (Grand Lake) reservoir with a surface area of 46,500 acres and a storage volume of 1,680,000 acre-feet at a water surface elevation of 745 feet Pensacola Datum (PD),[8] an intake structure, a powerhouse, and appurtenant facilities.  The approved

---

[5] Above Grand Lake, the river is called the Neosho River; below Pensacola Dam, it is called Grand River.  The record of this case refers to the river as the Grand River, the Neosho River, and the Grand/Neosho River.

[6] *Grand River Dam Auth.*, 59 FERC ¶ 62,073 (1992) (License Order).  The Commission approved an increase in capacity from the originally authorized 86.9-megawatts to 105.18-megawatts in a 1996 amendment order.  *See Grand River Dam Auth.*, 76 FERC ¶ 62,162 (1996).

[7] *Grand River Dam Auth.*, 168 FERC ¶ 62,145, at P 35 (2019), *order on clarification and reh'g*, 170 FERC ¶ 61,027 (2020).

[8] Pensacola datum (PD) is approximately 1.07 feet higher than National Geodetic Vertical Datum (NGVD), which is a national standard for measuring elevations above sea

project boundary is at the 750-foot PD contour line, encompassing Grand Lake and a narrow strip of land around the reservoir's perimeter (the perimeter includes approximately 521.86 miles of shoreline extending 66 miles upstream of the dam).[9]

6.      Grand Lake is a multi-purpose reservoir used for power generation, recreation, flood control, and water supply.  In addition to the power generation provided by the project, Grand Lake is a very popular recreation area for boating and fishing.  Most land surrounding the lake is privately owned and contains resorts, residences, parks, and docks.

7.      As to flood control in the Grand River Basin, Grand Lake is located in the middle of an expansive system of 11 large reservoirs managed by the Corps's Tulsa District. Flood storage at the project is provided between elevations 745 feet and 755 feet PD.[10] Whenever the reservoir elevation is within this flood pool range, the Corps directs water releases from the dam under the terms of a 1992 Letter of Understanding and Water Control Agreement between it and GRDA.[11]  Flood flows are first discharged through the project hydropower units for generation.[12]  Flows above the hydraulic capacity of the hydropower units are released through one or more spillway gates.

8.      Under Standard Article 5 of the project license, GRDA must, within five years from the date of issuance of the license (i.e., by April 24, 1997) acquire title in fee or the right to use in perpetuity all lands, other than lands of the United States, necessary or appropriate for the construction, maintenance, and operation of the Pensacola Project.[13] The Commission has explained that the "purpose of standard Article 5 is to ensure that the licensee has sufficient rights in project property to enable the Commission, through

---

level.  Reservoir levels discussed in this order are in PD unless otherwise specified.

    [9] *Grand River Dam Auth.*, 145 FERC ¶ 62,041, at P 4 (2013) (order modifying and approving GRDA's Shoreline Management Plan).

    [10] 33 C.F.R. § 208.25.

    [11] *See* Commission staff March 6, 2018 Record of Telephone Call with the Corps and Transmittal of the Updated Water Control Manual for the Pensacola Reservoir (attaching 1992 Water Control Manual for the Pensacola Reservoir, Letter of Understanding, and Water Control Agreement).

    [12] Commission staff April 27, 2018 Scoping Document 2 at 7.

    [13] License Order, 59 FERC at ordering para. (D) (incorporating the articles in Form L-3 into the license).

Project No. 1494-455                                                                    - 4 -

the licensee, to carry out its regulatory responsibilities with respect to the project."[14]  The License Order notes that GRDA holds all necessary property rights to lands within the project boundary, which is the shoreline up to elevation 750 feet PD.[15]

9.      Until recently, the Corps held flowage easements for lands outside the project boundary that were needed for flood pool operations from 750-757 feet National Geographic Vertical Datum (NGVD) at the dam and between 750-760 feet NGVD in the upper reaches of the reservoir.[16]  The Corps transferred all such property interests in the project to GRDA in 2021.[17]

10.     Article 401 of the license requires GRDA to control fluctuations of the reservoir surface elevation to protect fish, wildlife, and recreational resources, except as necessary for the Corps to provide flood control protection.  The License Order requires GRDA to maintain the reservoir elevation from 741 feet PD to 745 feet PD for different seasons of the year (referred to as the operating rule curve).[18]  As explained below, how and whether

---

[14] *Seneca Falls Power Corp.*, 129 FERC ¶ 61,132, at P 9 (2009).

[15] License Order, 59 FERC at 63,251.

[16] Although the Water Control Agreement states that the federal government acquired a perpetual flowage easement for over 12,000 acres of land between elevations 750 and 757 feet PD in order to store flood water to 755 feet PD, the quitclaim deeds for the flowage easements are in mean sea level, which we interpret in this order as NGVD, consistent with how the Corps has referenced the easements.  *See* GRDA November 8, 2022 Fifth Annual Encroachment Report at 7 ("The flowage easements in the main lake typically cover property up to an elevation of 757 mean sea level.  Easements upstream of the main lake typically cover property up to elevations of 760 mean sea level."); Water Control Manual at 2-2.  *See also* Corps January 28, 2014 Letter at 1 (stating that the Corps managed flowage easements owned by the U.S. between GRDA's project boundary and up to an elevation of between 757 feet Sea Level Datum and 760 feet Sea Level Datum, which is 1.1 feet higher than PD).

[17] *Infra* PP 51, 55.

[18] License Order, 59 FERC at art. 401.  In the relicensing proceeding for the 1992 relicensing proceeding, GRDA proposed to operate the project under a rule curve that would limit the maximum surface elevation to 743.5 feet PD.  GRDA proposed to generally maintain the reservoir at 742 feet PD for most of the year but raise it by 1.5 feet to improve fish habitat.  In the Environmental Assessment (EA), Commission staff acknowledged that GRDA implemented a new rule curve in 1982 to improve fish and wildlife resources and recreation.  1992 EA at 30-31.  Commission staff found that the new rule curve implemented in 1982 reduced the project's capacity to store inflows and

Project No. 1494-455                                                                                                - 5 -

Article 401's operating rule curve affects flood control has been a consistent question since issuance of the License Order.

11.     In 1996, the Commission amended the operating rule curve requiring GRDA to maintain specific target water surface elevations at the reservoir throughout the year, ranging from a minimum of 741 feet PD to a normal maximum elevation of 744 feet PD.[19]  The 1996 rule curve amendment order noted that a series of floods occurred along the Grand/Neosho River between September 1992 and July 1995,[20] which led to the formation of the Grand/Neosho River Committee[21] in June 1993 to address, among other things, the effects of flooding on recreational use of Grand Lake and on shoreline property.  In 1996, the River Committee recommended the changes to the rule curve for

---

increased the frequency and magnitude of flood events.  The License Order acknowledged that "[s]ince 1982, as a result of operating to meet the new rule curve [an increase in the minimum pool elevation from 734 feet PD during the summer and 730 feet PD during drought years to 740 feet PD and 732 feet PD during extreme drought], the frequency and magnitude of flood events (i.e., water level exceeding 745 feet PD) increased markedly.  From 1976 to 1982 pool elevations exceeded 746 feet PD twice; from 1982 to 1989, 746 feet PD was exceeded at least once every year.  The new operations have clearly reduced the project's capacity to store inflows during the hydrologic year and have increased the frequency of its function in flood control." (citations omitted).  License Order, 59 FERC at 63,237.  Nonetheless, the EA considered GRDA's proposal and recommendations from fish and wildlife agencies to address the adverse impacts on fishery and wildlife resources and recreation.  The Commission concluded in the License Order that the target reservoir elevations of 741 feet PD to 745 feet PD would benefit those resources.

[19] *Grand River Dam Auth.*, 77 FERC ¶ 61,251, at 62,001 (1996) (order amending license to modify the operating rule curve).

[20] The rule curve amendment order noted that a complaint in state court had been filed against GRDA in 1994 for five floods that occurred from September 1992 through September 1993 and two additional floods in April 1994 (citing *Dalrymple, et al. v. Grand River Dam Authority* (Oklahoma District Court, Ottawa County, Sept. 23, 1994). *Id.* at n.7.

[21] The Grand/Neosho River Committee included various towns and counties along the river, several chambers of commerce, state resource agencies, Kansas-Oklahoma Flood Control Alliance, the Neosho Basin Advisory Committee, and various lakeshore landowners associations.  *Id.* at 62,002.

the project, which GRDA proposed to the Commission in the rule curve proceeding.[22]
The 1996 rule curve amendment order approved changes to the rule curve, in part, to
provide additional flood storage capacity during specific times of year that the
Commission would expect "to result in fewer, or at least less severe, flooding events
around the lake shore and possibly upriver."[23]  Further, the Commission acknowledged
the Corps's efforts to determine the cause of upstream flooding from the project and
reserved the right to revise the rule curve depending on the results of the Corps study.
Overall, the Commission concluded "that the value of potential added protection from
flood damage from a modified rule curve outweighs the likely increment of adverse
effects on waterfowl and bass nursery habitat."[24]

12.    The Corps completed a Grand Lake Real Estate Adequacy Study in 1998 (1998
Corps Study), which recognized the need for additional flowage easements at the project,
but that further study was needed to determine the significance of the flooding.[25]  No
changes to the rule curve were made by the Commission in response to the Corps's study.

13.    The Commission amended the rule curve again in 2017, authorizing an increase in
the minimum reservoir surface elevation to 742 feet PD without changing the normal
maximum elevation of 744 feet PD, but increasing the reservoir elevation up to two feet
from the previous rule curve during late summer and early fall.[26]

### B.    The City's 2018 Complaint Proceeding

14.    The City's 2018 Complaint alleged that GRDA is in violation of Article 5 for
failure to acquire flowage easements for 13,000 acres of non-federal land located outside
the Pensacola Project's project boundary at the upper reaches of Grand Lake and along

---

[22] *Id.*

[23] *Id.* at 62,005.

[24] *Id.*

[25] Corps April 19, 2018 Filing (Corps, *Grand Lake, Oklahoma, Real Estate
Adequacy Study* at 11 (1998) (1998 Corps Study)) ("Theoretical backwater effects of
Grand Lake were found to exceed the limits of existing flowage easements using the
criterion of a 50-year land acquisition flood.")).

[26] *Grand River Dam Auth.*, 160 FERC ¶ 61,001, at P 8 (2017) (2017 Amendment
Order) (order amending license to permanently amend Article 401's reservoir elevation
rule curve requirements).

the Neosho River near the City of Miami.[27]  The City claimed that GRDA's project operations have repeatedly flooded land outside the project boundary and that GRDA has failed to acquire the necessary flowage easements as required by Article 5.[28]  The City alleged that this has been an ongoing issue since the issuance of the License Order and that neither GRDA nor the Commission has addressed it.[29]  Specifically, the City's 2018 Complaint requested that the Commission find that:  (1) GRDA is in violation of Article 5 of its license by flooding 13,000 acres for which it has no easements; (2) regardless of the project boundary, GRDA is obligated under Article 5 to obtain all necessary property rights; (3) even though the Corps directs the flood control activities, GRDA is still responsible for complying with Article 5; and (4) the Commission should not wait until relicensing the project to resolve the Complaint.

15.     To support its complaint, the City pointed to several Oklahoma state court decisions that found GRDA liable for repeated flooding of private property outside the project boundary due to operation of the Pensacola Project.[30]  The City explained that, in finding GRDA liable, the state trial court adopted evidence provided by a technical expert and court-appointed referee, Dr. Forrest M. Holly Jr., with no objection from GRDA.[31] The City stated that Dr. Holly completed an initial report in 1999, which was amended in 2001, concluding that the "existence and operation of the Pensacola Dam caused an increase in the duration and magnitude of above-easement flooding in the vicinity of Miami[,] Oklahoma for all but one of the fourteen floods that were the subject of the litigation."[32]  The City also stated that GRDA has acknowledged an obligation to

---

[27] 2018 Complaint at 2-4.

[28] *Id.* at 5.

[29] The City outlines the long and complex history of the issue and explains that Commission staff over the years responded to Article 401 compliance issues (i.e., the required reservoir management rule curve), but did not address the acquisition of additional flowage easements nor find GRDA in violation of Article 5.  *Id.* at 5-6, 11-12.

[30] 2018 Complaint at 8-10 (citing *Dalrymple v. Grand River Dam Auth.*, No. CJ 94-444 (Okla. Dist. Ct. Nov. 5, 1999), amended, Jan. 11, 2000; *McCool v. GRDA* No. 97-020 (Okla. Civ. App. June 15, 2004); *Perry v. Grand River Dam Authority*, 344 P.3d 1 (Okla. Civ. App. 2013)).

[31] *Id.* at 8.

[32] *Id.* at 7-8 (citing Dr. Holly's 2001 Report at 1.)  Dr. Holly evaluated and quantified the magnitude and duration of 14 flood events that occurred between 1992 and 1995.  *Id.* at 8.  The report defined "vicinity of Miami" as the land above 760 feet NGVD (760 feet NGVD equals approximately 758.93 feet PD) elevation from approximately

purchase more easements and expressed to the Commission its intent to do so, but that subsequently GRDA concluded that it would be cost prohibitive to acquire additional easements and notified the Commission it would instead take operational actions to prevent future flood events.[33]

16.     The City's 2018 Complaint also discussed the City's additional efforts to demonstrate that GRDA was out of compliance with Article 5.  For example, in the City's comments in opposition to a 2015 temporary variance request, it alleged that GRDA's operations of the project caused not only the 14 floods between 1992 and 1995, but also 23 floods between July 2007 and June 2010.[34]  In addition, the City made similar comments about the flooding and failure of GRDA to acquire the necessary easements during several proceedings where GRDA requested temporary variances from the Commission to raise the reservoir level.[35]  In 2015, in response to GRDA's request to the Commission to permanently change its operating rule curve, the City's engineering consultant, Tetra Tech, prepared a hydrologic modeling study evaluating the effect of project operation on flooding.  According to the City, Tetra Tech's study found similar results as Dr. Holly's study:  the total area flooded exceeded the existing easements by approximately 13,000 acres.[36]  The City contends that despite this evidence, the

---

river mile 139 (Twin Bridges) upstream to approximately river mile 153 (Commerce Gage), which includes the City of Miami.  *Id.*

[33] *Id.* at 12-15; *see, e.g.,* GRDA January 14, 2013 Filing ("To date, GRDA has acquired over 3,671.32 acres of land in Ottawa County, Oklahoma.  At this time, GRDA is not acquiring any additional land and is instead focusing on the use of the existing acreage.  The GRDA is also reviewing the current rule curve in cooperation with the City of Miami, the U.S. Army Corps of Engineers, other FERC staff members, and other agencies and have been meeting to discuss a flood routing study related to the Ottawa county project area."); GRDA October 16, 2007 Filing ("On February 13, 2007, GRDA Board of Directors approved a Resolution, which provided for the acquisition of flood lands in Ottawa County.  …As a result of the Resolution, GRDA has begun the process of flood land acquisition. . ."); GRDA August 29, 2006 Filing ("The acquisition of additional easements, however, does not appear to be a viable option at this time.").

[34] 2018 Complaint at 20.

[35] *Id.* at 20-23.

[36] *Id.* at 22.

Commission staff ultimately granted GRDA's request to permanently change the operating rule curve.[37]

17.     GRDA's January 15, 2019 answer to the complaint asserted that project operations are not the cause of upstream flooding and that by statute the Corps has exclusive jurisdiction for flood control at the project, including the acquisition of lands needed to support the Corps' flood control operations.[38]  GRDA also stated that the evidence offered by the City relied on incomplete portions of the record, as the "Tetra Tech study identified non-[p]roject factors as likely contributing to upstream flooding."[39]  Thus, GRDA urged the Commission to dismiss the complaint because land outside the project boundary is not being flooded due to project operations.

18.     In 2019, Congress passed the Pensacola Act.[40]  As discussed below, the Pensacola Act includes several provisions that affect the Pensacola Project, including management of the conservation pool (i.e., lands and waters below the flood pool) and jurisdiction of the flood pool, and the Commission's jurisdiction over the project.

19.     In response to the City's complaint, Commission staff issued a letter order on April 29, 2020, (April 29 Letter Order), finding that GRDA was not in violation of Article 5.  The April 29 Letter Order found that it was unclear whether it was GRDA's operation of the project pursuant to the license or the flood control operations directed by the Corps that had caused the flooding referenced in the 2018 Complaint, and that, in the absence of substantial evidence that GRDA's project operations had regularly caused the upstream flooding at issue, the Commission was not requiring GRDA to bring additional land into the project boundary.[41]  The April 29 Letter Order also explained that the Pensacola Act provides, with respect to the Pensacola Project, that "the licensing jurisdiction of the Commission for the project shall not extend to any land or water outside the project boundary" and that "any land, water, or physical infrastructure or

---

[37] *Id.* at 23-24.

[38] GRDA January 15, 2019 Answer at 2.

[39] *Id.* at n.17.

[40] As noted above, the Pensacola Act is section 7612 of the National Defense Authorization Act for Fiscal Year 2020.  Pub. L. No. 116-92, §§ 7612(b)(3)(A), (b)(3)(B), 133 Stat. 1198, 2313 (2019).

[41] April 29 Letter Order at 3.

Document Accession #: 20240118-3104          Filed Date: 01/18/2024

other improvement outside the project boundary shall not be considered to be part of the project."[42]

20.    On May 29, 2020, the City filed a timely request for rehearing, claiming that it has repeatedly presented substantial evidence that GRDA's operation of the project has caused unauthorized flooding for decades. The City further claimed that section 28 of the FPA, which provides that changes to the FPA shall not affect issued licenses or the rights of licensees, bars the Pensacola Act from affecting the Commission's jurisdiction over the existing license.

21.    On September 17, 2020, the Commission addressed the arguments raised on rehearing by the City (Rehearing Order).[43] On rehearing, the Commission did not address the extent to which GRDA and the Corps were responsible for flood control operations at the project, explaining that their responsibilities are delineated in other statutes and regulations, as discussed in the project license.[44] Rather, the Commission discussed only the issue whether GRDA was in violation of Article 5 license. The Commission determined that the City had not provided substantial evidence that project operations cause flooding such that GRDA should be required to acquire additional property rights and stated that the flooding issue could be explored in depth on relicensing.[45]

22.    The Commission also determined that the Pensacola Act would preclude the Commission from granting the City relief because the Commission would not have jurisdiction over any land outside the project boundary and could not require GRDA to acquire these additional lands.[46] The Commission did not determine whether the Pensacola Act altered, amended, or repealed any particular provision of the FPA, but

---

[42] *Id*. at 4 (citing Pensacola Act §§ 7612(b)(3)(A), (b)(3)(B), 133 Stat. at 2313).

[43] Rehearing Order, 172 FERC ¶ 61,255.

[44] *Id.* P 10.

[45] *Id.* PP 13-16. Commission staff approved GRDA's request to extend its license term and to modify the relicensing process, in part, because of the "need for GRDA to complete the collection of bathymetry data as part of the approved [Hydrologic & Hydraulic] Modeling Study[, as c]ollecting this data is required for the development of models predicting changes in flow, reservoir levels, and sediment transport through the Grand/Neosho River system" *Grand River Dam Auth.*, 168 FERC ¶ 62,145 at P 27. *See also supra* P 3.

[46] Rehearing Order 172 FERC ¶ 61,255 at PP 18-21.

stated that section 28 of the FPA is inconsistent with the Pensacola Act as a basic tenet of statutory construction.[47]

## C.    The Court's Remand Order

23.    The City subsequently appealed the Commission's orders to the D.C. Circuit.  On January 18, 2022, the court granted the City's petitions in *City of Miami, Oklahoma v. FERC*[48] and remanded to the Commission for further proceedings.  First, the court stated that the Commission did not discuss the Corps's responsibility for the flooding or the Commission's authority over the Corps's role.[49]  The court stated that although GRDA's alternative argument is that the Corps is responsible for the flooding, the Commission ignored the Corps's alleged responsibility.[50]

24.    The court further held that the Commission did not adequately analyze the evidence provided by the City and did not answer the narrow question whether Article 5 requires GRDA to acquire the necessary property rights.  Also, the court concluded that the Commission's stance that the flooding issue could be handled during the relicensing proceeding violated the "basic principle of administrative law: an agency faced with a claim that a party is violating the law (here an existing license) cannot resolve the controversy by promising to consider the issue in a prospective legal framework."[51]  Finally, the court stated that the Commission relied on the Pensacola Act, without actually interpreting it, to bar the Commission from acting on the City's complaint.  The court explained that it was unclear whether the amendment strips the Commission's jurisdiction under the existing license or under future licenses, especially because section 28 of the FPA "reserves the right of Congress to change the Act but states that such changes shall not 'affect any license' issued under the Act."[52]

---

[47] *Id.* P 20.

[48] 22 F.4th 1039.

[49] *Id.* at 1042-43.

[50] *Id.* at 1043.

[51] *Id.*

[52] *Id.* at 1044.

## II.    Preliminary Matters

### A.    GRDA's March 31, 2022 Motion

25.    On March 31, 2022, in response to the D.C. Circuit's remand, GRDA filed a motion with the Commission requesting that the Commission issue an order that establishes procedures to govern the remand proceeding, including providing an opportunity for briefing on the outstanding legal issues.  Specifically, GRDA asserts that before the Commission engages in further fact-finding it must first resolve two legal issues—the Corps's legal responsibilities relative to flood control operations at the project and the application of the Pensacola Act to the City's claim—because resolving the legal issues may be dispositive of whether GRDA violated Article 5 of its license, and resolving the legal issues at the outset of the proceeding will determine the scope of any fact-finding necessary to resolve the City's complaint.[53]

### B.    City's April 12, 2022 Answer

26.    On April 12, 2022, the City filed an answer to GRDA's motion.  The City requests that the Commission deny GRDA's motion because the process GRDA proposes is inconsistent with the D.C. Circuit's remand, would unduly delay the conclusion of this proceeding, and would continue to harm the City through continued flooding.  The City states that the Commission should not reopen the record for the submission of further evidence but rather review the existing record.  The City asserts that the Commission should first rule on the merits of the City's complaint, including the review of the factual evidence submitted by the City showing that project operations caused flooding in the City and, whether such flooding violates Article 5 of GRDA's license.  In doing so, the Commission should address whether the Corps's role would relieve GRDA of responsibility for violating Article 5.  According to the City, the record demonstrates that the Corps disagrees with GRDA's claim that the Corps is responsible for real property acquisition requirements.[54]  If the Commission rules in favor of the City as to the above questions, then it should address whether the Pensacola Act precludes the Commission from remedying the violation, which the City asserts is the only issue on remand that merits additional paper briefing by the parties.[55]

---

[53] GRDA March 31, 2022 Motion at 2.

[54] City April 12, 2022 Answer at 6 (citing Corps January 27, 2018 Letter).

[55] *Id.* at 4.

### C.     GRDA's April 29, 2022 Answer

27.     On April 29, 2022, GRDA filed a motion for leave to answer the City's answer.
In its filing, GRDA responded to the City's arguments and provided two filings from the
Corps, which GRDA provides as evidence that the City misrepresents the Corps's stated
position of its flood control jurisdiction.[56]  GRDA also states that regardless of the history
and previous statements of the Corps on this issue, the Pensacola Act clarifies the
distinction between the jurisdiction of the Corps and of the Commission over this project
and resolves this issue on remand, and because of this change in law, the Commission
should allow for further briefing and resolve this issue before further fact-finding.[57]
GRDA asserts that because it was not required to answer the City's initial complaint, it
should be allowed the opportunity on remand to defend its position and present
evidence.[58]  Further, if the Commission renders a decision on the City's complaint
without allowing GRDA to present relevant factual information, it would deny GRDA its
due process rights.[59]  GRDA asserts that under the Administrative Procedure Act (APA),
the Commission must support its factual findings with substantial evidence and must
review the entire record up to this time, not just the facts before it when the City filed its
complaint.  GRDA claims that the modeling and studies completed for the relicensing
process demonstrate that flooding in the City is not caused by project operations and the
Commission should not exclude this data.[60]

### D.     City's May 12, 2022 Reply

28.     On May 12, 2022, the City filed a request for the Commission to reject GRDA's
April 29, 2022 answer because it is prohibited by Rule 213(a)(2) of the Commission's
Rules of Practice and Procedure, and if the Commission waives for good cause, the City

---

[56] GRDA April 29, 2022 Answer at attach. A (Corps January 8, 2019 Letter) &
attach. B (Corps October 24, 2018 Letter).  *See infra* P 49.

[57] *Id.* at 8-10.

[58] *Id.* at 12-13.  We note that GRDA filed an answer to the City's 2018 Complaint.
*See supra* P 17.

[59] GRDA April 29, 2022 Answer at 11-13.  The Commission in this order is
analyzing the evidence already provided on the record in this proceeding and the
Commission has not limited GRDA's ability to provide additional information on the
record regarding such evidence, which GRDA has taken advantage of in its several post-
remand filings in this proceeding.

[60] *Id.* at 14.

requests that the Commission accepts its response to GRDA's answer.  In part, the City states that GRDA should not be permitted to introduce evidence from the relicensing proceeding, because the City asserts it is an attempt to delay the resolution of the City's complaint until relicensing, which the D.C. Circuit rejected.  The City claims that the Commission can and should address the complaint "solely on the basis of the evidentiary record already before the Commission in this [c]omplaint proceeding."[61]  The City also asserts that, contrary to GRDA's claims, GRDA had the opportunity and the legal obligation to contest factual allegations in its answer filed on the complaint before Commission staff issued its letter stating that the Commission would not be evaluating the complaint under Rule 206.[62]  Finally, the City claims that GRDA continues to mischaracterize the position of the Corps and provides evidence of the Corps' position.[63]

### E.    U.S. Department of the Interior's June 1, 2022 Comment

29.    On June 1, 2022, the U.S. Department of the Interior (Interior) filed a comment letter requesting that the Commission find that the Act does not apply to the current license based on section 28 of the FPA and not interpret how the Act may apply to a future license.[64]  Interior further states that the Commission should address the Pensacola Act's applicability on the relicensing proceeding at a later date when there is a fully developed record and interested parties may intervene and comment accordingly.[65]

### F.    Commission Determination

30.    Rule 213(a)(2) of the Commission's Rules of Practice and Procedure prohibits an answer to an answer unless otherwise ordered by the decisional authority.[66]  The Commission may, however, waive its procedural rules, when an answer provides factual information that assists in developing a complete record.  In order to assure a complete record in this proceeding, the Commission waives Rule 213 and accepts GRDA's April 29, 2022 answer and the City's May 12, 2022 reply.

---

[61] City May 12, 2022 Reply at 7.

[62] *Id.* at 6.

[63] *Id.* at 5 (citing Corps July 27, 2018 Letter).

[64] Interior June 1, 2022 Comment Letter at 3.

[65] *Id.* at 4.

[66] 18 C.F.R. § 385.213(a)(2) (2022).

31.    We decline to provide further briefing in this proceeding.  As further discussed below, there is already a robust record that has been developed on the issues remanded by the D.C. Circuit.

32.    We will discuss each issue remanded by the court and the comments filed by GRDA, the City, and Interior in more detail below.

## III.    Discussion

33.    We begin by providing an interpretation of how the Pensacola Act applies here.  We then discuss the role of the Corps in this proceeding, as well as the responsibility of GRDA.  Finally, we analyze evidence that the City provided in support of its complaint.

### A.    Interpretation of the Pensacola Act

34.    After the City filed its 2018 Complaint, Congress enacted section 7612 as part of the 2020 defense authorization, restricting the Commission's jurisdiction over the Pensacola Project by, among other things, limiting the Commission's authority to require that new lands be added to the project boundary.  The City alleges that FPA section 28, which precludes any revision to the FPA from "affect[ing] any license theretofore issued under the provisions of this Act, or the rights of any licensee thereunder," bars the Pensacola Act from affecting the existing license.  GRDA disagrees and argues that the Pensacola Act removes the Commission's jurisdiction over any lands currently outside the project boundary.

35.    In the Rehearing Order, the Commission found it "unclear" how section 28 barred application of the Pensacola Act to this proceeding and, further, that subsequent and more specific legislation overrides prior and less specific provisions.[67]  The Commission also stated that interpreting the Pensacola Act was a matter for the courts.[68]

36.    The D.C. Circuit faulted the Commission for not interpreting the Pensacola Act and remanded the case so that the Commission could determine how the Act applies to the Commission's ability to enforce the existing license.[69]  We now address the subject of that remand and conclude that the Pensacola Act does not limit the Commission's jurisdiction over the current license.

---

[67] Rehearing Order, 172 FERC ¶ 61,255 at P 20.

[68] *Id*. P 21.

[69] *City of Miami, Okla.*, 22 F.4th at 1043-44.

37.    As relevant here, the Pensacola Act states that the Commission's licensing jurisdiction shall not extend to any land or water outside the project boundary,[70] and that any land, water, or physical infrastructure or other improvement outside the project boundary shall not be part of the project.[71]  The Act then provides that the Commission may amend the project boundary only with the express written agreement of the licensee. The Act states that if the licensee does not agree to a project boundary change proposed by the Commission, the purposes and requirements of Part I of the FPA are deemed to be satisfied without the Commission's proposed boundary or jurisdiction change.  Finally, the Act states that "the Secretary [of the Army] shall have exclusive jurisdiction and responsibility for management of the flood pool for flood control operations at Grand Lake O' the Cherokees."[72]

38.    We find that section 28 of the FPA precludes the application of the Pensacola Act to the complaint proceeding.  We begin with section 28 of the FPA, which provides that:

> The right to alter, amend, or repeal this chapter is expressly reserved; but no such alteration, amendment, or repeal shall affect any license theretofore issued under the provisions of this chapter, or the rights of any licensee thereunder.[73]

FPA section 28 reserves to Congress the authority to amend, alter, and repeal the FPA, but expressly precludes such actions from affecting an existing license or the rights and obligations thereto.

39.    The Rehearing Order stated that "[f]urther, assuming, *arguendo*, that the Pensacola Act is inconsistent with section 28 of the FPA, it is a basic tenet of statutory construction that where there are two irreconcilably conflicting statutes, subsequent

---

[70] The Act does not specify what the project boundary encompasses.  As noted above, in general, the project boundary for the project is at the 750-foot PD contour line and it encompasses Grand Lake and a narrow strip of land around the reservoir's perimeter.  In addition to the reservoir, the project boundary includes only a strip of land (of varying horizontal distance, depending on the steepness of the terrain) around the reservoir's perimeter, as well as the dam with a gated spillway, an auxiliary spillway, a powerhouse, a tailrace, and a spillway channel.  *See Grand River Dam Auth.*, 145 FERC ¶ 62,041, at P 4 (2013) (order modifying and approving GRDA's Shoreline Management Plan).

[71] Pensacola Act §§ 7612(b)(3)(A), (b)(3)(B), 133 Stat. at 2313.

[72] *Id.*

[73] 16 U.S.C. § 822.

legislation is to be construed as overriding earlier, inconsistent legislation and, similarly, that specific legislation overrides general provisions."[74]  Upon further review, we find that the two acts are not inconsistent.  It is a "cardinal rule"[75] of statutory interpretation that "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."[76]  We find that FPA section 28 and the Pensacola Act are fully capable of co-existence.  Indeed, we find that such co-existence is the most reasonable reading of the two statutory texts.  Specifically, we find that FPA section 28 and the Pensacola Act can be read harmoniously insofar as section 28 precludes the Pensacola Act's application to the existing license while the Pensacola Act nevertheless would apply to the Commission's authority with respect to licenses issued after 2019.[77]  That interpretation reasonably reconciles the relevant provisions of the two statutes by preserving section 28's protection of existing licenses while also giving meaning to the Pensacola Act.[78]

40.     The legislative history of FPA section 28 supports the conclusion that the Pensacola Act should not be applied to the existing license.  Specifically, the legislative history indicates that Congress intended section 28 to protect reliance interests based on existing licenses, whether those interests include rights of the licensee or obligations imposed by the Commission to protect the public interest, from subsequent congressional legislation.  Early drafts of the language that would become section 28 reserved

---

[74] Rehearing Order, 172 FERC ¶ 61,255 at P 20 (citing *Watt v. Alaska*, 451 U.S. 259, 266 (1981) ("the more recent of two irreconcilably conflicting statutes governs") and *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment").

[75] *Posadas v. Nat'l City Bank of New York*, 296 U.S. 497, 503 (1936).

[76] *Morton v. Mancari*, 417 U.S. at 551.

[77] We note in response to commenters' concerns regarding the application of the Pensacola Act that the scope and implications of the Pensacola Act's application to the relicensing of the project is the subject of an ongoing proceeding and will not be discussed here.

[78] *Silver v. New York Stock Exchange*, 373 U.S. 341, 357 (1963) (an appropriate analysis is one that "reconciles the operation of both statutory schemes with one another rather than holding one completely ousted").  Because we conclude that the Commission can give effect to both FPA section 28 and the Pensacola Act, we find the canon of statutory construction providing that the specific legislation overrides general provisions is inapplicable.

Congress's right to alter, amend, or repeal the act, without any protections for the rights and obligations existing under already issued licenses.[79]  But in the course of developing section 28, Congress added the latter half of the section prohibiting amendments from affecting existing licenses.  The addition of the prohibition on altering or amending existing licenses indicates a clear congressional intent to preclude the modification of existing licenses, and the Commission's authority to enforce those licenses, by subsequent legislation like the Pensacola Act.[80]

41.      Given Congress's unmistakable intent in section 28 to protect existing licenses from subsequent legislative modification, it is reasonable to expect that any legislation intended to affect prior licenses would, at the very least, contain a clear statement of that intent.  Yet neither the text nor, for that matter, the legislative history of the Pensacola Act contains any express indication that section 28 should not apply in full to the provisions of the Pensacola Act.  In any case, repeals by implication are disfavored,[81] with courts generally accepting implied repeals only:  "(1) where provisions in the two acts are in irreconcilable conflict" or "(2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute."[82]  Neither category applies here.  As

---

[79] 51 CONG. REC. H12,330-32 (1914) (debate over proposed amendments that would provide limitations to Congress's reservation (i.e., if the conditions of consent have been violated, or after the expiration of the license if necessary for the purposes of navigation); in response to these proposed amendments Rep. Lenroot stated, "[s]o by this amendment this committee says that after the 50 years have expired you may amend, alter, or repeal a franchise of a power company, or change the terms of this act, so far as it affects such power company, only as may be deemed necessary for the interest of navigation. . . . there are a great many rights that Congress might wish to exercise at the end of the [license]. . . ." *Id.* at 12,332.).

[80] *See, e.g., United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222 (1952) ("regard for the specific history of the legislative process that culminated in the Act now before us affords more solid ground for giving it appropriate meaning."). Congress also considered and rejected proposals that would have prohibited only subsequent changes that *adversely* affected licensees.  *See* Statement of C.F. Kelley, Esq., 42 Broadway, New York, Representing the Montana Power Co.: Hearing Before the H. Comm. on Water Power, 65th Cong. 2d Sess. 314 (1918) (statement of Rep. Raker); 56 Cong. Rec. H10,037 (1918).  We also note that the language in section 28 of the FPA was unaltered from its initial passage in the 1920 Federal Water Power Act to its inclusion in the 1935 FPA.

[81] *Posadas v. Nation City Bank of New York*, 296 U.S. 497, 503 (1936).

[82] *Id.*

explained above, section 28 and the Pensacola Act are not irreconcilably in conflict as reasonable effect can be given to both and the Pensacola Act does not explicitly address, much less entirely cover, the protections in section 28.

42.     Neither the courts nor the Commission have had occasion to evaluate how FPA section 28 applies to substantive amendments affecting the Commission's authority, such as the Pensacola Act.  The limited instances where a court or the Commission have discussed section 28 recognize that section 28 barred Congressional actions that sought to alter, amend, or repeal specific license requirements, while also recognizing that licenses are not necessarily immune from Congressional acts of "general application"[83] or possibly "changes in procedure or machinery applicable to a license."[84]

43.     But the Pensacola Act would not fall into those exceptions to section 28 because it is not an act of general application—indeed, the Act is named after the hydroelectric facility in question—nor can it be construed to simply change the procedures applicable to the license.  Instead, applying the Pensacola Act to the existing license for the Pensacola Project would substantively alter the licensee's obligation to obtain all necessary property rights required for project purposes.  Section 10 of the FPA requires the Commission to conduct a balancing test to determine whether a project is in the public interest.[85]  The public interest standard includes ensuring that the licensee has the

---

[83] *Appalachian Power Co. v. U.S.*, 607 F.2d 935, 939-40 (Ct. Cl. 1979) ("the Federal Power Act is not immune from effects of other subsequent acts of Congress of general application."); *Scenic Hudson Preservation Conference v. Callaway*, 370 F.Supp. 162 (S.D.N.Y. 1973), *aff'd per curiam*, 499 F.2d 127 (2d Cir. 1974) (explaining why amendments to the 1972 Clean Water Act may apply to current licensees, stating that "[w]e believe that s 28 was not intended to insulate FPC licensees from the effect of general Congressional legislation for the term of their licenses, but only to protect them from ex post facto law-making relating specifically to FPC license requirements." *Id.* at 171.  The court held that the 1972 amendments are "amendments to the [Clean Water Act] and *not* to the Federal Power Act[;]" therefore, the "[a]mendments constitute a law of general application which affect FPC licensees no more than any other economic group." *Id.*).

[84] *Montana Power Co. v. FPC*, 445 F.2d 739, 748 (D.C. Cir. 1970) ("We do not think it is the fair intendment of Congressional will to read § 28 so broadly as to constitute a general prohibition against changes in the procedure or machinery applicable to a license, changes that do not have the quality of changing substantive rights or obligations.").

[85] Section 10(a) of the FPA provides that the Commission may issue a license for a hydroelectric facility only where "the project…shall be such as in the judgement of the Commission will be best adapted to a comprehensive plan for improving or developing a

appropriate property rights to operate and maintain its project in perpetuity, and that obligation is memorialized in Article 5 of the license for the Pensacola Project.[86]

44.    For the foregoing reasons, we conclude that the most reasonable reading of FPA section 28 and the Pensacola Act is that the former precludes the latter from applying to the existing license for the Pensacola Project.  As such, the Pensacola Act does not limit the Commission's jurisdiction to address property rights under the current license.

## B.    The Role of the Corps

45.    In the Rehearing Order, the Commission noted that "the issue of whether, and to what extent, GRDA and the Corps are respectively responsible for flood control

---

waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of waterpower development, . . . for other beneficial public uses, including irrigation, flood control, water supply, and recreational and other purposes referred to in section 4(e); and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval."  16 U.S.C. § 803(a); *see also* 16 U.S.C. § 803(c) ("Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor.").  A project is defined by section 3(11) of the FPA as the "complete unit of improvement or development, consisting of. . . all water-rights, right-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit."  16 U.S.C. § 796.

[86] *See City of Holyoke Gas & Elec. Dept.*, 115 FERC ¶ 62,295 (2006) ("Standard license article 5 requires licensees to retain title in fee to, or the right to use in perpetuity, project property sufficient to accomplish all project purposes. This reflects the requirement that the licensee have sufficient control over project lands and works to enable the Commission, through the licensee, to carry out its regulatory responsibilities with respect to the project.  The necessary property rights must be held in perpetuity so that the license reserves adequate rights in project property not only for the current license, but also for future licenses and for the U.S. to operate and maintain the project under the relicensing and government take-over provisions of FPA section 14 and relicensing provisions of section 15."); *see also* FPA § 21, 16 U.S.C. § 814 (providing the licensee with the authority of eminent domain if it cannot acquire by contract the "right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure . . . .").

operations at the Pensacola Project is not presented by this case."[87]  The Commission stated that the relevant statutes and regulations, as reflected in the project license, explain the responsibilities for flood control.  The D.C. Circuit, however, directed the Commission to discuss the Corps' responsibility for flood control.[88]

46.     The Corps manages flood storage at the Pensacola Project as part of a larger system of reservoir flood storage in the Arkansas River Basin for the reduction of flood stages on the Arkansas and Mississippi Rivers.[89]  The License Order explains that, under flood conditions, the Corps manages the release of water from the flood pool by instructing GRDA "regarding the rates of release, times to start the release, and times to stop the release."[90]  Article 401 of the License Order requires GRDA to maintain certain reservoir surface elevations to protect fish, wildlife, and recreation, but includes an exception for when it is necessary for the Corps to provide flood protection in the Grand (Neosho) River.[91]  The license also states that the project consists of all lands enclosed by the project boundary as shown by Exhibit G, which includes a 750-foot PD contour line that encompasses Grand Lake and a narrow strip of land around the reservoir's perimeter, but does not include the entire flood pool.[92]

47.     To carry out the provisions of the Flood Control Act, the Corps and GRDA entered into a Water Control Agreement whereby the Corps is responsible for directing GRDA to store and release water in the flood control pool between elevation 745-755

---

[87] Rehearing Order, 172 FERC ¶ 61,255 at P 10.

[88] *City of Miami,* 22 F.4th 1039 at 1042-1043.

[89] See section 7 of the Flood Control Act of 1944, Pub. L. No. 78-534, 58 Stat. 890, 33 U.S.C. § 709, which directs the Secretary of the Army to prescribe regulations for the use of storage allocation for flood control or navigation at all reservoirs constructed wholly or in part with federal funds.  A federal grant provided a substantial part of the funding for the construction of the Pensacola Project.

[90] License Order, 59 FERC at 63,223-24.  Regulations implementing the Flood Control Act states that "whenever the pool stage exceeds elevation 745 [PD] at the dam, the discharge facilities shall be operated under the direction of the [Tulsa District of the Corps] so as to reduce as much as practicable the flood damage below the reservoir and to limit the pool stage to elevation 755 [PD] at the dam."  33 C.F.R. § 208.25(a) (2023).

[91] License Order, 59 FERC at 63,228.

[92] *Id.* at 63,226.

feet PD.[93]  The record indicates that although the federal government obtained flowage easements from 750-757 feet NGVD at the dam and between 750-760 feet NGVD in the upper reaches of the reservoir, the Corps has concluded that additional flowage easements would be needed for the project due to flood control operations.[94] Specifically, in 1994, the Corps completed the Grand Lake Initial Appraisal (1994 Corps Appraisal) to identify whether a flood easement adequacy study was needed at Grand Lake in order to determine what additional flood easements were needed at the project.[95] The 1994 Corps Appraisal explained that the studies from the 1940s concluded that the existing flood easements were not sufficient and it was recommended that an additional 11,750 acres of flood easements should be acquired (10,000 acres of which are in the Miami reach of the Grand River);[96] however, the appraisal concluded that the studies were outdated.[97]  The Corps also noted that correspondence in the 1950s indicates that the Corps no longer believed it was necessary to acquire the additional lands because within the 10 years since the major flood of 1951, no complaints were made by area residents, and therefore, the acquisition of lands was reclassified from active to inactive in 1960.[98]  The appraisal concluded that estimates of flood easement requirements were

---

[93] *See* Commission staff March 6, 2018 Record of Telephone Call with the Corps and Transmittal of the Updated Water Control Manual for the Pensacola Reservoir.  *See also* 33 C.F.R. § 208.11 (regulations outlining the responsibilities and general procedures for regulating reservoir projects for flood control).

[94] *See, e.g.,* GRDA April 12, 2018 Filing (Corps September 14, 2007 Letter ("Based on review of the Tulsa District's letter report which provided an initial technical evaluation of flood events, I concur that Federal actions have contributed to backwater effects at Grand Lake, thus warranting further detailed study.") and Corps May 2006 Letter Report, at 5 ("Based on the backwater modeling of selected historic storms and frequency events, water surface elevations were found to be up to 4.3 feet higher than existing easement elevations at selected locations due to flood control operations of the reservoir.  Using current [Corps] criteria for a non-urban setting, approximately 3,560 acres of additional flowage easement would be required for the reservoir. . . .")).

[95] Corps, April 19, 2018 Filing (*Grand Lake Initial Appraisal* at 13 (1994) (1994 Corps Appraisal) ("In the Miami Reach, estimates of flood easement requirements are from 3,000 to 10,000 acres more than existing flood easements.")).

[96] The 1994 Corps Appraisal explains that the Miami reach of the Grand River is about 10 river miles upstream of the City of Miami.  *Id.* at 3.

[97] *Id.* at 4.

[98] *Id.* at 5.

from 3,000 to 10,000 acres more than the existing flood easements in the Miami reach, but that more data and study were needed to determine what additional easements might be required, which would require Congressional authorization.[99]

48.    Congress has authorized studies to investigate flooding issues and easements related to the project, but no funding has been appropriated for the Corps to complete the studies or to acquire additional easements.[100]  For example, the 1998 Corps Study stated, "there is clearly flooding outside the easement area which is caused by Grand Lake and Pensacola Dam [and t]he significance of the flooding caused by the dam should be evaluated in future studies."[101]  The Corps also stated that it received authorization in 2000 to conduct a feasibility study to address the backwater effects of the operation of the Pensacola Dam and the Grand-Neosho River basin, which would include purchasing the necessary flowage easements; but Congress never funded the study and the Corps could not secure local funding.[102]

49.    GRDA asserts that although the City cites to a July 2018 letter from the Corps that states that GRDA is responsible for obtaining all property interests for project operations, including flood control, the Corps changed its position in its October 24, 2018 and January 8, 2019 letters.  GRDA asserts that Congress has established the Corps's exclusive jurisdiction over flood control at the project, including the Corps' obligation to

---

[99] *Id.* at 12-13.

[100] *See, e.g.,* Corps April 3, 2018 Letter (citing Water Resources Development Act of 2000, Pub. L. No. 106-541, § 1(a), 114 Stat. 2572, 449 (2000)); Water Resources Development Act of 1996, Pub. L. No. 104-303 § 560(b), 110 Stat. 3658 (1996)).

[101] 1998 Corps Study at 10.

[102] *See* Corps April 3, 2018 Letter (citing Water Resources Development Act of 2000, Pub. L. No. 106-541, § 1(a), 114 Stat. 2572, 449 (2000)); *see also* 1998 Corps Study; 1994 Corps Appraisal; GRDA April 12, 2018 Filing (Corps September 14, 2007 Letter & Corps May 2006 Letter Report).

obtain sufficient property rights[103] and that the Corps's position is that flood control issues are beyond the Commission's jurisdiction.[104]

50.      We find that the record indicates, contrary to GRDA's assertions, that the Corps's position has not changed from that in its July 2018 letter, which explicitly stated that it is the responsibility of GRDA to obtain all the flowage easements, even for flood control operations.[105]  The Corps explained that it directs the flood operations at the project, while GRDA is responsible for the physical operations of the flood control facilities.[106] The Corps further explained that in 2016 Congress authorized the Corps to transfer its existing easements to GRDA, which is consistent with how other Flood Control Act section 7 projects are operated.[107]  GRDA asserts that although the 2016 legislation

---

[103] GRDA April 29, 2022 Answer at 5 (citing Flood Control Act of 1938, Pub. L. No. 75-761 § 2, 52 Stat. 1215, 1215-16, 75 Cong. ch. 795 (1938) (codified at 33 U.S.C. § 701c-1); Flood Control Act of 1941, Pub. L. No. 77-228 § 2, 55 Stat. 638, 638 (1941); An Act To Authorize the Return of the Grand River Dam Project to the Grand River Dam Authority, Pub. L. No. 79-573 § 3, 60 Stat. 743, 744, 79 Cong. ch. 710 (1946); Water Resources Development Act of 1996, Pub. L. No. 104-303 § 560(b), 110 Stat. 3658 (1996)).

[104] *Id.* (citing Corps October 24, 2018 Letter).

[105] *See* Corps July 27, 2018 Letter at 1.  The October 2018 and January 2019 Corps letters referenced by GRDA as evidence of the Corps' change in position only speak to the management of flood operations being under its jurisdiction, rather than the Commission's jurisdiction.  The Commission has been clear over the years that the Corps has jurisdiction over the flood control operations above 745 feet PD and does not dispute this, but the Corps seems to argue that the Commission should not be studying the flood control operations and effects of the project because Congress would need to authorize any changes to such operations.  But there is nothing in the two letters that mentions the Corps' role or GRDA's role in acquiring additional flowage easements, which is what is at issue in this proceeding.

[106] Corps July 27, 2018 Letter.  The Corps explains that an examination of the various authorities that stipulate the responsibilities of the Corps regarding section 7 project operations "provides no foundation for the argument that the Corps is responsible for acquiring real property interests at state-owned and operated projects. . . . [and f]or projects authorized by the 1944 Flood Control Act the responsibility for acquiring the necessary project lands for authorized flood control purposes falls upon the project owner, not the Corps."  *Id.* at 2.  *See also* 33 C.F.R. § 208.11(b) and 33 C.F.R. § 208.25.

[107] Corps July 27, 2018 Letter.  *See* Water Infrastructure Improvements for the

"required the Corps to transfer its easements within the [p]roject boundary to GRDA, it
did not remove any obligation of the Corps to continue to acquire real property interests
as directed by the prior statutory requirements."[108]

51.     While Congress has the authority to direct and require the Corps to acquire
flowage easements, as GRDA contends, it did not require the Corps to acquire additional
flowage easements in the most recent legislation cited by GRDA, and that legislation
does not bar the Commission from requiring GRDA to obtain such easements if needed
for project purposes.[109]  Importantly, the transfer of the Corps's flowage easements to
GRDA was finalized in 2021 and GRDA admits that it is actively managing activities
occurring in the flowage easement area,[110] as the Corps no longer has jurisdiction or
enforcement duties over the flowage easements associated with the project.[111]

---

Nation Act, Public law 114-322, § 1(a),130 Stat. 1628, 1321(c) (2016).

[108] GRDA January 15, 2019 Answer at 12.

[109] *See, e.g.*, Public law 114-322, § 1(a),130 Stat. 1628, 1321(c)(1) (2016) ("[T]he
Secretary shall convey, by quitclaim deed and without consideration, to the Grand River
Dam Authority, an agency of the State of Oklahoma, for flood control purposes, all right,
title, and interest of the United States in and to real property under the administrative
jurisdiction of the Secretary acquired in connection with the Pensacola Dam project,
together with any improvements on the property."); Water Resources Development Act
of 1996, Pub. L. No. 104-303 § 560(b), 110 Stat. 3658 (1996)) ("Upon completion of the
study and subject to advance appropriations, the Secretary *may* acquire from willing
sellers such real property interests in any lands identified in the study. . . ." (emphasis
added)).

[110] *See* GRDA November 15, 2021 Filing at 6; GRDA November 10, 2020 Filing
at 7.  On November 15, 2021, GRDA stated in its fourth annual encroachment report filed
with the Commission that the Corps officially transferred all of its flowage easements by
quitclaim deed to GRDA on December 8, 2020.  GRDA November 15, 2021 Filing at 6.
GRDA explains that the transfer was recorded in the county land records in May of 2021,
and that "[o]n April 6, 2021, the GRDA Board of Directors approved Guidelines for the
flowage easements and is actively managing activities occurring in the flowage easement
area."  *Id.*  GRDA stated that "per the conveyances, GRDA is to utilize the easements to
flow water within the easement area and to maintain water storage capacity."  GRDA
November 8, 2022 Filing at 7.

[111] *Grand River Dam Auth.*, 161 FERC ¶ 62,107, at P 36 (2017) (delegated order).

52.     Additionally, the Pensacola Act does not explicitly require the Corps to purchase additional easements[112] but rather authorizes the Corps to study the "infrastructure and lands upstream from the project to evaluate resiliency to flooding," and then to report back to local communities about "any identified deficiencies and potential mitigation options."[113]     Therefore, the Commission finds that the Corps's role is limited to the directing flood operations at the project, per the provisions of the Flood Control Act and as outlined in the 1992 Water Control Agreement between GRDA and the Corps.

## C.     GRDA's Responsibility under the License

53.     On rehearing, the Commission found that GRDA was not in violation of Article 5 for failure to acquire flowage rights due to flooding lands outside the project boundary. But the D.C. Circuit faulted the Commission for failure to first explain whether Article 5 requires GRDA to acquire the flowage rights if project operations cause flooding in the City.

54.     Although the Corps maintains jurisdiction over the management of flood operations at the Pensacola Dam as explained above, the Commission has a statutory obligation under the FPA to examine the effects of project operations and purposes, including flood operations, when issuing a license and to require licensees to hold property rights over all land needed for such purposes.[114]     The Commission has stated on numerous occasions that standard license Article 5 requires licensees to acquire adequate property rights in perpetuity to accomplish all project purposes.[115]     Here, flood control is

---

[112] The legislative history of the Pensacola Act indicates that an amendment initially introduced by Senator Inhofe included a specific provision which stated "[i]f a feasibility study or other investigation determines that flood control operations at or associated with Pensacola Dam, including any backwater effect, may result in the inundation of, or damage to, land outside the project boundary to which the United States does not hold flowage rights or holds insufficient flowage rights, the project licensee shall not have any obligation to obtain or enhance those flowage rights."  165 Cong. Rec. S3,660-01 (2019).  This provision was removed by edits made in the House of Representatives and replaced with the requirement that the Corps conduct a study, which is the version enacted by Congress.  H.R. Rep. No. 116-333, pt. 2 (2019) (Conf. Rep.); Pensacola Act §§ 7612(b)(3)(A), (b)(3)(B), 133 Stat. at 2312.

[113] Pensacola Act §§ 7612(b)(3)(A), (b)(3)(B), 133 Stat. at 2313.

[114] See 16 U.S.C. § 803(a); supra n.86.

[115] See, e.g., Appalachian Power Co., 112 FERC ¶ 61,026, at P 89 (2005) ("Standard license Article 5 requires the licensee to acquire and retain all interests in non-federal lands and other property necessary or appropriate to carry out project purposes.");

a project purpose and operation of the project includes flood control operations, even if directed by the Corps, as releases made for flood control are also used for generation.[116] If additional property rights are needed for project purposes,[117] the Commission may

---

*Menominee Co. N.E.W. Hydro, Inc.*, 74 FERC ¶ 61,023, at 61,066 (1996) ("Standard license Article 5 requires licensees to acquire and retain title in fee to, or the right to use in perpetuity, project property sufficient to accomplish all project purposes."); *Public Utility District No. 1 of Chelan County, Washington*, 15 FERC ¶ 62,168, at 63,279 (1981) ("Article 5 requires the District to acquire sufficient property rights for the maintenance and operation of the project. It is emphasized that the 'maintenance and operation of the project' encompasses the broad range of project purposes mandated by the comprehensive development standard of Section 10(a). Should the District at some point in the future find itself unable to control or prevent an objectionable use of project lands, the District may be directed to take appropriate measures to protect project resources, including, *inter alia,* the acquisition of additional rights in the project lands involved.").

[116] The License Order states that "in addition to power generation, project waters are used for water supply, flood control, and recreation. . . . [and] releases may be made irregularly in response to system power demands and flood control." License Order, 59 FERC at 63,237. *See also* Commission staff March 6, 2018 Record of Telephone Call with the Corps and Transmittal of the Updated Water Control Manual for the Pensacola Reservoir, Attachment at 8-2; Commission staff April 27, 2018 Scoping Document 2 at 18 ("The operating goal of the project is to use any water in the project's flood control pool for power generation, up to the maximum hydraulic capacity of the turbines, whenever possible."). The Corps also acknowledged that flood control is an authorized project purpose with how section 7 projects are operated, stating in its July 2018 letter, "the project owner is responsible for acquiring all real property interests needed for all authorized project purposes, including flood control[.]" Corps July 27, 2018 Letter at 2; *see also* 33 C.F.R. § 208.11(d)(1) ("During the planning and design phases, the project owner should consult with the Corps of Engineers regarding the quantity and value of space to reserve in the reservoir for flood control and/or navigation purposes, and for utilization of the space, and other requirements of the license, permit or conditions of the law. Relevant matters that bear upon flood control and navigation accomplishment include: . . . real estate acquisition for flowage requirements (fee and easement). . . .").

[117] The Commission's regulations under 4.41(h)(2) state: "existing residential, commercial, or other structures *may* be included within the boundary only to the extent that underlying lands are needed for project purposes (e.g., for flowage, public recreation, shoreline control, or protection of environmental resources)" (emphasis added). The Commission has held that "[t]he inclusion of lands within a project boundary serves the function of indicating that the lands are used in some manner for project purposes. . . .[a] licensee is required to acquire and retain all interests in non-federal lands necessary or

require such lands to be included in the project boundary.[118]  Although lands acquired under Article 5 and lands designated within the project boundary typically overlap—both reflect the lands needed for project purposes—the Commission has discretion in determining the project boundary on a case-by-case basis, while the licensee's obligation under Article 5 to acquire the necessary property rights for all project purposes is separate and distinct as required under the FPA.[119]  Therefore, Article 5 requires GRDA to obtain

---

appropriate to carry out project purposes. [citing standard license Article 5]" *Union Elec. Co.*, 137 FERC ¶ 61,114, at P 25 (2011)).  *See also Pa. Power & Light Co.*, 21 FERC ¶ 61,429, at 62,009 (1980) ("The project boundary should encompass at a minimum all lands on which flowage rights would be needed for the reservoir under reasonably predictable flood conditions.").

[118] *See N. Y. Power Auth.*, 105 FERC ¶ 61,102, at P 179 (2003) ("That level [of the project boundary] is based on the 100-year high water level . . . [i]t is not necessary for a project boundary to be set at this level; the normal high water mark is generally sufficient. . . . We are however concerned about the possibility that [future modifications] could [ ] cause lands that would be outside the proposed Project boundary. . . to be commonly inundated. In such an event, [the licensee] would need to request an amendment to the license to modify the Project boundary so as to bring those lands back into the Project boundary."); *New England Power Co.*, 9 FERC ¶ 61,322, at 61,681 (1979) ("The project boundary should be revised to encompass highwater levels, *i.e.,* all lands on which waters flow when the reservoir is at full pond (including increase in the water level in upstream reaches because of backwater effects), and all other land which is necessary for project purposes."); *S. C. Pub. Serv. Auth.*, 7 FERC ¶ 61,148, at 61,236 (1979) ("Our recent notice of proposed rulemaking in Docket No. RM79-36. . . reflects our policy that, as a general rule, project lands should include only those necessary for project purposes, such as operation and maintenance, flowage, recreation, public access, protection of environmental resources, and shoreline control (including protection of shoreline aesthetic values).").

[119] *See Wis. Public Service Corp.*, 104 FERC ¶ 61,295, at 62,088-89 (2003) ("It is useful to review the meaning, in this context, of the terms 'project lands' and 'project boundaries'. . . . Standard license Article 5 requires the licensee to acquire and retain all interests in non-federal lands and other property necessary or appropriate to carry out project purposes. The licensee may obtain these property interests by contract or, if necessary, by means of federal eminent domain pursuant to FPA Section 21.  A licensee's property interests can range from fee simple to perpetual or renewable leases, easements, and rights-of-way.  If the licensee wishes to convey any of its interests in project property, Article 5 requires it to obtain the Commission's approval.  Project boundaries are used to designate the geographic extent of the lands, waters, works, and facilities that the license identifies as comprising the licensed project and for which the licensee must

the necessary property rights for all project purposes, including flowage easements to accommodate flood control.

55.    Additionally, as discussed above, ensuring that GRDA has all the necessary property rights for all project purposes is consistent with the recent transfer of all flowage easements from the Corps to GRDA.[120]  GRDA already owns and maintains easements for project operations above the current project boundary of 750 feet.[121]

### D.    Evidence that the City Provided in this Proceeding

56.    The D.C. Circuit held that the Commission did not analyze the evidence provided by the City to support its 2018 Complaint.  We analyze the evidence below and find it sufficient to conclude that the project has increased flooding around the City of Miami.

57.    In its 2018 Complaint, the City relied on Dr. Holly's 1999 and 2001 reports (Holly Reports), which concluded that the existence and operation of the project caused an increase in the duration and magnitude of flooding near the City.[122]  The City also referenced a 2015 hydrologic modeling study prepared by its engineering consultant, Tetra Tech, that assessed the extent to which flooding occurred above 760 feet NGVD (Tetra Tech Study).[123]  The Tetra Tech Study found, by using the results from the 2001 Holly Report, that the total area flooded in the vicinity of the City exceeded the existing easements by approximately 12,892 acres, which was generally consistent with Dr. Holly's estimate of 13,707 acres.[124]

58.    In general, Dr. Holly's 1999 Report focused on the relative differences for the magnitude and duration of flooding between with-dam scenarios and without-dam

---

hold the rights necessary to carry out the project purposes.").

[120] *Supra* P 51.  We also note that the Corps acknowledges that "dam operations are under GRDA control above [755 feet PD]. . . . [thus,] GRDA controls operations below elevation 745' PD and above 755' PD."  Corps July 27, 2018 Letter at 2.

[121] We note that GRDA also acquired thousands of acres of low-lying lands outside the project boundary for flood control purposes between 2009 and 2013, in response to the state court decisions.  *See supra* n.33.  *See, e.g.*, GRDA March 26, 2013 Filing.

[122] 2018 Complaint at 7-8.

[123] *Id.* at 21.  The City filed the report with the Commission on July 22, 2016.

[124] *Id.*, attach. A at 3.

scenarios and did not attempt to estimate actual water surface elevations.  Dr. Holly's 2001 Report expanded the scope of the modelling referenced in the 1999 Report and aimed to quantify the magnitude and duration of the flooding, with and without the dam, on the specific properties at issue in the state court proceedings.  Dr. Holly acknowledged the limitations of his study by stating:

> "[f]lood analyses such as those reported herein, and used by the Defense and Plaintiffs, push the limit of what can be reliably determined from one-dimensional models in complex river valleys.  As fully two-dimensional models become more available and economical, they should be used for future analyses of this kind in the interest of obtaining even more reliable and precise predictions."[125]

59.     As noted above, the 2018 Complaint also references the Tetra Tech Study.  The Tetra Tech Study used one-dimensional and two-dimensional unsteady flow analysis that included model runs with and without the dam for six historic floods.[126]  The study used a combination of bathymetric studies ranging from 2008 to 2015 to develop the terrain underlying the with-dam model geometry.[127]  To account for changes in channel and floodplain geometry over time, the study adjusted the with-dam geometry based on information obtained from a 1940 Corps report and survey to best represent channel and floodplain conditions prior to dam construction.[128]  The modeling results showed a 3.5-foot to 5.9-foot incremental increase in flooding for modelled with-dam scenarios compared to without-dam scenarios for six historic flood events.[129]  We find the results from the Tetra Tech Study are reasonable with no critical flaws, but we acknowledge that other models may refine these results further, as discussed in more detail below.

60.     Given the age and limitations of the Holly Reports and because the Commission's previous compliance proceedings that considered the Tetra Tech Study only studied flooding incrementally and not comprehensively,[130] Commission staff required a new

---

[125] *Id.*, Ex. E at 19 (Dr. Holly's 2001 Report).

[126] City July 22, 2016 Filing at 2 (Tetra Tech Study).

[127] *Id.* at 32.

[128] *Id.* at 43.

[129] *Id.* at ix.

[130] The Commission reviewed the Tetra Tech study in a 2016 request to temporarily change the rule curve in license Article 401 and in the 2017 Amendment Order, which permanently changed the project's rule curve, but these proceedings only analyzed the study with regard to the proposed incremental changes to the rule curve.

study in the relicensing proceeding.[131]  Commission staff explained in the relicensing proceeding, that "[a] comprehensive H&H [Hydrologic and Hydraulic] study would determine the extent of flooding that is attributable to project operation and support an analysis of project-related flooding."[132]

61.    In the relicensing proceeding, GRDA produced a 2019 Mead & Hunt model.[133] The Mead & Hunt model includes a flood routing model and upstream hydraulic model that refined the Tetra Tech model by including an additional two-dimensional flow area around the reservoir and upstream tributaries (i.e., Spring River and Elk River) and simulated six historic floods for a with-dam scenario to evaluate the effect of the starting

---

*See Grand River Dam Auth.*, 156 FERC ¶ 61,106, at PP 26-34 (2016) (Order Approving Request for Temporary Variance) (concluding that "although both the 2016 Tetra Tech Inundation Study and the inundation mapping conducted by Mead & Hunt show a greater number of structures impacted, both studies also determined no additional structures would be impacted by increased flooding due to the proposed rule curve change. Further, as discussed above, the Mead & Hunt hazard analysis using the 2016 Tetra Tech Study found no additional risk to human life." *Id.* P 34.); 2017 Amendment Order, 160 FERC ¶ 61,001 (concluding that the final Environmental Assessment and all the hydraulic studies submitted with GRDA's application and filed by other stakeholders, including the Tetra Tech Study, have shown that GRDA's proposed amendment would result in, at most, incremental upstream flooding in the vicinity of the City and would only have insignificant risks to infrastructure and negligible risk to human life. *Id.* P 49.).

    [131] On November 8, 2018, as part of the Integrated Licensing Process (ILP), Commission staff issued a Study Plan Determination that required GRDA to complete certain studies, including a Hydrologic and Hydraulic (H&H) Modeling Study, Sedimentation Study, and Infrastructure Study.

    [132] Commission staff November 8, 2018 Study Plan Determination for the Pensacola Hydroelectric Project at B-2.  GRDA stated in its filing of its Study Plan that "GRDA is proposing an H&H Study to identify areas inundated during the current operation of the Project, as well as during any operational changes that may be proposed as part of the relicensing effort.  In addition to the inundation area, the study will provide other flood routing specifics such as the frequency, timing, amplitude, and duration of the inundation.  The overall H&H Study goal is to provide information through modeling and mapping to determine the effect of the operation of the Project upon several resource areas."  GRDA April 27, 2018 Filing at 9.

    [133] GRDA September 30, 2022 Updated Study Report.

water surface elevation on flooding upstream.[134]  Because the Mead & Hunt model did
not include a without-dam scenario, as this was not required in the relicensing
proceeding, the results cannot be used to quantify the backwater effects[135] caused by the
existence of the project.  Nonetheless, the modeling results from the Mead & Hunt model
produced similar water surface elevations for the with-dam condition as the Tetra Tech
study did for historic storms of similar return period[136] and therefore validated the with-
dam modeled water surface elevations in the Tetra Tech Study.[137]

62.     Both the Mead & Hunt and Tetra Tech studies make reference to the 1998 Corps
Study that the Corps conducted to "…determine the scope of backwater effects … and to
identify any lands that …have been adversely impacted …or should have been originally
purchased as flowage easements for the project."[138]  As part of the 1998 Corps Study, the
Corps developed a one-dimensional, steady-state model to evaluate the with- and
without-dam backwater profile for peak flows corresponding to six historic storm events.
The model used the same geometric inputs for the with-dam scenario and without-dam
scenario but varied the downstream boundary condition.  The results indicated an
incremental increase in flooding of up to 1.6 feet at the City of Miami for the with-dam
scenario compared to the without-dam scenario.[139]  Although there are known limitations
in the 1998 Corps Study pertaining to the quantification of flowage easements because it
was a steady-flow study and did not evaluate how the temporal impact of tributary
inflows can influence the backwater, as explained in Dr. Holly's 1999 Report and the

---

[134] *Id.* at 4-18.

[135] The Commission has defined backwater as the amount the depth of flow has
been increased by an obstruction such as a dam.  *Pub. Util. Dist. No. 1 of Pend Oreille
Cty., Wash.*, 77 FERC ¶ 61,146, at 61,543 n.11 (1996).

[136] The return period refers to the average number of years between floods of
similar intensity and is the inverse of the probability of exceeding the storm magnitude in
any given year.

[137] *Compare* GRDA September 30, 2022 Updated Study Report (with-dam water
surface elevations for July 2007 an October 2009 flood events), *with* Tetra Tech Study,
Table 5.12 at 45 (with-dam water surface elevations at the Miami Gage).

[138] 1998 Corps Study at 6.  *See supra* P 48.

[139] *See* 1998 Corps Study, app. III at 1992 Flood Event Table (River Station
341616).

Mead & Hunt model,[140] the Corps Study does provide a relative comparison to evaluate the effect of a change in the backwater boundary conditions within the City of Miami.

63.    In sum, based on review of the evidence provided in the 2018 Complaint, specifically the Tetra Tech Study, and confirmed by the Mead & Hunt model, we conclude that the flooding around the City of Miami has increased since construction of the project.[141]    Additionally, the 1998 Corps Study results generally agree with the Holly 2001 and Tetra Tech 2015 studies that the backwater effects exceed the limits of the existing flowage easements.

64.    As explained above, Article 5 requires GRDA to acquire adequate property rights in perpetuity to accomplish all project purposes.[142]    Flood control is a project purpose; accordingly, GRDA must acquire the necessary property rights to operate the project for flood control.[143]    But while the record includes sufficient information to conclude that the

---

[140] *See* GRDA May 30, 2023 Final License Application, app. E-12 at 5, 28-29, and Comment 16 of app. A (Mead & Hunt Downstream Hydraulic Model); 2018 Complaint, Ex. D at 8 (Dr. Holly's 1999 Report).

[141] In its relicensing proceeding, GRDA filed its Operations Model on April 2, 2022, and updated study report (USR) on September 30, 2022.  The City in its May 12, 2022 Filing asserts that the Commission cannot use such data because it has not been filed as part of this proceeding and would cause unnecessary delay.  On the other hand, GRDA asserts that the Commission is required under the APA to review all the information on the record and not just the information filed at the time of the 2018 Complaint when providing a determination on the 2018 Complaint.  *See* 5 U.S.C. § 706. While this order analyzes the City's data provided in its 2018 Complaint and concludes that flooding upstream is caused by the project based on this evidence, it is our obligation to review all relevant information, and the Mead & Hunt model, as explained above, confirms our determinations here.  The parties will have the opportunity to address on rehearing our conclusions regarding the evidence in this order.

[142] *Supra* P 54.  We note that both GRDA and the City comment on the project boundary; however, the discussion on the project boundary is not dispositive to our inquiry as to what additional property rights are needed for project purposes under Article 5, so a response in this order on the possible expansion of the project boundary would be premature.  *See, e.g.*, GRDA March 31, 2022 Motion at 4-5; GRDA January 15, 2019 Answer at 6-7; 2018 Complaint at 26-28.

[143] We note that how GRDA acquires the necessary property rights is not within the Commission's jurisdiction.

project causes flooding, it is not clear whether GRDA holds all necessary property rights to operate the project.[144]

65.    To determine whether GRDA holds all necessary property rights, we direct GRDA, within 120 days of the date of issuance of this order, to file a report according to the following methodology:  (1) develop a flood-frequency analysis for the peak inflow into Grand Lake that estimates the 2-, 5-, 10-, 25-, and 50-year peak inflow into Grand Lake;[145] (2) develop inflow hydrographs by scaling a range of historic inflow events to match the peak inflows estimated for the 2-, 5-, 10-, 25-, and 50-year peak inflows estimated above;[146] (3) develop water surface profiles for the Neosho River and major tributaries for with- and without-dam conditions for each of the scaled frequency floods;[147] (4) determine for each flood frequency, the point of intersection where the with-dam and without-dam water surface profiles are within one foot of each other—the point of intersection should be placed at the elevation of the higher of the two profiles; and (5) develop a backwater envelope curve connecting the high points of intersection of the with-dam and without-dam water surface elevation profiles for each of the flood frequencies and map these elevations on the best available topographic data to determine the spatial extent of flooding due to the project.[148]  This methodology follows the Corps'

_____

[144] GRDA holds all necessary property rights within the project boundary up to elevation 750 PD and GRDA currently holds and manages flowage easements that are outside the project boundary, which were acquired after it was found liable for flooding in the 1990's and easements recently transferred from the Army Corps.  *Supra* P 55.

[145] The flood frequency analysis included in the May 30, 2023 final license application for the Pensacola Project would meet this criterion.

[146] The range of historic events and method of scaling used for the 100-year event in the May 30, 2023 final license application's upstream hydraulic model would meet this criterion.

[147] The upstream hydraulic model submitted with GRDA's May 30, 2023 final license application would meet the criterion for the with-dam model geometry.  For the without-dam model geometry, remove the dam from the model and instead use normal depth as the downstream boundary condition.

[148] *See* Corps *Engineering and Design Manual 1110-2-1420: Hydrologic Engineering Requirements for Reservoirs*, 8-4 (2018), https://www.publications.usace.army.mil/Portals/76/Users/182/86/2486/EM_1110-2-1420.pdf (guidance on developing envelope curves).

Document Accession #: 20240118-3104          Filed Date: 01/18/2024

*Engineering and Design Manual 1110-2-1420*,[149] which updates guidance used in the 1998 Corps Study and Tetra Tech Study to determine the extent of lands to be acquired for reservoir projects.

66.     In addition, GRDA must include in its report an analysis of each parcel or lot on lands upstream of the Pensacola Dam affected by flooding due to the existence of the project. GRDA must compare the results in step (5) above (backwater envelope curve) to its existing property rights, including flowage easements, as identified in the analysis above. Specifically, GRDA must develop a table with a unique identifier for each parcel/lot and provide the acreage amount of the parcel/lot. For each parcel/lot GRDA must identify: (1) the specific project purpose(s), including flowage, that is served by each individual parcel/lot and whether the parcel/lot is within the current project boundary; and (2) GRDA's current property rights (i.e., fee title, easement, lease, or other types.) for each property. The report must also include detailed maps and/or geographic information system data to visualize the above information, including the current project boundary location.

## IV.     <u>Conclusion</u>

67.     We conclude that section 28 of the FPA precludes the application of the Pensacola Act to the 2018 Complaint proceeding and does not limit the Commission's jurisdiction to address property rights under the current license. We also find that the role of the Corps in this proceeding is limited to directing flood operations at the project, per the provisions of the Flood Control Act and as outlined in the 1992 Water Control Agreement between GRDA and the Corps. We determine that Article 5 requires GRDA to acquire adequate property rights in perpetuity to accomplish all project purposes, including flood control.

68.     Finally, we find that the evidence provided in the 2018 Complaint, specifically the Tetra Tech Study, and confirmed by the Mead & Hunt 2019 model, is sufficient to conclude that the project has increased flooding around the City of Miami. Therefore, we are directing GRDA to file a report that analyzes the lands affected by flooding upstream of the project.

<u>The Commission orders</u>:

     Within 120 days from the issuance date of this order, GRDA must file a report with the Commission that includes: (1) a flood-frequency analysis for the peak inflow into Grand Lake that estimates the 2-, 5-, 10-, 25-, and 50-year peak inflow into Grand Lake; (2) inflow hydrographs by scaling a range of historic inflow events to match the peak inflows estimated for the 2-, 5-, 10-, 25-, and 50-year peak inflows estimated above;

---

[149] *Id.*

(3) water surface profiles for the Neosho River and major tributaries for with- and without-dam conditions for each of the scaled frequency floods; (4) for each flood frequency, the point of intersection where the with-dam and without-dam water surface profiles are within one foot of each other—the point of intersection should be placed at the elevation of the higher of the two profiles; and (5) a backwater envelope curve connecting the high points of intersection of the with-dam and without-dam water surface elevation profiles for each of the flood frequencies and map these elevations on the best-available topographic data to determine the spatial extent of flooding due to the project.

GRDA must include in its report an analysis of each parcel or lot on lands upstream of the Pensacola Dam affected by flooding due to the existence of the project and develop a table with a unique identifier for each parcel/lot and provide the acreage amount of the parcel/lot. For each parcel/lot GRDA must identify: (1) the specific project purpose(s), including flowage, that is served by each individual parcel/lot and whether the parcel/lot is within the current project boundary; and (2) GRDA's current property rights (i.e., fee title, easement, lease, or other types) for each property. GRDA must compare the results in step (5) above (backwater envelope curve) to its existing property rights, including flowage easements, as identified in the analysis above. The report must also include detailed maps and/or geographic information system data to visualize the above information, including the current project boundary location. The

Commission reserves the right to require changes to the report and/or require additional actions based on the report and any comments and recommendations by interested parties.

By the Commission.

( S E A L )

Debbie-Anne A. Reese,
Acting Secretary.

Document Content(s)

P-1494-455.docx...............................................................1

ATTACHMENT B

186 FERC ¶ 62,124
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Grand River Dam Authority                    Project No. 1494-468

NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND
PROVIDING FOR FURTHER CONSIDERATION

(March 18, 2024)

Rehearing has been timely requested of the Commission's order issued on
January 18, 2024, in this proceeding. *Grand River Dam Auth.*, 186 FERC ¶ 61,045
(2024). In the absence of Commission action on a request for rehearing within 30 days
from the date it is filed, the request for rehearing may be deemed to have been denied.
16 U.S.C. § 825*l*(a); 18 C.F.R. § 385.713 (2023); *Allegheny Def. Project v. FERC*,
964 F.3d 1 (D.C. Cir. 2020) (en banc).

As provided in 16 U.S.C. § 825*l*(a), the request for rehearing of the above-cited
order filed in this proceeding will be addressed in a future order to be issued consistent
with the requirements of such section. As also provided in 16 U.S.C. § 825*l*(a), the
Commission may modify or set aside its above-cited order, in whole or in part, in such
manner as it shall deem proper.

Debbie-Anne A. Reese,
Acting Secretary.

ATTACHMENT C

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, Grand River Dam Authority ("Petitioner") states as follows:

Petitioner is a non-appropriated agency of the State of Oklahoma, created by the Oklahoma legislature in 1935 to be a "conservation and reclamation district for the waters of the Grand River."  As such, Petitioner is not a "nongovernmental corporation" under Federal Rule of Appellate Procedure 26.1, nor is it a "corporation, association, joint venture, partnership, syndicate, or other similar entity" under Circuit Rule 26.1.  Nonetheless, Petitioner, as a governmental entity, has neither parent companies nor any publicly held company with a 10% or greater ownership interest.

Dated: March 19, 2024.

/s/ *Misha Tseytlin*

MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

*Counsel for Grand River Dam Authority*

ATTACHMENT D

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on March 19, 2024, I filed the foregoing Petition For Review with the Clerk of the U.S. Court of Appeals for the District of Columbia Circuit using the CM/ECF System.

Pursuant to Federal Rules of Appellate Procedure 15(c) and 25(d), I certify that on March 19, 2024, a true and accurate copy of this Petition For Review was served on all parties in the agency sub-docket proceeding below and on the FERC solicitor. Service was accomplished by electronic mail or by first class mail if no consent to electronic mail service was provided.

I further certify that, upon receiving a file-stamped copy of this Petition For Review, I will cause a paper copy of the stamped Petition to be served via first class mail on the following parties that participated in the agency sub-docket proceeding below:

Debbie-Anne A. Reese, Acting Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Robert Solomon, Solicitor
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Craig Gannett
Davis Wright Tremaine LLP
920 Fifth Ave., Suite 3300
Seattle, WA 98104

Walker C. Stanovsky
Davis Wright Tremaine LLP
920 Fifth Ave., Suite 3300
Seattle, WA 98104-1610

Shannon E. O'Neil
Davis Wright Tremaine LLP
1301 K St. NW, Suite 500 East
Washington, D.C. 20005

I declare the above to be true and correct under penalty of perjury.

Dated: March 19, 2024

/s/ *Misha Tseytlin*
MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

*Counsel for Grand River Dam Authority*