**ORAL ARGUMENT NOT YET SCHEDULED**

# THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 24-1071, 24-1238 (consol.)

GRAND RIVER DAM AUTHORITY
*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

On Petitions For Review Of Final Agency Action By The Federal Energy
Regulatory Commission, 186 FERC ¶ 61,045 (2024), 186 FERC ¶ 62,124
(2024), 187 FERC ¶ 61,211 (2024)

## BRIEF OF PETITIONER GRAND RIVER DAM AUTHORITY

Charles R. Sensiba
Elizabeth J. McCormick
TROUTMAN PEPPER HAMILTON
SANDERS LLP
401 9th Street, NW
Suite 1000
Washington, DC 20004
(202) 274-2850 (CS)
charles.sensiba@troutman.com
elizabeth.mccormick@troutman.com

Dabney J. Carr
TROUTMAN PEPPER HAMILTON
SANDERS LLP
1001 Haxall Point
15th Floor
Richmond, VA 23219
(804) 697-1200
dabney.carr@troutman.com

Misha Tseytlin
*Counsel of Record*
TROUTMAN PEPPER HAMILTON
SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240 (MT)
misha.tseytlin@troutman.com

*Attorneys for Petitioner*
*Grand River Dam Authority*
*(Additional counsel in*
*signature block)*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.  Parties And Amici

Petitioner is the Grand River Dam Authority ("Licensee"). Respondent is the Federal Energy Regulatory Commission ("FERC" or "Commission"). This Court has granted the City of Miami, Oklahoma's ("Miami") motion to intervene in support of FERC. No.24-1071, Dkt.2066766.  As of the time of this filing, the Court has not granted any other intervention motions, no other party has sought to intervene, and there have been no amici.

### B.  Rulings Under Review

FERC's orders under review here are exhibits to its Petitions for Review.  *See* Case No. 24-1071, Dkt.2046093 (Exs. A and B); Case No. 24-1238, Dkt.2064001 (Ex. A). Those Orders are as follows:

- *Grand River Dam Auth.*, 186 FERC ¶ 61,045 (Jan. 18, 2024) ("Order on Remand")

- *Grand River Dam Auth.*, 186 FERC ¶ 62,124 (Mar. 18, 2024) ("Notice of Rehearing Denial")

- *Grand River Dam Auth.*, 187 FERC ¶ 61,211 (Jun. 27, 2024) ("Rehearing Order")

## C. Related Cases

This Court on January 18, 2022, previously granted petitions for review arising from the FERC agency proceedings below in *City of Miami v. FERC*, Nos. 20-1325, 20-1446, reporting its decision as *City of Miami v. FERC*, 22 F.4th 1039 (D.C. Cir. 2022). So far as counsel are aware, there are no other related cases currently pending in this Court or in any other court.

Dated: October 18, 2024

/s/ Misha Tseytlin
MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Court Rule 26.1, Licensee provides the following corporate disclosure statement:

Licensee is a non-appropriated agency of the State of Oklahoma, created by the Oklahoma legislature in 1935 to be a "conservation and reclamation district for the waters of the Grand River." As such, Licensee is not a "nongovernmental corporation" under Federal Rule of Appellate Procedure 26.1, nor is it a "corporation, association, joint venture, partnership, syndicate, or other similar entity" under Circuit Rule 26.1. Nonetheless, Licensee, as a governmental entity, has neither parent companies nor any publicly held company with a 10% or greater ownership interest.

Dated: October 18, 2024   /s/ Misha Tseytlin

MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 2

STATUTES AND REGULATIONS .......................................................... 3

INTRODUCTION ........................................................................................ 4

STATEMENT OF THE CASE ................................................................... 7

   A. Historical Background ................................................................. 7

   B. Procedural Background And The Pensacola Act ........................ 16

SUMMARY OF ARGUMENT ................................................................ 24

STANDARD OF REVIEW ...................................................................... 28

STANDING ................................................................................................ 29

ARGUMENT .............................................................................................. 29

   I. The Pensacola Act Prohibits FERC From Requiring Licensee To Purchase Land Outside Of The Project Boundary, Which Should Be The End Of This Dispute ............................................. 29

   II. Even Before The Pensacola Act, Standard Article 5 Did Not Require Licensee To Purchase Land Outside Of The Project Boundary ...................................................................................... 40

   III. FERC Violated This Court's Mandate And Implicated Takings Clause Concerns By Refusing To Determine If The Corps—And Not Licensee—Caused All The Disputed Flooding ......................................................................................... 51

   IV. Congress Gave The Corps Exclusive Responsibility To Purchase Land Outside Of The Pensacola Project's Boundary .... 57

CONCLUSION ........................................................................................... 66

# TABLE OF AUTHORITIES*

**Cases**

*Arkansas Game & Fish Comm'n v. United States,*
568 U.S. 23 (2012) ...............................................................56

*Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.,*
370 F.3d 1214 (D.C. Cir. 2004).......................................51

*Atl. City Elec. Co. v. FERC,*
295 F.3d 1 (D.C. Cir. 2002) .....................................28, 48

*Baltimore Gas & Elec. Co. v. FERC,*
954 F.3d 279 (D.C. Cir. 2020)..........................................49

*Burns v. United States,*
501 U.S. 129 (1991) .............................................................63

*City of Arlington v. FCC,*
569 U.S. 290 (2013) .............................................................30

*\*City of Miami v. FERC,*
22 F.4th 1039 (D.C. Cir. 2020) ............4, 6, 21, 22, 26, 51, 53, 54, 56

*Col. R. Indian Tribes v. Nat'l Indian Gaming Comm'n,*
466 F.3d 134 (D.C. Cir. 2006)..........................................61

*Cook v. FDA,*
733 F.3d 1 (D.C. Cir. 2013) .............................................29

*Dorsey v. United States,*
567 U.S. 260 (2012) ....................................................34, 38

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2007) .............................................................49

*Gozlon-Peretz v. United States,*
498 U.S. 395 (1991) .............................................................34

*Hoopa Valley Tribe v. FERC,*
913 F.3d 1099 (D.C. Cir. 2019)........................................28

---

\* Authorities upon which Licensee chiefly relies are marked with asterisks.

*In re Aiken Cnty.*,
 725 F.3d 255 (D.C. Cir. 2013)...........................................................63

*Ind. & Mich. Distribs. Ass'n v. FERC*,
 659 F.2d 1193 (D.C. 1981)...................................................................9

*Johnson v. United States*,
 559 U.S. 133 (2010) ..........................................................................32

*Kokajko v. FERC*,
 873 F.2d 419 (1st Cir. 1989)..........................................................45, 46

*La. Pub. Serv. Comm'n v. FCC*,
 476 U.S. 355 (1986) ................................................................58, 59, 61

*Lingle v. Chevron U.S.A. Inc.*,
 544 U.S. 528 (2005) ..........................................................................55

*Loper Bright Enters. v. Raimondo*,
 144 S. Ct. 2244 (2024) ..................................................................28, 30

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ..........................................................................29

*Michigan v. EPA*,
 268 F.3d 1075 (D.C. Cir. 2001).........................................................28

*Morales v. Trans World Airlines, Inc.*,
 504 U.S. 374 (1992) ..........................................................................29

*Morton v. Mancari*,
 417 U.S. 535 (1974) ....................................................................35, 63

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto.
 Ins. Co.*, 463 U.S. 29 (1983)........................................................49, 54

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
 583 U.S. 109 (2018) ....................................................................29, 31

*Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
 103 F.4th 45 (D.C. Cir. 2024) ...........................................................32

*Pac. Gas & Elec. Co. v. FERC*,
 720 F.2d 78 (D.C. Cir. 1983) ............................................................39

*Palazzolo v. Rhode Island*,
 533 U.S. 606 (2001) ....................................................................55, 57

*Penn Cent. Transp. Co. v. New York City*,
    438 U.S. 104 (1978) ...................................................... 55, 56, 57

*Sheetz v. Cnty. of El Dorado*,
    601 U.S. 267 (2024) ...................................................................... 54

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) ..................................................... 29

*Sierra Club v. Neb. Pub. Power Dist.*,
    53 F.P.C. 1836 (1975) .................................................................. 46

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ...................................................................... 63

*Tex Tin Corp. v. EPA*,
    992 F.2d 353 (D.C. Cir. 1993) ........................................ 26, 51, 54

*Yearsley v. W.A. Ross Const. Co.*,
    309 U.S. 18 (1940) ........................................................................ 56

**Statutes**

*5 U.S.C. § 706 .................................................................... 2, 3, 28

16 U.S.C. § 791 ..................................................................................... 36

16 U.S.C. § 796 ....................................................... 25, 31, 41, 47

16 U.S.C. § 799 ................................................................... 39, 41

16 U.S.C. § 802 ....................................................... 25, 41, 47

16 U.S.C. § 822 ........................................................................... 36, 39

16 U.S.C. § 825e ....................................................................................... 1

16 U.S.C. § 825*l* ...................................................................................... 1

33 U.S.C. § 709 ..................................................................................... 62

An Act to Authorize the Return of the Grand River Dam Project to
    the Grand River Dam Authority and the Adjustment and
    Settlement of Accounts Between the Authority and the
    United States, Pub. L. No. 79-573, 60 Stat. 743 (1946) ......... 11, 58

An Act to Transfer Certain Indian Lands to the Grand River Dam
    Authority, Pub. L. No. 76-597, 54 Stat. 303 (1940) ................ 11, 58

Extension of Commencement of Construction of Hydroelectric
Project, Pub. L. No. 105-213, 112 Stat. 884 (1998)........................38

Extension of Time for FERC Project, Pub. L. No. 107-376, 116
Stat. 3114 (2002) ..............................................................................38

Extension of Hydroelectric Project — American Falls Reservoir,
Pub. L. No. 113-177, 128 Stat. 1911 (2014) ...................................37

Extension of Hydroelectric Project Construction—Alaska, Pub. L.
109-297, 120 Stat. 1471 (2006) ......................................................37

Extension of Hydroelectric Project Construction—Wyoming, Pub.
L. No. 109-298, 120 Stat. 1472 (2006) .....................................37–38

*Flood Control Act of 1938, Pub. L. No. 75-761, 52 Stat. 1215,
1218 (1938) ..........................7, 8, 9, 15, 56, 57, 58, 59, 62, 63, 64, 65

*Flood Control Act of 1941, Pub. L. No. 77-228, 55 Stat. 638
(1941) ..........................................9, 27, 56, 57, 58, 59, 62, 63, 64, 65

Glacier Bay National Park Boundary Adjustment Act of
1998, Pub. L. No. 105-317, 112 Stat. 3002 (1998) .........................38

Hydroelectric Project – Deadline Extension, Pub. L. No. 111-60,
123 Stat. 1995 (2009) ......................................................................37

Hydroelectric Project, West Virginia, Pub. L. No. 104-246, 110
Stat. 3146 (1996) ..............................................................................38

*National Defense Authorization Act for Fiscal Year 2020, Pub.
L. No. 116-92, 133 Stat 1198 (2019) ............... 2, 4, 5, 18, 19, 20, 24,
30, 31, 32, 33, 34, 64

Omnibus Public Land Management Act of 2009, Pub. L. No. 111-
11, 123 Stat. 991 (2009) ..................................................................37

Swan Lake Hydroelectric Project Boundary Correction Act, Pub.
L. No. 115-200, 132 Stat. 1527 (2018) ...........................................37

Water Infrastructure Improvements for the Nation Act, Pub L.
No. 114-322, 130 Stat. 1628 (2016)............................... 15, 16, 64, 65

Water Resources Development Act of 1996, Pub. L. No. 104-03,
§ 560(a)–(b), 110 Stat. 3658, at 3783–84 (1996) ............................59

**Regulations**

*18 C.F.R. § 4.41................................................................ 42, 47

33 C.F.R. § 208.25 ............................................................. 12, 59

**Administrative Materials**

*Appalachian Power Co.*,
    112 FERC ¶ 61,026 (2005) ............................................. 50

*City of Holyoke Gas & Elec. Dep't*,
    109 FERC ¶ 61,206 (2004) ................................... 26, 44, 49

*City of Seattle*,
    75 FERC ¶ 61,319 (1996) .............................................. 43

Dep't of Army, *Pensacola Reservoir Grand (Neosho) River*,
    *Oklahoma Water Control Manual* (Aug. 1992)........................ 11, 12

*Form L-3, Terms and Conditions of License for Constructed
    Major Project Affecting Navigable Waters of the United
    Sates, Article 5
    54 F.P.C. 1817 (1975). .................................... 13, 40, 41, 47

*Grand River Dam Auth.*,
    59 FERC ¶ 62,073 (1992) ........................................ 12, 13

*Grand River Dam Auth.*,
    67 FERC ¶ 62,239 (1994) ........................................ 12, 60

*Grand River Dam Auth.*,
    77 FERC ¶ 61, 251 (1996) ..................................... 7, 10, 14

*Grand River Dam Auth.*,
    126 FERC ¶ 62,249 (2009) ............................................ 14

*Grand River Dam Auth.*,
    135 FERC ¶ 62,233 (2011) ............................................ 15

*Grand River Dam Auth.*,
    138 FERC ¶ 62,091 (2012) ............................................ 15

*Grand River Dam Auth.*,
    160 FERC ¶ 61,001 (2017) ................................ 12, 16, 43, 60, 61

*Grand River Dam Auth.*,
    172 FERC ¶ 61,255 (2020) ............................................ 21

*Grand River Dam Auth.,
186 FERC ¶ 61,045 (2024) ......... 1, 22, 29, 33, 35, 36, 37, 38, 39, 46, 47,49, 53, 56, 57

Grand River Dam Auth.,
186 FERC ¶ 62,124 (2024) ........................................................................ 1

*Grand River Dam Auth.,
187 FERC ¶ 61,211 (2024) ...................... 2, 6, 23, 46, 47, 50, 53, 62

Menominee Co.,
74 FERC ¶ 61,023 (1996) ............................................................... 50

N.Y. Power Auth.,
105 FERC ¶ 61,102 (2003) ............................................................ 44

New England Power Co.,
9 FERC ¶ 61,322 (1979) ................................................................ 44

Order Authorizing Issuance of License for Major Project, Project
No. 1494 (1939)......................................................................... 9, 10

PacifiCorp,
105 FERC ¶ 61,237 (2003) ...................................................... 44, 45

Penn. Power & Light Co.,
21 FERC ¶ 61,429 (1980) .............................................................. 44

Policy Statement on Hydropower Licensing Settlements,
116 FERC ¶ 61,270 (2006) ............................................................ 44

Pub. Util. Dist. No. 1 of Chelan Cnty.,
119 FERC ¶ 61,055 (2007) .................................................. 43, 45, 49

Pub. Util. Dist. No. 1 of Chelan Cnty.,
15 FERC ¶ 62,168 (1981) ............................................................... 50

Wis. Pub. Serv. Comm'n,
104 FERC ¶ 61,295 (2003) ...................................................... 43, 48

# GLOSSARY

| | |
|---|---|
| **1938 Act** | Flood Control Act of 1938, Pub. L. No. 75-761, 52 Stat. 1215 |
| **1941 Act** | Flood Control Act of 1941, Pub. L. No. 77-228, 55 Stat. 638 |
| **2020 NDAA** | National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat 1198 (2019) |
| **Commission or FERC** | Respondent Federal Energy Regulatory Commission |
| **Corps** | United States Army Corps of Engineers, which has exclusive jurisdiction and responsibility for management of the flood pool for flood control operations at the Pensacola Project |
| **Grand Lake** | Grand Lake O' the Cherokees |
| **Licensee** | Petitioner Grand River Dam Authority |
| **Licensee Answer** | Answer of Grand River Dam Authority to the Complaint of the City of Miami, R.9, JA __ |
| **Letter Order** | *Grand River Dam Auth.*, Letter to Mr. Dean Kruithof, City Manager, from CarLisa Linton, Director, Division of Hydropower Administration and Compliance, Office of Energy Projects, Federal Energy Regulatory Commission, Project No. 1494-445 (Apr. 29, 2020), R.148, JA __ |
| **Notice of Rehearing Denial** | *Grand River Dam Auth.*, Notice of Denial of Rehearing by Operation of Law and Providing Further Consideration, Project No. 149-468, |

| | |
|---|---|
| | 186 FERC ¶ 62,124 (Mar. 18, 2024), R.1346, JA __ |
| **Original License** | *Grand River Dam Auth.,* Order Authorizing Issuance of License for Major Project, Project No. 1494 (1939) |
| **P** | A paragraph in a FERC order |
| **Pensacola Act** | Section 7612 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat. 1198 (2019) |
| **Pensacola Project** | Pensacola Project, No. 1494, located on the Grand (Neosho River in Craig, Delaware, Mayes, and Ottawa Counties, Oklahoma |
| **R.** | The record item listed in the Certified Index to the Record, Dkt.2071593 |
| **Rehearing Order** | *Grand River Dam Auth.*, Order Addressing Arguments Raised on Rehearing, Project No. 1494-468, 187 FERC ¶ 61,211 (June 27, 2024), R.1407, JA ___ |
| **WIIN Act** | Water Infrastructure Improvements for the Nation Act ("WIIN Act"), Pub L. No. 114-322, 130 Stat. 1628 (2016) |

# JURISDICTIONAL STATEMENT

This Court has jurisdiction to review orders of the Commission under 16 U.S.C. § 825*l*(b), which requires a petition for review to be filed within sixty days after the Commission's order upon the application for rehearing issues. FERC had jurisdiction over Miami's complaint pursuant to 16 U.S.C. § 825e. On January 18, 2024, the Commission issued its Order on Remand, which is a final order that disposed of all parties' claims. Order on Remand, *Grand River Dam Auth.*, 186 FERC ¶ 61,045 (2024) ("Order on Remand"), R.1291, JA __.[1] The Commission denied Licensee's application for rehearing on March 18, 2024. Notice of Rehearing Denial, *Grand River Dam Auth.*, 186 FERC ¶ 62,124 (2024) ("Notice of Rehearing Denial"), R.1346, JA __. Licensee timely filed its petition for review in this Court challenging the denial of rehearing on March 19, 2024. No.24-1071, Dkt.2046093. The Commission's Order Addressing Arguments Raised on Rehearing issued on June 27, 2024.

---

[1] The parties are using the deferred appendix option. *See* Circuit Rule 30(c). In Licensee's preliminary brief, cites to documents to be included in the Joint Appendix are after the Record Document cite noted as "JA __." In the final brief, these citations will be replaced to reflect their location in the Joint Appendix.

*Grand River Dam Auth.*, 187 FERC ¶ 61,211 (2024) ("Rehearing Order"), R.1407, JA ___.  Licensee filed its petition on July 10, 2024.  No.24-1238, Dkt.2064001.

## STATEMENT OF THE ISSUES

1. Whether the Commission's orders are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 7612, 133 Stat 1198, 2312 (2019) ("2020 NDAA"), provides that the Commission has no authority outside of the Pensacola Project's boundary and may not change that boundary without Licensee's consent.

2. Whether the Commission's orders are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because those orders misinterpret Standard Article 5, as well as depart from the Commission's prior interpretation of Standard Article 5 without reasoned explanation.

3. Whether the Commission's orders are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because the Commission failed to follow this Court's remand

instructions, implicating concerns under the Takings Clause, by refusing to determine whether the U.S. Army Corps of Engineers ("Corps")—and not Licensee—caused the disputed flooding.

4. Whether the Commission's orders exceed its jurisdiction and statutory authority, or are otherwise "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because the Corps has exclusive responsibility to acquire land outside of the Pensacola Project's boundary for flood control purposes.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in an addendum to this Brief.  D.C. Cir. Rule 28 (a)(5).

## INTRODUCTION

Miami blames the Pensacola Project—a hydroelectric dam owned by Licensee and managed for flood control operations by the Corps—for flooding certain upstream properties in and around Miami. In 2018, Miami filed a complaint with FERC, asserting that Standard Article 5 of the Pensacola Project license required Licensee to acquire approximately 13,000 acres of land outside of the Pensacola Project's boundary that Miami asserts is worth over $150 million.

This Court's prior decision in this dispute, *City of Miami v. FERC*, 22 F.4th 1039 (D.C. Cir. 2020), remanded the case and ordered FERC to (1) interpret the 2020 NDAA § 7612 (known as the "Pensacola Act"), which provides that FERC lacks authority outside of the Pensacola Project's boundary; (2) "really answer[ ]" the meaning and application of Standard Article 5; and (3) decide whether the Corps bears responsibility for the alleged flooding at issue. *Id.* at 1043–44. On remand, FERC concluded that the Pensacola Act contains a temporal limit not found in the statute's text, held for the first time that Standard Article 5 requires licensees to purchase lands outside of the project boundary, and flouted

this Court's instructions to decide if the Corps had responsibility for the disputed flooding.

Licensee thus respectfully asks that this Court set aside FERC's unlawful orders for four independently sufficient reasons.

*First*, Congress decisively ended any dispute over FERC's authority to require Licensee to purchase land outside of the project boundary by enacting the Pensacola Act. The Act provides in clear terms that FERC has no authority outside of the project boundary and may not change that boundary without Licensee's consent, 2020 NDAA, § 7612(b)(3)(A)–(C). FERC impermissibly rewrote the Pensacola Act by providing that it does not take effect immediately, without any basis in the statutory text, and contrary to the Act's core purpose and design.

*Second*, FERC concluded that Licensee violates Standard Article 5 by failing to acquire lands outside the project boundary for "project purposes." Even if this Court were to put the Pensacola Act aside, this reading is inconsistent with the Standard Article, the Federal Power Act, and uniform FERC precedent and practice. By applying a novel and erroneous reading of a Standard Article found in numerous federal

hydropower licenses to Licensee alone, the Commission violated the Federal Power Act and Administrative Procedure Act.

*Third*, FERC violated this Court's remand order to determine "the Corps' responsibility" for any alleged flooding, due to Licensee's concerns that the Corps must acquire any property rights for its flood operations. *City of Miami*, 22 F.4th at 1043. The Commission only decided that "flooding is caused by the existence and operation of the project." Rehearing Order, R.1407 at P 47, JA __. FERC did so even though it knows that the Corps directs flood control operations at the Pensacola Project. *Id.*, R.1407 at P 46, JA __. The Commission's failure to answer this critical question places the burden of addressing flood damage caused by a federal agency upon Licensee, in violation of the Takings Clause.

*Finally*, FERC unlawfully held that Licensee must acquire lands to serve the Corps' flood control operations. Under the Flood Control Act of 1938, and in multiple statutory enactments thereafter, Congress has given the Corps exclusive control over flood operations and authorized it to acquire property for such operations. As a creature of statute, FERC

cannot exercise the Corps' exclusive authority, and thus, the Commission cannot order Licensee to acquire property for the Corps' operations.

This Court should vacate the Commission's orders, make clear that the Corps is responsible for acquiring any lands outside of the project boundary, and remand with instructions for FERC to dismiss Miami's complaint.

## STATEMENT OF THE CASE

### A. Historical Background

1. Congress originally authorized the Pensacola Project in the Flood Control Act of 1938 (the "1938 Act") as a flood control project, Pub. L. No. 75-761, § 2, 52 Stat. 1215, 1218 (1938). The Project is located within the 185,000 square-mile Arkansas River Basin, which spans Colorado, Kansas, New Mexico, Texas, Oklahoma, Missouri, and Arkansas. The Project lies on the Grand (Neosho) River in Craig, Delaware, Mayes, and Ottawa Counties, Oklahoma, and includes a reservoir known as Grand Lake O' the Cherokees. *Grand River Dam Auth.*, 77 FERC ¶ 61,251, at p. 62,006 (1996). This map shows the Pensacola Project's boundary:



App. for Non-Capacity Related Amend., R.211 App.4 at 4 Fig. 1, JA __.

The 1938 Act "authorized and directed" the Secretary of War "to acquire in the name of the United States title to all lands, easements, and rights-of-way necessary for any dam and reservoir project" for flood control. § 2, 52 Stat. at 1218. So in the same Act approving the Pensacola

Project, *id.*, 52 Stat. at 1218, Congress directed the Corps to obtain all property rights needed for flood control there.

Three years later, Congress again authorized the construction and development of the Pensacola Project for flood control purposes in the Flood Control Act of 1941 (the "1941 Act"). *See* Pub. L. No. 77-228, § 4, 55 Stat. 638, 645 (1941). Section 2 of the 1941 Act maintains the Secretary of War's obligation to acquire properties needed for authorized flood control projects. *See id.* § 2, 55 Stat. at 638. It also expressly authorized the Corps to "purchase . . . lands, easements, and rights-of-way" when needed to complete a planned project. *Id.*

2. In 1939, the Federal Power Commission[2] issued the Original License for the Pensacola Project. *Grand River Dam Auth.,* Order Authorizing Issuance of License for Major Project, Project No. 1494 (1939) ("Original License"). Consistent with the 1938 Act and impending 1941 Act, the Original License delineated the Commission's jurisdiction

---

[2] FERC replaced the Federal Power Commission in 1977. *See Ind. & Mich. Distribs. Ass'n v. FERC*, 659 F.2d 1193, 1194 n.1 (D.C. 1981). Because this appeal discusses agency action taken both before and after the reorganization, "Commission" refers to both.

over the Pensacola Project for hydropower and the Corps' authority for flood control.

The Original License allowed Licensee to utilize storage space below elevation 745 feet "for power production purposes." *Id.* at 8–9.[3] The "storage capacity between elevations 745 and 755 [was] expressly reserved for the control of floods." *Id.* at 9. Above elevation 745, Licensee could only "release flood waters" "*in the manner directed by the Secretary of War.*" *Id.* (emphasis added). The Original License also dictated that the United States must acquire "*the necessary flowage rights above*" elevation 750. *Id.* (emphasis added). Licensee need only "acquire all necessary lands . . . up to elevation 750." *Id.* at 8. The Original License confirms that flood control operations at the Pensacola Project "shall at all times be subject to the control of the Secretary of War[.]" *Id.* at 9.

3. Congress has repeatedly confirmed that Licensee should acquire lands up to elevation 750 and that the Corps should acquire land above

---

[3] The Pensacola Project's reservoir is measured by its elevation in feet, specifically in Pensacola Datum. 77 FERC ¶ 61,251, at p. 62,001 (1996). Pensacola Datum is 1.07 feet higher than National Geodetic Vertical Datum, a national standard for measuring elevations above sea level. Under normal operations, the Pensacola Project's reservoir levels fluctuate between elevations 742 and 744 feet. *Id.* All references to elevation in this brief are in Pensacola Datum.

that level. In 1940, legislation authorized Licensee to obtain title to federally owned and Native American lands "below an elevation of seven hundred and fifty feet above mean sea level." An Act to transfer certain Indian lands to the Grand River Dam Authority, Pub. L. No. 76-597, 54 Stat. 303 (1940). When the Federal Government returned the Pensacola Project's non-flood operations to Licensee (after acquiring the Project during World War II), Congress directed that the "Secretary shall retain all lands or interests therein of the United States *above elevation seven hundred and fifty feet*" to operate the Pensacola Project. An Act to authorize the return of the Grand River Dam project to the Grand River Dam Authority and the adjustment and settlement of accounts between the authority and the United States, Pub. L. No. 79-573, § 3, 60 Stat. 743, 744 (1946) (emphasis added).

Corps regulations reflect the same understanding that Licensee is "not required to purchase lake lands above elevation 750." Req. for Reh'g, Attach. 25, Dep't of Army, *Pensacola Reservoir Grand (Neosho) River*, *Oklahoma Water Control Manual*, at 3-3 (Aug. 1992) ("*Water Control Manual*"), R.1314, JA __. These regulations affirmed its exclusive jurisdiction over flood control because above "elevation 745 at the dam,

the discharge facilities shall be operated under the direction of the District Engineer." 33 C.F.R. § 208.25. Whenever the reservoir exceeded 745 feet and was "forecasted to exceed 755 feet," the Corps directed releases "to reduce as much as practical the flood damage below the dam." Req. for Reh'g, Attach. 25, *Water Control Manual*, Table 7-1, at p. 7-4, R.1314, JA __.

FERC has also recognized that "[u]nder flood conditions, [Licensee] follows instructions from the [Corps] with respect to operating the reservoir." *See Grand River Dam Auth.*, 59 FERC ¶ 62,073, at p. 63,233 (1992) ("1992 Relicensing Order"). It has explained that "[a]ny attributions to issues such as flooding" are *under the purview of the U.S. Army Corps of Engineers.*" *Grand River Dam Auth.*, 67 FERC ¶ 62,239, at p. 64,431 (1994) (emphasis added). The Commission reaffirmed that "the Corps maintains exclusive jurisdiction over operations within the flood pool, i.e., from 745 to 755 feet." *Grand River Dam Auth.*, 160 FERC ¶ 61,001, at P 49 n.67 (2017).

4. In 1992, FERC issued Licensee a new license for a 30-year term. *See* 59 FERC ¶ 62,073, at p. 63,225 (1992). FERC again recognized that, "[u]nder flood conditions, [Licensee] follows instructions from the [Corps]

with respect to operating the water reservoir." *Id.* at p. 63,223. The license also identified all lands necessary for the Pensacola Project, *i.e.* the "project lands," by approving project boundary maps prepared by Licensee, which did not include the lands at issue here. *Id.* at p. 63,226.

FERC explained that the license is subject to the "Terms and Conditions of License for Constructed Major Project Affective Navigable Waters of the United States," including—most relevant to the dispute here—"Standard Article 5." *Id.* at 63,227. Standard Article 5, in turn, requires Licensee to "acquire title in fee simple or the right to use in perpetuity all lands, other than lands of the United States, necessary or appropriate for the construction, maintenance, and operation of the [Pensacola Project]" within five years from the date the Commission issued the license. Form L-3, Terms and Conditions of License for Constructed Major Project Affecting Navigable Waters of the United States, Article 5, 54 F.P.C. 1817, 1818–19 (1975). Notably, Standard Article 5 does not require Licensee to identify any lands outside the project boundary, i.e., "non-project lands," that may be necessary for the Pensacola Project. Nor did the Commission's 1992 licensing order: (1) identify any non-project lands as necessary for the Pensacola Project; (2)

notify Licensee that it may be required to acquire such lands in the future; or (3) reserve authority to unilaterally amend the approved maps during the new license term.

FERC did not interpret Standard Article 5 any differently in the decades following the issuance of the 1992 license. For example, in 1996, Licensee applied to amend the Pensacola Project's license. Licensee sought to change the operating guide rule curve that governs seasonal target elevations of Grand Lake throughout the year, in response to flooding concerns highlighted by a Congressional committee. *Grand River Dam Auth.*, 77 FERC ¶ 61,251 (1996). FERC recognized that the modification partly allowed Licensee "to increase flood storage capacity." *Id.* at p. 62,001. But FERC did not mention any obligation under Standard Article 5 for Licensee to identify and acquire non-project lands outside of the Pensacola Project boundary to do so. *See id.*

Then, from 2008 to 2014, FERC approved six license amendment requests by Licensee to update the project boundary maps depicting all lands necessary and appropriate for the Pensacola Project. *E.g.*, *Grand River Dam Auth.*,126 FERC ¶ 62,249 (2009). Each time, the Commission acknowledged that "the 750-foot contour line is generally recognized as

the Pensacola Project boundary" for the Pensacola Project.  *Id.*; *see, e.g.*, *Grand River Dam Auth.*, 135 FERC ¶ 62,233, at P 2 (2011) ("The [Pensacola Project] boundary should generally follow the 750-foot contour . . . ."); *Grand River Dam Auth.*, 138 FERC ¶ 62,091, at P 2 (2012) (same). None of these orders amending the Pensacola Project boundary maps required or recommended that Licensee purchase lands outside of the Pensacola Project boundary, even though Miami and its citizens had been petitioning the Commission to address Licensee's alleged failure to acquire rights to affected properties.  *See* Miami's Complaint, R.1 at 13–18.

5.  Shortly thereafter, Congress enacted the Water Infrastructure Improvements for the Nation Act ("WIIN Act").  Pub L. No. 114-322, 130 Stat. 1628 (2016).  The Act remedied concerns about the permitting system to develop docks and other infrastructure around the Pensacola Project where residents sought permits from Licensee, the Corps, and the Commission.  To alleviate this administrative burden, Congress instructed the Corps, "*notwithstanding the [1938 Act]*," to "convey, by quitclaim deed and without consideration, to [Licensee]" all its interests "in and to real property under the administrative jurisdiction of the

Secretary acquired in connection with the Pensacola Dam project, together with any improvements on the property" "for flood control purposes." *Id.* § 1321(c) (emphasis added). The WIIN Act consolidated the permitting under Licensee.

## B. Procedural Background And The Pensacola Act

1. In early 2018, the Commission initiated relicensing of the Pensacola Project. During that process, federal regulators and relicensing participants—including Miami—raised concerns about flood control at the Pensacola Project, signaling an intent to seek major changes to the license. *See, e.g.*, Corr. of City of Miami, Oklahoma, Project No. 1494-444 (filed June 14, 2019), R.55 at 4–5. FERC also signaled that "[a]lthough we agree with Licensee that the Corps maintains exclusive jurisdiction over operations within the flood pool, i.e., from 745 to 755 feet [Pensacola Datum], in relicensing the Commission may consider the effect of Licensee's operations on flooding, including the appropriate target elevations and any necessary mitigation." *Grand River Dam Auth.,* 160 FERC ¶ 61,001, at P 49 n.67. One civilian employee in the Corps' Tulsa Division claimed that Licensee was responsible "for land requirements above [ ] 750 feet." U.S. Army

Corps of Engineers Comments to Grand River Dam Authority's Proposed Study Plan for the Pensacola Hydroelectric Project, FERC No. 1494 (September 24, 2018), R.228.

Miami filed a complaint with FERC, which began the current dispute. Complaint, R.1. Miami asserted that Standard Article 5 obligated Licensee to acquire non-project lands necessary for the Corps' flood control operations. *Id.*, R.1, at 4, 24–30. Accordingly, Miami requested that FERC find Licensee in violation of Standard Article 5 and order it to acquire approximately 13,000 acres of non-project lands, which it estimated would exceed $150 million. *Id.*, R.1, at 2, 73.

Licensee disputed Miami's position as a matter of law, arguing that Standard Article 5 does not require the purchase of land outside of the project boundary and that FERC had not determined any additional lands were necessary and amended the license to reflect that determination. Licensee Answer, R.9, at 1–2. Licensee reasoned that "the Commission's 1992 relicensing order approved the Project's . . . maps, which identifies all lands that are needed for Project purposes," and because Licensee "owns in fee all lands within the Project boundary," Licensee "is not in violation of Standard Article 5." *Id.,* R.9 at 18.

Licensee also noted that "it simply makes no sense at all to require [Licensee] and its customers to incur the significant cost of land acquisitions due to the Corps' flood control activities." *Id.*, R.9 at 12. Licensee also argued the Corps had "exclusive responsibility for . . . associated land acquisitions beyond 750 feet," which "foreclose[ed] FERC's jurisdiction over both issues." *Id.*, R.9 at 6–7.

2. Congress intervened in this dispute, enacting Section 7612 of the 2020 NDAA. The Act resolves the disagreement between Miami and Licensee as to whether FERC has the authority to require Licensee to purchase land outside of the Pensacola Project's boundary.

First, in Section 7612(b)(3) Congress clarified the Commission's jurisdiction with respect to the Pensacola Project:

(3) PROJECT SCOPE.—

(A) LICENSING JURISDICTION.—The licensing jurisdiction of the Commission for the project shall not extend to any land or water outside the Pensacola Project boundary.

(B) OUTSIDE INFRASTRUCTURE.— Any land, water, or physical infrastructure or other improvement outside the project boundary shall not be considered to be part of the project.

(C) BOUNDARY JURISDICTION AMENDMENTS.—The Commission may, consistent with the requirements of the Federal Power Act, amend the project boundary, only with the expressed written agreement of the project licensee. If the licensee does not agree to a project boundary change proposed by the Commission,

the purposes and requirements of part I of the Federal Power Act (16 U.S.C. 791a et seq.) shall be deemed to be satisfied without the Commission's proposed boundary or jurisdiction change.

2020 NDAA, § 7612(b)(3). Thus, the Pensacola Act dictates that the Pensacola Project does not include lands outside the project boundary, FERC's licensing jurisdiction is limited to the existing geographic extent of the Pensacola Project, and that Licensee must specifically agree to any change in that project boundary.

Second, Congress confirmed the Corps' exclusive jurisdiction over flood control at the Pensacola Project: "[t]he Secretary shall have exclusive jurisdiction and responsibility for management of the flood pool for flood control operations at [the Pensacola Project]." *Id.* § 7612(c).

Finally, Congress recognized and preserved the Corps' ongoing obligation to acquire property interests necessary as an integral part of its flood control activities at the Pensacola Project. It stated:

(e) SAVINGS PROVISION.—Nothing in this section affects, with respect to the project—

(1) any authority or obligation of the Secretary or the Chief of Engineers pursuant to section 2 of the Act of June 28, 1938 (commonly known as the "Flood Control Act of 1938") (33 U.S.C. 701c–1); . . .

(3) any obligation of the United States *to obtain flowage or other property rights* pursuant to the Act of July 31, 1946 (60 Stat. 743, chapter 710);

(4) any obligation of the United States *to acquire flowage or other property rights* for additional reservoir storage pursuant to Executive Order 9839 (12 Fed. Reg. 2447; relating to the Grand River Dam Project);

(5) any authority of the Secretary to *acquire real property interest* pursuant to section 560 of the Water Resources Development Act of 1996 (Public Law 104–303; 110 Stat. 3783) . . . .

*Id.* § 7612(e) (emphases added).

3. FERC found "no violation of Article 5 of the [Pensacola Project] license." Letter from CarLisa Linton, FERC, to Dean Kruithof, City of Miami, Project No. 1494-445, at 2 (issued Apr. 29, 2020), R.148, JA __. The Commission claimed that although "Miami is correct that the [Pensacola P]roject boundary does not limit the scope of Article 5, because the Commission" had never determined that additional lands were necessary for the Pensacola Project, Licensee could "not be in violation of Article 5 for not obtaining such rights." *Id.*, R.148 at 3, JA __. FERC had never required Licensee to bring additional land into the Pensacola Project boundary "[i]n the absence of substantial evidence that Licensee's operations regularly caused flooding of the lands at issue." *Id.* Without any analysis, FERC summarily stated that the Pensacola Act supported its conclusion. *Id.*, R.148 at 4, JA __. FERC then again rejected Miami's arguments after it requested a rehearing. *See Grand River Dam Auth.,*

172 FERC ¶ 61,255, at P 7 (2020). It also explained that Section 28 of the Federal Power Act does not bar applying the Pensacola Act to the license because "it is not clear how the Pensacola Act, the sole effect of which is to limit the Commission's jurisdiction with respect to the Pensacola Project, can be said to alter, amend, or repeal any particular provision of the" Federal Power Act. *Id.* at P 20.

4. Miami sought review in this Court, which granted that petition and remanded the case to the Commission. *City of Miami*, 22 F.4th at 1039. This Court reasoned that the Commission "never really answer[ed] . . . whether Article 5 of the license obliges [Licensee]—putting aside the Corps' role—to acquire rights (either ownership or easements) to cover the expense of flooding in" Miami. *Id.* at 1043. And FERC "never actually construed the Pensacola Act." *Id.* at 1044. This Court then remanded to the Commission, explaining that FERC on remand should: (1) interpret the Pensacola Act and, relatedly, how Section 28 of the Federal Power Act affects it, (2) analyze Licensee's obligations under Standard Article 5, and (3) determine Licensee's responsibility in causing the flooding in the City, and the "role of the Corps in this imbroglio." *Id.* at 1043–44. On this last point, this Court noted that it was "completely at sea

regarding [ ] the Corps of Engineers, which may be the *deus ex machina* of this play." *Id.* at 1042.

5. In its Order on Remand, FERC now held in Miami's favor. R.1291 at P 67, JA __. First, FERC reversed course and concluded that Section 28 of the Federal Power Act "precludes the application of the Pensacola Act to the complaint proceeding." *Id.*, R.1291 at P 38, JA __. It reasoned that as Section 28 "protect[s] existing licenses from subsequent legislative modification," "any legislation intended to affect prior licenses would, at the very least, contain a clear statement of that intent." *Id.*, R.1291 at P 41, JA __. But FERC did not analyze the Pensacola Act's text to determine whether it amended the Federal Power Act or any licenses. The Commission determined that the Pensacola Act does not apply to Licensee's existing license but only "to licenses issued after 2019." *Id.*, R.1291 at P 39, JA __. Second, the Commission found that Standard Article 5 imposed a "separate and distinct" obligation on Licensee to identify and acquire non-project lands without a Commission determination that those lands served a project purpose. *Id.*, R.1291 at P 54, JA __. In FERC's view, this Article "requires licensees to hold property rights over all land needed for such purposes, and "flood control

is a project purpose." *Id.* The Commission concluded that it "may require" any lands necessary for flood control "to be included in the project boundary." *Id.* Third, the Commission addressed the Corps' role at the Pensacola Project (without the Corps' input), attempting to bifurcate the Corps' flood control operations from necessary land acquisitions. Crediting the claims of a single civilian employee in Tulsa, FERC concluded that "the Corp's role is limited to [ ] directing flood operations at the [Pensacola Project]" and that Licensee—not the Corps—has the exclusive responsibility to obtain property interests to further those operations. *Id.*, R.1291 at P 52, JA __. As a result, FERC ordered Licensee to file a report that analyzes each parcel of land upstream of the Pensacola Dam affected by flooding due to the existence of the Pensacola Project and identify whether Licensee holds ownership interests in each affected parcel. *Id.*, R.1291 at P 68, JA __.

When justifying its denial of Licensee's petition for rehearing, FERC concluded that the Pensacola Act did not apply immediately to Licensee's existing license. Rehearing Order, R.1407 at P 37, JA __. It reiterated its belief that Standard Article 5 requires Licensee to acquire non-project land not identified in the license to further the Corps' flood

control operations. *Id.*, R.1407 at PP 31–32, JA __. FERC also rejected Licensee's argument that its directives constituted a taking under the Fifth Amendment, explaining that Licensee's concerns were "premature" because it had not yet directed Licensee to buy additional property rights. *Id.*, R.1407 at PP 55–56, JA __. Finally, it refused to examine the Corps' responsibility for any flooding. *Id.*, R.1407 at PP 24–25, JA __.

## SUMMARY OF ARGUMENT

I. Congress has left no doubt that the Pensacola Project currently holds all the necessary project lands, and this Court should enforce the Pensacola Act's plain text providing that FERC lacks authority over lands outside the project boundary. *See* 2020 NDAA, § 7612(b). The Pensacola Act unambiguously defines the necessary project lands and prohibits FERC from requiring Licensee to acquire additional lands. Moreover, Congress again determined that the Corps is the only entity responsible for acquiring additional lands at the Pensacola Project.

Instead of following the Pensacola Act's express directions, the Commission erroneously decided that the Act did not take effect immediately. This interpretation is contrary to the Act's text, and FERC's application of Section 28 of the Federal Power Act to immunize

its actions is constitutionally nonsensical. The Pensacola Act neither amends the Federal Power Act nor alters any license under the Federal Power Act, which are both required for Section 28 to apply. Moreover, FERC's approach violates the principle that specific laws (the Pensacola Act) trump those of general applicability (Section 28). The Commission's decision to reject Congress' last and most specific direction on Licensee's obligations at the Pensacola Project was contrary to law.

II. Even if this Court were to put the Pensacola Act aside, FERC's novel interpretation that Standard Article 5 imposes an ongoing obligation for licensees to acquire land outside of the project boundary violates the Federal Power Act's text, regulations, and precedent. The Federal Power Act defines the "project" as all lands "necessary or appropriate" for the hydropower project, 16 U.S.C. § 796 (11), and requires that those lands be identified in the license application and enclosed within the project boundary, *id.* § 802(a). Standard Article 5 uses the same terms as the Federal Power Act, which means that it does not apply to lands outside the project boundary because those lands cannot be "necessary or appropriate" for the project.

Commission precedent confirms that the "project boundary is to encompass" all lands necessary or appropriate for the licensee "to carry out its regulatory responsibilities with respect to the project." *City of Seattle*, 75 FERC ¶ 61,319, at p. 62,015 n.11 (1996). And under the Federal Power Act, that means lands identified in the license. Precedent further shows that Standard Article 5 does not require Licensee to acquire property outside the project boundary unless the Commission approves a license amendment application to change the project boundary to encompass the identified additional property. *City of Holyoke Gas & Elec. Dep't*, 109 FERC ¶ 61,206, at p. 61,972 (2004). The Commission's decision to depart from this precedent and treat Licensee differently from all similarly situated hydropower licensees was arbitrary and capricious.

III. FERC violated this Court's mandate to determine the Corps' responsibility for the disputed flooding. *City of Miami*, 22 F.4th at 1043. The orders on review refuse to do so and sidestep this critical question. This failure warrants reversal. *Tex Tin Corp. v. EPA*, 992 F.2d 353, 355 (D.C. Cir. 1993).

The Commission's refusal to engage on the issue of whether the Corps has caused the disputed flooding and the Corps' responsibility for its flood operations implicates grave constitutional concerns under the Takings Clause. By failing to determine the Corps' responsibility, FERC unconstitutionally seeks to shift any damages caused by the Corps onto Licensee. This failure implicates the Taking Clause because although the Corps has exclusive responsibility for acquiring the lands necessary for its flood control program, FERC appears ready to require Licensee to purchase land at its own expense for the Corps' regulatory purpose. The Commission's orders expanding the scope of Standard Article 5 to require an ongoing obligation to acquire non-project lands for any and all project purposes upset Licensee's reasonable investment backed expectations.

IV. Since 1938, the Corps has had exclusive authority and responsibility to acquire properties above elevation 750 feet necessary to support its flood control operations at the Pensacola Project. Congress reaffirmed that responsibility several times, including in the 1941 Act and the Pensacola Act. At no point has Congress conferred that authority on the Commission. FERC's claims that the Corps requires further congressional authorization or that Congress has repealed this grant of

authority by implication have no support in the record or in law. The Commission cannot exercise authority granted to another agency, thus it cannot order Licensee to fulfill the regulatory duties of another agency.

## STANDARD OF REVIEW

This Court reviews FERC's orders under the Administrative Procedure Act, which requires this Court to "reverse any agency action that is arbitrary, capricious, an abuse of discretion, [ ] otherwise not in accordance with law, . . . [or] in excess of statutory . . . authority." *Hoopa Valley Tribe v. FERC*, 913 F.3d 1099, 1102 (D.C. Cir. 2019) (citations omitted); 5 U.S.C. § 706 (2)(A). As a "creature of statute," the Commission has "only those authorities conferred upon it by Congress," and this Court must therefore set aside any Commission action taken "[i]n the absence of statutory authorization." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (quoting *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001)). This Court reviews FERC's interpretation of a statute *de novo*, "independently interpret[ing] the statute and effectuat[ing] the will of Congress subject to constitutional limits," *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024), relying on the "traditional tools of statutory construction" to do so, *id.* at 2268.

## STANDING

Licensee has standing because it is the "object of the action (or forgone action) at issue" in FERC's orders. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). FERC's orders hold that the Commission has "jurisdiction to address property rights under the current license" and interpret that license as requiring Licensee to "acquire adequate property rights" in non-project lands. Order on Remand, R.1291 at PP 67–68, JA __. Those orders inflict a direct Article III injury on Licensee, which this Court can redress. *See Lujan*, 504 U.S. at 560–62.

## ARGUMENT

## I. The Pensacola Act Prohibits FERC From Requiring Licensee To Purchase Land Outside Of The Project Boundary, Which Should Be The End Of This Dispute

A. When a statute's text is plain, the Court's inquiry "begins with the statutory text, and ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018) (citation omitted); *see Cook v. FDA*, 733 F.3d 1, 9 (D.C. Cir. 2013). Where two statutes intersect, "[i]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).

"[A]fter applying all relevant interpretive tools," the Court must use the interpretation it "concludes is best." *Loper Bright*, 144 S. Ct. at 2266.

B. The Pensacola Act's plain text resolves this dispute in Licensee's favor by making clear that FERC lacks authority over lands outside the Pensacola Project boundary and prohibits FERC from expanding the project boundary without Licensee's express consent. 2020 NDAA, § 7612(b). Thus, the Pensacola Act prohibits FERC from requiring Licensee to acquire the lands at issue here. Several statutory provisions compel this straightforward conclusion.

Section 7612(b)(3) establishes in multiple ways that FERC has no authority to act outside of the project boundary, using a belt-and-suspenders approach so as to avoid any possible doubt. First, Section 7612(b)(3)(A) provides that FERC's "licensing jurisdiction" over the "Pensacola Hydroelectric Project (FERC No. 1494)," "shall not extend to any land or water outside the project boundary." 2020 NDAA, § 7612(b)(3)(A). The Act thus precludes FERC from exercising authority over any land or waters not within the project boundary existing at the time of enactment. *See City of Arlington v. FCC*, 569 U.S. 290, 296–97 (2013) (interpreting "jurisdiction" as referring to agency authority).

Second, Section 7612(b)(3)(B) provides that the project only extends to its current project boundary: "[a]ny land, water, or physical infrastructure or other improvement outside the project boundary *shall not be considered* to be part of the project." 2020 NDAA, § 7612(b)(3)(B) (emphasis added). The Federal Power Act, in turn, defines a "project" as those "lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit [of improvement or development]." 16 U.S.C. § 796(11). Congress thus determined that the lands and waters *outside* the project boundary are not "necessary or appropriate in the maintenance and operation," *id.*, of the Pensacola Project and thus not "part of the project" over which FERC has authority, 2020 NDAA, § 7612(b)(3)(B). Third, Section 7612(b)(3)(C) prohibits FERC from expanding the project boundary without first obtaining Licensee's "expressed written agreement." *Id.* § 7612(b)(3)(C).

The Pensacola Act also confirms that the Corps—not Licensee—is responsible for flood control at the Pensacola Project. Section 7612(c) provides that "[t]he Secretary shall have exclusive jurisdiction and responsibility for management of the flood pool for flood control operations at [the Pensacola Project]." *Id.* § 7612(c). Further, Section

7612(e) is a "savings provision" pursuant to which "[n]othing in this" Act "affects . . . any authority or obligation of the Secretary or the Chief of Engineers" to, among other things, "obtain flowage or other property rights" under certain statutory mandates. *Id.* § 7612(e).

In all, the Pensacola Act's text demonstrates that Congress prohibited FERC from exercising authority outside of the Pensacola Project's current project boundary, that this boundary cannot change without Licensee's consent, and that the Corps—not Licensee—has responsibility for such land acquisition as part of its ongoing flood control activities at the Pensacola Project.

The Pensacola Act's evident purpose, demonstrated by the context of its enactment, further confirms that Congress intended to prohibit FERC from exercising authority over the lands at issue in this dispute without Licensee's express consent. *See Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 103 F.4th 45, 50 (D.C. Cir. 2024); *Johnson v. United States*, 559 U.S. 133, 139 (2010). For the Pensacola Project's eighty-year history, Licensee's responsibility for property acquisition extended only up to 750 feet in elevation, and the Corps was responsible for acquiring property to support its flood control operations above that point. *See*

*supra* pp.9–15. But in recent years, disagreements arose between Miami and Licensee with respect to the acquisition of these non-project lands, with a civilian Corps' employee echoing Miami's position. *See supra* pp.16–17. To resolve this disagreement, Congress enacted the Pensacola Act to prohibit FERC from exercising authority outside the project boundary, while making clear FERC had to obtain Licensee's consent before changing that boundary. *See* 2020 NDAA, § 7612(b)(3).

C. In the orders on review, FERC declined to analyze the Pensacola Act's actual text and simply declared that this Act applies only "with respect to licenses issued after 2019" because, in FERC's view, giving immediate effect to the Pensacola Act would "violate" Section 28 of the Federal Power Act—a different, previously enacted statute. Order on Remand, R.1291 at P 39, JA __. The notion of a statute violating a prior statute is, of course, constitutionally nonsensical, and FERC's attempt to rewrite the Pensacola Act to increase its own authority fails.

1. As a threshold matter, there is nothing in the statutory text that supports FERC's failure to give immediate effect to the Pensacola Act, meaning that the prior-enacted Section 28 is irrelevant here. As a matter of our constitutional structure, "statutes enacted by one Congress cannot

bind a later Congress." *Dorsey v. United States*, 567 U.S. 260, 274 (2012).

Further, laws take effect immediately upon their enactment unless

Congress clearly directs otherwise. *See Gozlon-Peretz v. United States*,

498 U.S. 395, 407 (1991). Nothing in the Pensacola Act even arguably

supports FERC's conclusion that it takes effect at some later time. Had

Congress intended for the Pensacola Act to become effective at a later

date, it would have said so—as it did in numerous other provisions of the

2020 NDAA. *See* 2020 NDAA, § 512(b) (providing that amendment "shall

take effect 180 days after the date of the enactment of this Act"); *id.*

§ 514(b) ("[A]mendment . . . shall take effect on the date that is one year

after the date of the enactment of this Act and shall apply to

appointments made after such date."); *id.* § 570A(d) ("This section shall

take effect 180 days after the date of the enactment of this Act[.]"); *id.*

§ 622(f) ("This section and the amendments made by this section shall

take effect on the first day of the first month that begins after the

enactment of this Act, except subsections (d) and (e) of this section and

the amendments made thereby shall take effect on January 1, 2023.").

Accordingly, FERC was duty-bound to enforce the Pensacola Act by its

plain terms, not blue-pencil the statute to avoid a constitutionally

impossible finding of a violation of a prior enacted law. Order on Remand, R.1291 at P 39, JA __.

FERC's interpretation of how the Pensacola Act and Section 28 of the Federal Power Act interact also violates the principle that specific laws trump those of general applicability, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974), and—if allowed to stand—would defeat the Pensacola Act's evident purpose. Here, Congress enacted Section 28 over 100 years ago and this provision applies in FERC's reading, *but see infra* pp.36–38, to a large class of hydropower projects subject to and licensed under the Federal Power Act. On the other hand, Congress enacted the Pensacola Act less than five years ago to resolve the specific, ongoing dispute over the sufficiency of Licensee's property rights related to the Pensacola Project only. Under the Commission's view of its power, it can require Licensee to purchase additional property outside the license's project boundary. By using a hundred-year-old law to deny the Pensacola Act from settling Licensee's obligation to obtain non-project lands, the Commission would defeat an Act of Congress in an unprecedented and atextual manner.

2. Even if Section 28 could somehow be read to alter the express terms of a later enacted statute, *but see supra* pp.33–35, nothing in Section 28's text applies to the issues in dispute here. Section 28 provides that "[t]he right to alter, amend, or repeal this chapter is expressly reserved; but no such alteration, amendment, or repeal shall affect any license theretofore issued under the provisions of this chapter, or the rights of any licensee thereunder." 16 U.S.C. § 822. Section 28 thus applies exclusively to "alter[ations], amend[ments], or repeal[s] [of] *this chapter*," *id.* (emphasis added)—meaning the Federal Power Act itself (codified at 16 U.S.C. § 791 *et seq.*). But the Pensacola Act does not amend the Federal Power Act, and therefore Section 28 simply does not apply here.

FERC ignored the key limiting phrase "this chapter," *id.*, when it concluded that Section 28 broadly "preclude[s] the modification of existing licenses," and "protect[s] existing licenses from subsequent legislative modification." Order on Remand, R.1291 at PP 40–41, JA __. The Commission claims, on the one hand, that Section 28 precludes all such modifications, *id.*, and, on the other, that "licenses are not necessarily immune from [certain] Congressional acts," *id.*, R.1291 at

P 42, JA __, and the Commission identifies several instances where Section 28 did not preclude the application of a legislative act, *id.*

Rather than give effect to Section 28's plain text, FERC remarkably asserted that Section 28 bars all legislation—not merely amendments to the Federal Power Act—that "substantively alter[s] [a] licensee's obligations" under any license, Order on Remand, R.1291 at P 43, JA __, as if a statute enacted by one Congress could bar another Congress from taking such an action.  In fact, Congress frequently enacts legislation doing exactly that, as is Congress' constitutional right to do.  *See supra* pp.33–35.  For instance, Congress has enacted legislation changing project boundaries, Swan Lake Hydroelectric Project Boundary Correction Act, Pub. L. No. 115-200, 132 Stat. 1527 (2018); Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat. 991, extending time to commence project construction, Extension of Hydroelectric Project — American Falls Reservoir, Pub. L. No. 113-177, 128 Stat. 1911 (2014); Hydroelectric Project – Deadline Extension, Pub. L. No. 111-60, 123 Stat. 1995 (2009); Extension of Hydroelectric Project Construction—Alaska, Pub. L. 109-297, 120 Stat. 1471 (2006); Extension of Hydroelectric Project Construction—Wyoming, Pub. L. No. 109-298,

120 Stat. 1472 (2006); Extension of Time for FERC Project, Pub. L. No. 107-376, 116 Stat. 3114 (2002); Extension of Commencement of Construction of Hydroelectric Project, Pub. L. No. 105-213, 112 Stat. 884 (1998); Hydroelectric Project, West Virginia, Pub. L. No. 104-246, 110 Stat. 3146 (1996), and authorizing occupation of a national park, Glacier Bay National Park Boundary Adjustment Act of 1998, Pub. L. No. 105-317, 112 Stat. 3002, all without transgressing Section 28. In these cases (and many others), FERC faithfully followed Congress' instructions without reference to Section 28 including because those laws—like the Pensacola Act—did not amend *the Federal Power Act itself*. R.1315, Req. for Reh'g, Attach. 27, JA __.

The Commission's suggestion that the Pensacola Act's requirement that FERC and Licensee mutually consent to any project boundary change constitutes a "substantive amendment[] affecting the Commission's authority" over the Pensacola Project, Order on Remand, R.1291 at P 42, JA __, is a non-starter. FERC's interpretation of Section 28 effectively prohibits Congress from ever limiting FERC's jurisdiction through subsequent legislative action, which no Congress (let alone the Commission) can do. *Dorsey*, 567 U.S. at 274. The Commission

also fails to explain how this mutuality requirement amounts to an "alter[ation], amend[ment], or repeal[]" of the *license*, which the Commission interprets Section 28 to prohibit. This mutuality requirement is consistent with existing license requirements and Section 6 of the Federal Power Act, which provides that a license "may be altered or surrendered *only upon* mutual agreement between the licensee and the Commission." 16 U.S.C. § 799 (emphasis added). FERC's concern that the Pensacola Act's mutuality requirement may affect its authority under Section 10 of the Federal Power Act, Order on Remand, R.1291 at P 42, JA __, is misplaced because the Commission's statutory obligations do not override the protections to a licensee under Section 6. *See, e.g., Pac. Gas & Elec. Co. v. FERC,* 720 F.2d 78, 83 (D.C. Cir. 1983).

Finally, even if Section 28 did apply to preclude the subsequent enactments beyond the scope of the Federal Power Act itself, *contra* 36–38, Section 28 would still not apply here because the Pensacola Act does not "alter, amend, or repeal" any requirement of Licensee's existing license. *See* 16 U.S.C. § 822. In enacting the Pensacola Act, Congress confirmed the status quo that Licensee's Standard Article 5 responsibilities extend only to lands within the project boundary. *See*

*infra* pp.40–51. To the extent that the Commission or this Court disagrees with that interpretation of Standard Article 5's status quo, Congress, which gave FERC authority to issue the license to begin with, has now spoken definitively on the issue, and nothing that Congress said 100 years ago could alter Congress' authority today.

## II. Even Before The Pensacola Act, Standard Article 5 Did Not Require Licensee To Purchase Land Outside Of The Project Boundary

Through the Pensacola Act, Congress already decided that FERC cannot require Licensee to purchase land outside of the project boundary, whether under Standard Article 5 or otherwise. *See supra* 30–33. But even putting the Pensacola Act aside, FERC misinterpreted Standard Article 5 and violated its own settled precedent on the meaning of this provision.

A. When Standard Article 5 requires a licensee to acquire "all lands" "necessary or appropriate for the construction, maintenance, and operation of the project" this applies only to lands within the project boundary, 54 F.P.C. at 1818–19, under the Federal Power Act.

This conclusion follows by simply reading the Federal Power Act and Standard Article 5 together. Section 3(11) defines "project" as "all

water-rights, rights-of-way, ditches, dams, reservoirs, *lands, or interest in lands* the use and occupancy of *which are necessary or appropriate* in the maintenance and operation of" a unit of development. 16 U.S.C. § 796(11) (emphases added). To obtain a license for a project, the licensee must submit "maps, plans, specifications" "required for a full understanding of the proposed project." *Id.* § 802(a)(1). These maps "shall be made a part of the license," and "no change shall be made" until "approved and made a part of the license by the commission." *Id.* Once part of the license, the maps may only be altered "upon mutual agreement between the licensee and the Commission." *Id.* § 799. Standard Article 5 *uses the same terms* as Section 3(11) of the Federal Power Act: the licensee "shall acquire" all lands "necessary or appropriate for the construction, maintenance, and operation of the project." 54 F.P.C. at 1818. This comports with the statutory definition that "project" includes all lands necessary for the maintenance and operation of the project. 16 U.S.C. § 796(11). Simply put, lands not within the project boundary are, by statutory definition, not "necessary or appropriate" for project purposes, and thus outside of Standard Article 5's use of the same "necessary or appropriate" phrase.

FERC regulations are in accord, taking the same position on the scope of the project boundary as the Federal Power Act and Standard Article 5. The contents of a license application must include a map "show[ing] a project boundary enclosing all project works and other features" as in Exhibit A. 18 C.F.R. § 4.41(h)(2). Exhibit A describes the reservoir and power facilities. *Id.* § 4.41(b). That boundary "must enclose only those lands necessary for operation and maintenance of the project and for other project purposes, such as recreation, shoreline control, or protection of environmental resources," as described in the environmental reports required for Exhibit E. *Id.* § 4.41 (h)(2). Other structures may be included "only to the extent that underlying lands are needed for project purposes (e.g., for flowage, public recreation, shoreline control, or protection of environmental resources)." *Id.*

Commission precedent confirms that the project boundary includes all the lands necessary and appropriate for project purposes, the very phrase that Standard Article 5 uses. The "project boundary is to encompass" all lands necessary for the licensee "to carry out its

regulatory responsibilities with respect to the project."[4]  *See, e.g.*, *City of Seattle*, 75 FERC at 62,015 n.11; *Pub. Util. Dist. No. 1 of Chelan Cnty.*, 119 FERC ¶ 61,055, at P 20 (2007) (same).  Further, in *Wisconsin Public Service Commission*, 104 FERC ¶ 61,295 (2003), the licensee sought to remove land from a reservoir's project boundary, including ski trails used for recreational purposes.  *Id.* at p. 62,086, 62,091.  FERC explained that, under Standard Article 5, "[p]roject boundaries" "designate the geographic extent of the lands, waters, works, and facilities . . . for which the licensee must hold the rights necessary to carry out the project purposes."  *Id.* at p. 62,089.  And to "remove lands from a project," the licensee must file an application to amend the license.  *Id.*  FERC followed that procedure by amending the license and removing lands (ski trails) "not necessary for project purposes."  *Id.* at p. 62,091.

Notably, FERC has an established procedure to require licensees to acquire additional property, which first requires bringing the land within the project boundary.  If FERC determines that it needs additional control or "amends the license to expand or add a project purpose," it may

---

[4] For purposes outside of the Commission's regulatory goals, like flood control at the Pensacola Project, FERC has relied on the Corps' exclusive authority.  *Grand River Dam Auth.,* 160 FERC ¶ 61,001, at P 49 n.67.

direct the licensee to obtain additional property rights, and "amend the boundary as appropriate." *City of Holyoke Gas & Elec. Dep't*, 109 FERC ¶ 61,206, at p. 61,972 (2004); *see also Policy Statement on Hydropower Licensing Settlements*, 116 FERC ¶ 61,270, at P 31 (2006). Standard Article 5 only requires licensees to obtain additional or release property rights after such amendment or relicensing. *See N.Y. Power Auth.*, 105 FERC ¶ 61,102, 61587 (2003) (issuing new license); *Penn. Power & Light Co.*, 21 FERC ¶ 61,429, at p. 62,008 (1980) (relicensing); *New England Power Co.*, 9 FERC ¶ 61,322, at p. 61,681 (1979) (issuing new license).

FERC's practice has consistently maintained that any changes to project lands during a license term require a license amendment order that formally approves changes to the project boundary maps. For example, in *PacifiCorp*, 105 FERC ¶ 61,237 (2003), federal, state, and non-governmental organizations reached a complex series of agreements requiring the licensee to undertake certain environmental mitigation measures for their support of a new license. *Id.* at P 15. The Commission ultimately approved the settlement and issued the new license with the settlement's various conditions as amendments to the license. *Id.* at P 114. The Commission cautioned that if the licensee's new

environmental mitigation obligations occur outside the present project boundary, "the licensee will have to request an amendment of the license to include within the project boundary" those other lands.  *Id.*

FERC resolved a similar issue in the Lake Chelan Project licensing. *Pub. Util. Dist. No. 1 of Chelan Cnty.*, 119 FERC ¶ 61,055 (2007).  There, the licensee wanted to delete a license provision requiring that the licensee amend the project boundary to add new lands every five years for the maintenance of wildlife habitats, because a state wildlife agency (rather than the licensee) would manage those lands.  *Id.* at PP 18–19. The Commission denied that request because it only had jurisdiction over the licensee and the "[p]roject boundaries" designated the land "comprising the licensed project and for which the licensee must hold the rights necessary to carry out project purposes."  *Id.* at P 20.

Consistent with this practice, the First Circuit has also held that FERC has no jurisdiction over "non-project" lands—those lands outside the project boundary.  In *Kokajko v. FERC*, 873 F.2d 419 (1st Cir. 1989), the complainant challenged a six-dollar rafting fee charged by the Central Maine Power Company.  But the rafting fee covered both project lands and non-project lands, and as to the project lands, the fee was high

but not unreasonable. *Id.* at 421. FERC expressly noted that "we have no authority over the non-project fee that Central Maine can charge the rafters." *Id.* at 422. Licensee claimed that the Commission did have authority over the entire fee, but the First Circuit disagreed. *Id.* at 422–24. Under the Federal Power Act, the Commission's powers are limited to "projects and project works." *Id.* at 423. Citing FERC decisions, the Court noted the Commission has been "consistent in its refusal to exercise regulatory power over non-project land and facilities." *Id.* Relying on such a Commission decision, the court held that the Commission had no jurisdiction over non-project lands. *Id.* at 423–24 (citing *Sierra Club v. Neb. Pub. Power Dist.,* 53 F.P.C. 1836 (1975)).

B. For the first time in the orders on review, FERC erroneously read into Standard Article 5—a provision dating back to the 1950s and included in all hydropower licenses—an ongoing obligation for the licensee to acquire unidentified lands outside the project boundary that the Commission has never determined to be necessary for the project in an order approving a change in the project maps. Order on Remand, R.1291 at P 54, JA __; Rehearing Order, R.1346 at P 30, JA __. This new obligation is inconsistent with the Federal Power Act, not found in the

text of Standard Article 5, and fails to treat Licensee and numerous other hydropower licensees alike without reasoned explanation.

The Commission's new interpretation of Standard Article 5 does not withstand scrutiny. FERC claimed that because "flood control is a project purpose," Standard Article 5 compels Licensee to acquire non-project land for the Corps' flood control operations. Order on Remand, R.1291 at P 54, JA __. Under the Federal Power Act, the property shown in Exhibit G contains the "full understanding of the proposed project," including all required land, 16 U.S.C. § 802(a)(1), meaning all land "necessary or appropriate" for the project, *id.* § 796(11). Land that is not identified in the license and project boundary cannot be necessary for a project purpose. *See* 18 C.F.R. § 4.41(h)(2). And Standard Article 5's text simply requires that the licensee must "acquire" the "necessary or appropriate" property "within five years" and then "retain" that property. 54 F.P.C. at 1818–19. The Article says nothing about identifying other lands, that by statutory definition, are not necessary or appropriate for the project.

FERC also claims that Standard Article 5's requirements "are not necessarily limited to this project boundary" because the project boundary is a mere "administrative tool." Rehearing Order, R.1407 at

P 30, JA __.  But because FERC is "a creature of statute," the Federal Power Act limits its jurisdiction.  *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (citation omitted).  Again, "[p]roject" only means "all land" "necessary or appropriate" for the maintenance and operation of the project.  16 U.S.C. § 796(11).  The project boundary "designate[s] the geographic extent of the lands" of which "the licensee must hold the rights necessary to carry out the project purposes."  *Wis. Pub. Serv. Corp.*, 104 FERC at 62,089.  And the Commission's jurisdiction only extends to "projects and project works."  *Kokajko*, 873 F.2d at 423.  *Kokajko* shows that although FERC's jurisdiction over a licensee reached the rafting fee (clearly a recreational purpose of the project), its jurisdiction cannot extend beyond the project lands.  *Id.* at 423–24.  Like the First Circuit, this Court should find that the Commission's authority only extends to its regulatory obligations.  *See id.*

FERC's new approach to Standard Article 5 also violates the Administrative Procedure Act by failing to treat like cases alike and departing from agency precedent.  The Commission must supply a reasoned analysis for any departure from previous agency decisions.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 48 (1983). And the agency must "display awareness that it *is* changing decisions." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2007) (emphasis in original). To the extent that the Commission claims to apply "existing policy," it "must explain how an outcome coheres with previous decisions." *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020).

FERC has broken with decades of precedent by reading Standard Article 5 as requiring Licensee to acquire non-project lands. FERC has— so far as the record here reflects—never before required a licensee to acquire property outside the project boundary under Standard Article 5 in the absence of an order amending the approved project maps and plans. *See generally Pub. Util. Dist. No. 1 of Chelan Cnty.*, 119 FERC ¶ 61,055 (2007). FERC also has not explained why it changed its established procedure by directing a licensee to obtain property rights in non-project lands without amending the project boundary. *See City of Holyoke Gas & Elec. Dep't,* 109 FERC ¶ 61,206, at P 17. And the Order on Remand shows no self-awareness that the Commission changed positions, which violates the Administrative Procedure Act. *Fox Television Stations*, 556 U.S. at 515.

FERC's claims that its orders here are consistent with past practice fail. Rehearing Order, R.1407 at P 31 n.84, JA __. None of the cited cases above, *supra* 42–45, or those cited in its orders support that proposition. In *Appalachian Power Company*, 112 FERC ¶ 61,026 (2005), FERC only held that Standard Article 5 does not alter property rights. *Id.* at P 89. In *Menominee Company*, 74 FERC ¶ 61,023 (1996), FERC approved deviations from Standard Article 5's requirements to permit a license transfer. *Id.* at p. 61,066–61,067. And in issuing a new license, the Commission had no reason to "require the [licensee] to acquire further property rights on all those parcels of project lands." *Pub. Util. Dist. No. 1 of Chelan Cnty.*, 15 FERC ¶ 62,168, at p. 63,279.

By failing to abide by its longstanding practice, the Commission has treated other hydropower licensees more favorably because Licensee must now attempt to identify lands outside the project boundary to acquire that land at great expense. Other hydropower plants need not acquire lands that fall outside of the project boundary. *See supra* 40–46. FERC has wrongly maintained that its orders are consistent with past practice, and, thus, it has neither provided a reasoned explanation for its policy shift nor displayed awareness that it changed its policy as the

Administrative Procedure Act requires. *Fox Television Stations*, 556 U.S. at 515–16.

### III. FERC Violated This Court's Mandate And Implicated Takings Clause Concerns By Refusing To Determine If The Corps—And Not Licensee—Caused All The Disputed Flooding

A. An agency faced with a remand order has a duty to respond to the specific issues remanded. *Tex Tin*, 992 F.2d at 355; *Ass'n. of Civilian Technicians v. Fed. Lab. Rels. Auth.*, 370 F.3d 1214, 1223 (D.C. Cir. 2004). This Court explained that FERC, on remand, had to: "determine the role of the Corps in this imbroglio, the responsibility [Licensee] bears if it caused flooding in the City, analyze the evidence petitioner has produced, and finally interpret the Pensacola Act." *City of Miami*, 22 F.4th at 1044.

Licensee introduced evidence to FERC showing that natural events and the Corps—not Licensee —caused the disputed flooding in the course of the Corps' flood control operations, for the benefit of the entire Arkansas River System. Licensee produced the H&H Modeling Study—an extensive, years-long study performed under the direction of FERC staff and designed specifically to isolate the effects of Licensee's

operations at the Pensacola Dam.  Hydrologic and Hydraulic Modeling Study, Project No.1494-438 ("H&H Modeling Study"), R.227, Attach. A, JA ___.  To determine these effects, the H&H Modeling Study created two models: first, an operations model that captured both Licensee's operations during normal surface elevations at Grand Lake and the Corp's flood control operations, and second, a comprehensive hydraulic model to calculate inundation and flood routing specifics like frequency, timing, amplitude, and duration.  *Id.*, R.227, Attachment A at 4–6, JA __.  The H&H Modeling Study also includes a flood frequency analysis showing the peak inflows observed at the Pensacola Dam during a series of flood events over a series of starting elevations of Grant Lake.  *Id.*, R.227, Attachment A at 18, JA __.  Collectively, these models quantify the effects of Licensee's manipulation of Grand Lake surface elevations before the initiation of flood control operations.  *Id.*, R.227, Attachment A at 4–6, JA __.  FERC approved this study on the basis that it "would determine the extent of the flooding that is attributable to project operation and support and analysis of project related flooding."  Study Plan Determination for the Pensacola Hydroelectric Project, R.232, App. B., at p. B-2, JA __.  The study concludes that Licensee's operations at

the Pensacola Dam have an "immaterial impact" on the frequency, timing, amplitude, and duration of flooding in and around Miami. *Id.,* R.232 at § 4.1.2 (Upstream Model), JA __.

FERC, however, refused to analyze "the responsibility [Licensee] bears *if it caused flooding in the City*," including not addressing the H&H Modeling study or commissioning any study of its own to determine whether the Corps is "*deus ex machina*" with regard to the disputed flooding. *City of Miami*, 22 F.4th at 1042, 44 (first emphasis added). FERC has alleged that "the project has increased flooding around the City," Order on Remand, R.1291 at P 56, JA __, but it has not even attempted to decide if this is all the Corps' doing. In the Rehearing Order, FERC explained that "upon its review of all the evidence, the Commission concluded that flooding around [Miami] has increased since construction of the project." Rehearing Order, R.1407 at P 45, JA __. That says nothing about what entity caused any flooding. *Id.*, R.1407 at P 47, JA __. In the Commission's view, because flood control is a purpose of the dam, it is Licensee's responsibility to "acquire adequate property rights" for the Corps' damages. *Id.*

B. There are two problems with the Commission's refusal to determine whether the Corps has caused the disputed flooding.

First, FERC violated this Court's explicit directive to determine the responsibility Licensee "bears if it caused flooding in the City," *City of Miami*, 22 F.4th at 1044. This is a core factual dispute, as evidenced by the voluminous studies in the record, but FERC will simply not do the work and "analyze" the evidence. The Commission's failure to obey the Court's remand order warrants reversal. *Tex Tin Corp.*, 992 F.2d at 355.

Second, FERC's failure to consider whether the Corps was "*deus ex machina*," *City of Miami*, 22 F.4th at 1042, with responsibility for the flooding under these circumstances ignores an "important aspect of the problem," *State Farm*, 463 U.S. at 43. Requiring a party to acquire land because a different party—including, here, a federal agency—caused flooding on that land implicates grave constitutional concerns under the Takings Clause, as the D.C. Circuit itself suggested. *See City of Miami*, 22 F.4th at 1043.

Under the Fifth Amendment's Takings Clause, "[w]hen the government wants to take private property to build . . . public projects, it must compensate the owner at fair market value." *Sheetz v. Cnty. of El*

*Dorado*, 601 U.S. 267, 273 (2024).  The Takings Clause prevents the government from "forcing some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole."  *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001) (citation omitted).  Additionally, "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  Whether such a "regulatory taking may be compensable" turns on a number of factors, including "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations."  *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).  And whether the government's action "amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good'" is also relevant.  *Lingle*, 544 U.S. at 537 (quoting *id.*).

FERC's failure to determine whether the Corps has caused the disputed flooding creates serious concerns under the Taking Clause.  The orders on review find that the "project has increased flooding around"

Miami and require Licensee to "file a report that analyzes the lands affected by flooding upstream of the project." Order on Remand, R.1291 at P 68, JA __. At the next step, FERC has made clear that it will order Licensee to acquire the necessary property rights to property identified in the report. But "[t]here is no ground for holding [the government's] agent liable who is simply acting under the authority thus validly conferred." *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 22 (1940). The Commission's order—if affirmed—implicates a direct appropriation of Licensee's personal property to acquire lands due to flooding that Licensee had no responsibility in causing. *City of Miami*, 22 F.4th at 1043 (citing *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012)).

At a minimum, FERC's failure to consider whether the Corps caused the disputed flooding threatens to impose a regulatory taking by upsetting Licensee's reasonable expectations. First, Licensee previously operated with the understanding that the Corps bears exclusive responsibility for acquiring the lands necessary for its flood control program. *See Penn Cent.*, 438 U.S. at 124–25. As seen here, Licensee's financial liabilities may increase by $150 million—to acquire land that it

always expected the Corps would do, as Congress instructed in the 1938 and 1941 Acts. Second, FERC's order here also expands the scope of Standard Article 5 to require an ongoing obligation to acquire non-project lands for any and all project purposes. *Id.* at 125. That means that Licensee must now constantly be on the lookout for a complaint to require it to increase its lands for recreational, environmental, and other "project" purposes. This new Standard Article 5 interpretation will increase litigation and uncertainty that will impact ratepayers and require them to "bear public burdens" that "should be borne by the public as a whole." *Palazzolo*, 533 U.S. at 617–18 (citation omitted). Licensee's expectations about the costs and liabilities were set long ago, and the Commission's orders on review have "interfered with distinct investment-backed expectations." *Penn Cent.*, 438 U.S. at 124.

## IV. Congress Gave The Corps Exclusive Responsibility To Purchase Land Outside Of The Pensacola Project's Boundary

The Commission determined that the Corps' flood control obligations at the Pensacola Project are "limited to directing flood operations at the project" and do not include acquiring property affected by those operations. Order on Remand, R.1291 at PP 2, 50–51, JA __.

The Commission concluded that Licensee must acquire property to support the Corps' flood control operations at the Pensacola Project.  In so holding, the Commission disregards the 1938 and 1941 Acts and 85 years of history, which demonstrate that the Corps has sole responsibility to acquire property necessary for its flood control operations.

A. "[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

In the 1938 and 1941 Acts, Congress conferred exclusive authority and responsibility upon the Corps to acquire properties above elevation 750 feet necessary to support its flood control operations at the Pensacola Project.  The 1938 Act, which authorized the Pensacola Project, authorizes and directs the Corps to acquire "all lands, easements, and rights of way necessary for any dam and reservoir project . . . with funds heretofore or hereafter appropriated or made available for such projects." *See* Pub. L. No. 75-761, § 2, 52 Stat 1215.  The 1941 Act similarly confers sole jurisdiction over flood control at the Pensacola Project to the Corps and obligates the Corps to acquire lands necessary for it.  *See* Pub. L. No. 77-228, 55 Stat. at 638, 643.

Congress repeatedly enacted legislation giving Licensee responsibility over the Pensacola Project only up to 750 feet, *see* Pub. L. No. 76-597, 54 Stat. 303 (1940); Pub. L. No. 79-573, § 3, 60 Stat. at 744. Congress also required the Corps to acquire property needed to support its flood control operations. *See* Water Resources Development Act of 1996, Pub. L. No. 104-03, § 560(a)–(b), 110 Stat. 3658, at 3783–84 (1996).

Notably, neither the 1938 nor 1941 Acts grant the Commission authority over flood control or property acquisition to further that flood control at the Pensacola Project.

The 1938 and 1941 Acts—which authorized the Pensacola Project— provide only the Corps with authority over flood control operations at the Pensacola Project and, pursuant to that authority, the obligation to acquire any land necessary to further flood control at the Pensacola Project. By failing to confer such flood control authority to the Commission, those Acts necessarily demonstrate that FERC lacks that same authority because an agency only has the powers that Congress has given to it. *See La. Pub. Serv. Comm'n*, 476 U.S. at 374.

Consistent with Congress' commands, the Corps has promulgated numerous regulations enforcing its exclusive jurisdiction over flood

control at 745 feet. Specifically, "[w]henever the pool stage exceeds elevation 745 at the dam, the discharge facilities shall be operated under the direction of the District Engineer." 33 C.F.R. § 208.25. The Corps also issued Licensee a schedule that similarly explained that below elevation 745 feet, "[h]ydropower release[s] will be made by" Licensee but if "the pool [ ] exceed[s an] elevation of 745 [feet], the Corps may direct that flood control releases be made." Req. for Reh'g, Attach. 25, *Water Control Manual*, Table 7-1, at p. 7-4 (When the reservoir exceeds elevation "745 [feet and is] forecasted to exceed 755 [feet Pensacola Datum]," the Corps will direct "releases [ ] to reduce as much as practical the flood damage below the dam . . . ."), R.1314. In other words, the Corps has always exercised its obligation to direct flood control at the Pensacola Project at 745 feet.

FERC has also recognized the Corps' exclusive authority—and, in turn, its own lack of authority—over flood control. In 2017, the Commission noted that "the Corps maintains *exclusive* jurisdiction over operations within the flood pool." *Grand River Dam Auth.,* 160 FERC ¶ 61,001, at P 49 n.67 (emphasis added). It has also noted that flood conditions are "under the purview of the U.S. Army Corps of Engineers."

*Grand River Dam Auth.,* 67 FERC ¶ 62,239, at p. 64,431 (1994); *see also* Project No. 1494-438, Accession No. 20181024-5162 (filed Oct. 24, 2018) ("The Corps believes discussions regarding changes in the flood control operations are outside the scope of this relicensing process and beyond the jurisdiction and authority of the Federal Energy Regulatory Commission."). And the Commission had never required Licensee to acquire non-project lands for the Corps' responsibilities. *See Grand River Dam Auth.,* 160 FERC ¶ 61,001, at P 49.

In all, the Corps may regulate regarding flood control—including land acquisition in furtherance of flood control—and the Commission cannot. *See La. Pub. Serv. Comm'n*, 476 U.S. at 374; *accord Col. R. Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 139 (D.C. Cir. 2006). Yet, for the first time in the Pensacola Project's long history, the Commission attempts to exercise flood-control authority over the Pensacola Project.

B. The Commission's claims that the Corps does not have the exclusive responsibility to acquire property necessary to its flood control responsibilities fall flat. The Commission cannot rely on Congressional

silence about the Corps' pre-existing statutory duties or its command to convey property from the Corps to Licensee.

First, the Commission relied on the absence of Congress reaffirming the Corps statutory responsibility to acquire property in the later Flood Control Act of 1944. The Commission believes that Congress' omission "represent[s] a shift in the legislative authority . . . , moving [ ] away from land rights acquisition and toward defining the role of the Corps and the licensees without regard to the ownership of land rights." Rehearing Order, R.1407 at P 25, JA __. And the Commission also posited that the Corps is not responsible for property acquisition because Congress has not provided it funding to acquire such property.

The Commission most heavily relied on the Flood Control Act of 1944 failing to contain an express authorization because the Corps promulgated many regulations regarding the Pensacola Project under that Act. Rehearing Order, R.1407 at P 26, JA __. But that statute does not revoke the 1938 or 1941 Act's previous authorizations. *See* 33 U.S.C. § 709 ("[I]t shall be the duty of the Secretary of the Army to prescribe regulations for the use of storage allocated for flood control[.]"). The 1944

Act has no effect on the Corps' preexisting and exclusive duty to obtain property rights for its flood control operations.

The Commission fails to explain why the Corps needed additional Congressional authorization. Congress previously directed the Corps to acquire properties needed for flood control at this Project numerous times. *Supra* 9–15. The 1938 and 1941 Acts—which, again, authorized the Pensacola Project—remain in effect and impose an ongoing responsibility on the Corps to acquire those properties that are necessary for its flood control operations. That more recent legislation is silent on the Corps' previous obligation to acquire property for flood control means nothing—the 1938 and 1941 Acts had already spoken. Congress need not repeat its direction in each statute. *See Burns v. United States*, 501 U.S. 129, 136 (1991).

The Commission similarly cannot "infer that Congress has implicitly repealed or suspended statutory mandates based simply on the amount of money Congress has appropriated." *In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (citing *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978)). That inference violates the "cardinal rule . . . that repeals by implication are not favored." *Tenn Valley Auth.*, 437 U.S. at

189 (alteration in original) (citation omitted). "In the absence of some affirmative showing of an intention to repeal" or that the relevant statutes are "irreconcilable," the Commission must apply the 1938 and 1941 Acts. *Morton*, 417 U.S. at 550. With no subsequent statutory support, the Commission's suggestion that Congress repealed the Corps' responsibility for property acquisition lacks merit.

Further, to the extent that the Commission required confirmation of the Corps' ongoing obligation to acquire additional property, Congress provided it in the Pensacola Act. There, Congress explicitly referenced the Corps' obligations pursuant to the "Flood Control Act of 1938" and its "obligation" to "obtain" and "acquire flowage or other property rights" under various other statutory confirmations. 2020 NDAA, § 7612(e). Congress left no doubt that the Corps' exclusive duty to acquire property necessary for its flood control operation continues.

Second, to support its position that Congress absolved the Corps of its responsibility, the Commission erroneously relied on the WIIN Act's directive that the Corps convey certain property rights to Licensee. The WIIN Act—enacted simply to alleviate an administrative burden—does not speak at all to the Corps' statutory obligation to *acquire* properties

necessary to support its own flood operations. It does not repeal the property acquisition requirements of the 1938 and 1941 Acts; it merely creates an exception to the Corps' responsibility to *retain* properties by conveying them to Licensee. WIIN Act, § 1321(c).

To the extent that the WIIN Act gives any indication of Congress' intent, its reference to the Corps' obligations under Acts of 1938 and 1941 confirms that the Corps must generally acquire and maintain property interests necessary to support its flood control obligations. *See id.* (requiring the Corps to convey certain property "[n]otwithstanding the [1938 Act], as amended by section 3 of the [1941 Act])." And, again, the Pensacola Act—enacted after the WIIN Act—reaffirms the Corps' property acquisition responsibilities. Thus, the WIIN Act does not support the Commission's new-found position.

Both the 1938 and 1941 Acts apply: the Corps has exclusive responsibility over flood control at the Pensacola Project, including the responsibility to acquire land necessary to fulfill that responsibility. As a result, FERC cannot require Licensee to acquire non-project properties needed to further the Corps' flood control obligations.

## CONCLUSION

This Court should vacate the Commission's orders, make clear that the Corps is responsible for acquiring any lands outside of the project boundary and remand with instructions for FERC to dismiss Miami's complaint.

Dated: October 18, 2024

Respectfully Submitted,

Charles R. Sensiba
Elizabeth J. McCormick
TROUTMAN PEPPER HAMILTON
SANDERS LLP
401 9th Street, NW
Suite 1000
Washington, DC 20004
(202) 274-2850 (CS)
charles.sensiba@troutman.com
elizabeth.mccormick@troutman.com

Dabney J. Carr
Jeff P. Johnson
TROUTMAN PEPPER HAMILTON
SANDERS LLP
1001 Haxall Point
15th Floor
Richmond, VA 23219
(804) 697-1200
dabney.carr@troutman.com
jeff.johnson@troutman.com

/s/Misha Tseytlin
Misha Tseytlin
*Counsel of Record*
TROUTMAN PEPPER HAMILTON
SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

Anais M. Jaccard
TROUTMAN PEPPER HAMILTON
SANDERS LLP
301 S. College Street
34th Floor
Charlotte, NC 28202.
(704) 998-4050
anais.jaccard@troutman.com
*Attorneys for Grand River Dam Authority*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify the following:

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,954 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using the 2013 version of Microsoft Word in 14-point Century Schoolbook font.

Dated: October 18, 2024

/s/Misha Tseytlin
MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1939 (fax)
misha.tseytlin@troutman.com

# ADDENDUM OF STATUTES AND REGULATIONS

# TABLE OF CONTENTS FOR ADDENDUM
## OF STATUTES AND REGULATIONS

**Statutes**

5 U.S.C. § 706 ...................................................A1

16 U.S.C. § 796(11)...........................................A1

16 U.S.C. § 802 ................................................A2

Flood Control Act of 1938, Pub. L. No. 75-761, § 2,
    52 Stat. 1215, 1218 (1938) ........................A3

Flood Control Act of 1941, Pub. L. No. 77-228, § 4,
    55 Stat. 638, 645 (1941) ............................A4

Pensacola Act, National Defense Authorization Act
    for Fiscal Year 2020, Pub. L. No. 116-92, § 7612,
    133 Stat 1198, 2312 (2019) ......................A7

**Regulations**

18 C.F.R. § 4.41(a), (b), (h) ..............................A11

**5 U.S.C. § 706, Scope of Review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

* * *

**16 U.S.C. § 796(11), Definitions**

The words defined in this section shall have the following meanings for purposes of this chapter, to wit:

. . .

> (11) "project" means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay reservoirs directly connected therewith, the primary line or lines transmitting power therefrom to the point of junction with the distribution system or with the interconnected primary transmission system, all miscellaneous structures used and useful in connection with said unit or any part thereof, and all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit;

* * *

**16 U.S.C. § 802. Information to accompany application for license; landowner notification**

(a) Each applicant for a license under this chapter shall submit to the commission--

(1) Such maps, plans, specifications, and estimates of cost as may be required for a full understanding of the proposed project. Such maps, plans, and specifications when approved by the commission shall be made a part of the license; and thereafter no change shall be made in said maps, plans, or specifications until such changes shall have been approved and made a part of such license by the commission.

(2) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting and distributing power, and in any other business necessary to effect the purposes of a license under this chapter.

(3) Such additional information as the commission may require.

(b) Upon the filing of any application for a license (other than a license under section 808 of this title) the applicant shall make a good faith effort to notify each of the following by certified mail:

(1) Any person who is an owner of record of any interest in the property within the bounds of the project.

(2) Any Federal, State, municipal or other local governmental agency likely to be interested in or affected by such application.

* * *

# Flood Control Act of 1938, Pub. L. No. 75-761, § 2, 52 Stat. 1215 (1938)

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That, hereafter, Federal investigations and improvements of rivers and other waterways for flood control and allied purposes shall be under the jurisdiction of and shall be prosecuted by the War Department under the direction of the Secretary of War and supervision of the Chief of Engineers, and Federal investigations of watersheds and measures for run-off and waterflow retardation and soil erosion prevention on watersheds shall be under the jurisdiction of and shall be prosecuted by the Department of Agriculture under the direction of the Secretary of Agriculture, except as otherwise provided by Act of Congress.

Sec. 2. That section 3 of the Act of June 22, 1936 (Public, Numbered 738, Seventy-fourth Congress), as heretofore amended and as herein further modified, shall apply to all flood control projects, except as otherwise specifically provided by law.

That in case of any dam and reservoir project, or channel improvement or channel rectification project for flood control, herein authorized or heretofore authorized by the Act of June 22, 1936 (Public, Numbered 738, Seventy-fourth Congress), as amended, and by the Act of May 15, 1928 (Public, Numbered 391, Seventieth Congress) as amended by the Act of June 15, 1936 (Public, Numbered 678, Seventy-fourth Congress), as amended, title to all lands, easements, and rights-of-way for such project shall be acquired by the United States or by States, political subdivisions thereof or other responsible local agencies and conveyed to the United States, and provisions (a), (b), and (c) of section 3 of said Act of June 22, 1936, shall not apply thereto. Notwithstanding any restrictions, limitations, or requirement of prior consent provided by any other Act, the Secretary of War is hereby authorized and directed to acquire in the name of the United States title to all lands, easements, and rights-of-way necessary for any dam and reservoir project or channel improvement or channel rectification project for flood control, with funds heretofore or here after appropriated or made available for such projects, and States, political subdivisions thereof, or other responsible local agencies, shall be

granted and reimbursed, from such funds, sums equivalent to actual expenditures deemed reasonable by the Secretary of War and the Chief of Engineers and made by them in acquiring lands, easements, and rights-of-way for any dam and reservoir project, or any channel improvement or channel rectification project for flood control heretofore or herein authorized: *Provided*, That no reimbursement shall be made for any indirect or speculative damages: *Provided further*, That lands, easements and rights-of-way shall include lands on which dams, reservoirs, channel improvements, and channel rectifications are located; lands or flowage rights in reservoirs and highway, railway, and utility relocation.

\* \* \*

## Flood Control Act of 1941, Pub. L. No. 77-228, § 4, 55 Stat. 638, 645 (1941)

SEC. 4. The Secretary of War is hereby authorized and directed to cause preliminary examinations and surveys for flood control, to he made under the direction of the Chief of Engineers, in drainage areas of the United States and its territorial possessions, which include the following-named localities, and the Secretary of Agriculture is authorized and directed to cause preliminary examinations and surveys for run-off and water-flow retardation and soil erosion prevention on such drainage areas; the cost thereof to be paid from appropriations heretofore or hereafter made for such purposes: *Provided*, That after the regular or formal reports made on any examination, survey, project, or work under way or proposed are submitted to Congress no supplemental or additional report or estimate shall be made unless authorized by law except that the Secretary of War may cause a review of any examination or survey to be made and a report thereon submitted to the Congress if such review is required by the national defense or by changed physical or economic conditions: *And provided further*, That the Government shall not be deemed to have entered upon any project for the improvement of any waterway or harbor mentioned in this Act until the project for the proposed work shall have been adopted by law:

Barren River, Kentucky and Tennessee, with special reference to a dam in the vicinity of a site known as Barren No. 2.

Byram River and tributaries, Connecticut.

Blind Brook and tributaries, New York. Mamaroneck and Sheldrake Rivers and their tributaries, New York.

Bronx River and tributaries, New York.

Hutchinson River and tributaries, New York.

Saw Mill River and tributaries, New York.

Garden Creek, Mathews County, Virginia.

Indian River, Zipper Saint Johns River and Marsh, and North Fork, Saint Lucie River, and their tributaries, the Kissimmee River and its tributaries, Florida.

Red River in the vicinity of Shreveport, Louisiana, with a view to determining the advisability of providing bank-protection works.

Polecat Creek, Creek County, Oklahoma.

Walnut Creek, Love and Carter Counties, Oklahoma.

Rio Grande and tributaries, New Mexico.

Mimbres River and tributaries, New Mexico.

Pearl River, Mississippi.

Lake Pontchartrain, Louisiana, from the Orleans-Jefferson Parish line westward and northward to the vicinity of Frenier.

Black River, Catahoula and Concordia Parishes, Louisiana.

Dogy and Clear Creeks, tributaries of the Arkansas River, Oklahoma.

Salt Creek of the Arkansas River and tributaries, Osage County, Oklahoma.

Red River of the North Drainage Basin, Minnesota, South Dakota, and North Dakota.

Inlets and outlets to Lake Hendricks, South Dakota and Minnesota.

North Fork and South Fork of the Shoshone River and their tributaries, Wyoming.

Emery River and tributaries, Tennessee.

Redstone and Dunlap Creeks and tributaries, Pennsylvania.

West Fork River and tributaries, West Virginia, with a view to determining the advisability of constructing a system of multiple use reservoirs.

Milwaukee River and tributaries, Wisconsin.

Little Calumet River and tributaries, Indiana.

Little Black River and tributaries, Michigan.

Sturgeon and Otter Rivers, and their tributaries, Michigan.

Cuyahoga River and tributaries, Ohio.

Big Sur River and Carmel River, and their tributaries, Monterey County, California.

Laguna Canyon, California.

All streams in San Diego County, California, flowing into the Pacific Ocean.

All streams in San Diego and Imperial Counties, California, flowing into the Salton Sea.

Coyote River and tributaries, California.

San Francisquito Creek, San Mateo and Santa Clara Counties, California.

Alhambra Creek and tributaries, California.

Matadero Creek, Santa Clara County, California.

Novato Creek and its tributaries, Marin County, California.

Petaluma Creek and tributaries, Sonoma County, California.

Guadalupe River and tributaries, California.

Silvies River and tributaries, Oregon.

Columbia River and tributaries, Washington, from the downstream point of Vancouver Lake to upstream point of Bachelor Island.

Salmon Creek, in the vicinity of Juneau, Alaska.

Yaguez, Estero, Portuguez, Bucana, Lapa, Guamani. Chico, Maunabo, Quebrada Arena, and Susua Rivers, and tributaries, Puerto Rico.

Creque Gut and Fair Plain Gut and their tributaries, Island of Saint Croix, and of Turpentine Run, and Crown Mountain water courses and their tributaries, Island of Saint Thomas, Virgin Islands.

\* \* \*

**Pensacola Act, National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, § 7612, 133 Stat 1198, 2312 (2019)**

SEC. 7612. PENSACOLA DAM AND RESERVOIR, GRAND RIVER, OKLAHOMA.

(a) DEFINITIONS.—In this section:

(1) COMMISSION.—The term "Commission" means the Federal Energy Regulatory Commission.

(2) CONSERVATION POOL.—The term "conservation pool" means all land and water of Grand Lake O' the Cherokees, Oklahoma, below the flood pool.

(3) FLOOD POOL.—The term "flood pool" means all land and water of Grand Lake O' the Cherokees, Oklahoma, allocated for flood control or navigation by the Secretary pursuant to section 7 of the Flood Control Act of 1944 (33 U.S.C. 709).

(4) PROJECT.—The term "project" means the Pensacola Hydroelectric Project (FERC No. 1494).

(5) SECRETARY.—The term "Secretary" means the Secretary of the Army.

(b) CONSERVATION POOL MANAGEMENT.—

(1) FEDERAL LAND.—Notwithstanding section 3(2) of the Federal Power Act (16 U.S.C. 796(2)), any Federal land within the project boundary, including any right, title, or interest in or to land held by the United States for any purpose, shall not—

(A) be subject to the first proviso in section 4(e) of the Federal Power Act (16 U.S.C. 797(e)); or

(B) be considered to be—

(i) land or other property of the United States for purposes of recompensing the United States for the use, occupancy, or enjoyment of the land under section 10(e)(1) of that Act (16 U.S.C. 803(e)(1)); or

(ii) land of the United States for purposes of section 24 of that Act (16 U.S.C. 818).

(2) LICENSE CONDITIONS.—

(A) IN GENERAL.—Except as may be required by the Secretary to carry out responsibilities under section 7 of the Flood Control Act of 1944 (33 U.S.C. 709), the Commission or any other Federal or State agency shall not include in any license for the project any condition or other requirement relating to—

(i) surface elevations of the conservation pool; or

(ii) the flood pool (except to the extent it references flood control requirements prescribed by the Secretary).

(B) EXCEPTION.—Notwithstanding subparagraph (A), the project shall remain subject to the Commission's rules and regulations for project safety and protection of human health.

(3) PROJECT SCOPE.—

(A) LICENSING JURISDICTION.—The licensing jurisdiction of the Commission for the project shall not extend to any land or water outside the project boundary.

(B) OUTSIDE INFRASTRUCTURE.—Any land, water, or physical infrastructure or other improvement outside the project boundary shall not be considered to be part of the project.

(C) BOUNDARY JURISDICTION AMENDMENTS.—The Commission may, consistent with the requirements of the Federal Power Act, amend the project boundary, only with the expressed written agreement of the project licensee. If the licensee does not agree to a project boundary change proposed by the Commission, the purposes and requirements of part I of the Federal Power Act (16 U.S.C. 791a et seq.) shall be deemed to be satisfied without the Commission's proposed boundary or jurisdiction change.

(c) EXCLUSIVE JURISDICTION OF FLOOD POOL MANAGEMENT.— The Secretary shall have exclusive jurisdiction and responsibility for management of the flood pool for flood control operations at Grand Lake O' the Cherokees.

(d) STUDY OF UPSTREAM INFRASTRUCTURE.—Not later than 90 days after the date of the enactment of this Act, the Secretary shall initiate a study of infrastructure and lands upstream from the project to evaluate resiliency to flooding. Not later than one year after initiating the study, the Secretary shall issue a report

advising local communities and State departments of transportation of any identified deficiencies and potential mitigation options.

(e) SAVINGS PROVISION.—Nothing in this section affects, with respect to the project—

(1) any authority or obligation of the Secretary or the Chief of Engineers pursuant to section 2 of the Act of June 28, 1938 (commonly known as the "Flood Control Act of 1938") (33 U.S.C. 701c–1);

(2) any authority of the Secretary or the Chief of Engineers pursuant to section 7 of the Act of December 22, 1944 (commonly known as the "Flood Control Act of 1944") (33 U.S.C. 709);

(3) any obligation of the United States to obtain flowage or other property rights pursuant to the Act of July 31, 1946 (60 Stat. 743, chapter 710);

(4) any obligation of the United States to acquire flowage or other property rights for additional reservoir storage pursuant to Executive Order 9839 (12 Fed. Reg. 2447; relating to the Grand River Dam Project);

(5) any authority of the Secretary to acquire real property interest pursuant to section 560 of the Water Resources Development Act of 1996 (Public Law 104–303; 110 Stat. 3783);

(6) any obligation of the Secretary to conduct and pay the cost of a feasibility study pursuant to section 449 of the Water Resources Development Act of 2000 (Public Law 106–541; 114 Stat. 2641);

(7) the National Flood Insurance Program established under the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), including any policy issued under that Act; or

(8) any disaster assistance made available under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42

U.S.C. 5121 et seq.) or other Federal disaster assistance program.

\* \* \*

## 18 C.F.R. § 4.41(a), (b), (h). Contents of application

Any application under this subpart must contain the following information in the form prescribed:

(a) Initial statement.

Before the Federal Energy Regulatory Commission

Application for License for Major Unconstructed Project or Major Modified Project

(1) [Name of applicant] applies to the Federal Energy Regulatory Commission for a [license or new license, as appropriate] for the [name of project] water power project, as described in the attached exhibits. [Specify any previous FERC project number designation.]

(2) The location of the proposed project is:

State or territory:  ................

County: ......................

Township or nearby town: ...........

Stream or other body of water: ........

(3) The exact name, business address, and telephone number of the applicant are:

(4) The applicant is a (citizen of the United States, association of citizens of the United States, domestic corporation, municipality, or State, as appropriate) and (is/is not) claiming preference under section 7(a) of the Federal Power Act. See 16 U.S.C. 796.

(5)(i) The statutory or regulatory requirements of the state(s) in which the project would be located and that affect the project as proposed with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes, and with respect to the right to engage in the business of developing, transmitting, and distributing power and in any other business necessary to accomplish the purposes of the license under the Federal Power Act, are: [provide citation and brief identification of the nature of each requirement; if the applicant is a municipality, the applicant must submit copies of applicable state or local laws or a municipal charter or, if such laws or documents are not clear, any other appropriate legal authority, evidencing that the municipality is competent under such laws to engage in the business of developing, transmitting, utilizing, or distributing power.]

(ii) The steps which the applicant has taken, or plans to take, to comply with each of the laws cited above are: [provide brief description for each requirement]

(b) Exhibit A is a description of the project. If the project includes more than one dam with associated facilities, each dam and the associated component parts must be described together as a discrete development. The description for each development must contain:

(1) The physical composition, dimensions, and general configuration of any dams, spillways, penstocks, powerhouses, tailraces or other structures proposed to be included as part of the project;

(2) The normal maximum water surface area and normal maximum water surface elevation (mean sea level), gross storage capacity of any impoundments to be included as part of the project;

(3) The number, type and rated capacity of any proposed turbines or generators to be included as part of the project;

(4) The number, length, voltage and interconnections of any primary transmission lines proposed to be included a part of the project [See 16 U.S.C. 796(11)];

(5) The description of any additional mechanical, electrical, and transmission equipment appurtenant to the project; and

(6) All lands of the United States, including lands patented subject to the provisions of section 24 of the Act, 16 U.S.C. 818, that are enclosed within the project boundary described under paragraph (h) of this section (Exhibit G), identified and tabulated by legal subdivisions of a public land survey, by the best available legal description. The tabulation must show the total acreage of the lands of the United States within the project boundary.

. . .

(h) Exhibit G is a map of the project that must conform to the specifications of § 4.39. In addition, to the other components of Exhibit G, the Applicant must provide the project boundary data in a geo-referenced electronic format—such as ArcView shape files, GeoMedia files, MapInfo files, or any similar format. The electronic boundary data must be positionally accurate to ±40 feet, in order to comply with the National Map Accuracy Standards for maps at a 1:24,000 scale (the scale of USGS quadrangle maps). The electronic exhibit G data must include a text file describing the map projection used (i.e., UTM, State Plane, Decimal Degrees, etc.), the map datum (i.e., feet, meters, miles, etc.). Three sets of the maps must be submitted on compact disk or other appropriate electronic media. If more than one sheet is used for the paper maps, the sheets must be numbered consecutively, and each sheet must bear a small insert sketch showing the entire project and indicate that portion of the project depicted on that sheet. Each sheet must contain a minimum of three known reference points. The latitude and longitude coordinates, or state plane coordinates, of each reference point must be shown. If at any time after the application is filed there is any change in the project boundary, the applicant must submit, within 90 days following the completion of project

construction, a final exhibit G showing the extent of such changes. The map must show:

(1) Location of the project and principal features. The map must show the location of the project as a whole with reference to the affected stream or other body of water and, if possible, to a nearby town or any other permanent monuments or objects, such as roads, transmission lines or other structures, that can be noted on the map and recognized in the field. The map must also show the relative locations and physical interrelationships of the principal project works and other features described under paragraph (b) of this section (Exhibit A).

(2) Project boundary. The map must show a project boundary enclosing all project works and other features described under paragraph (b) of this section (Exhibit A) that are to be licensed. If accurate survey information is not available at the time the application is filed, the applicant must so state, and a tentative boundary may be submitted. The boundary must enclose only those lands necessary for operation and maintenance of the project and for other project purposes, such as recreation, shoreline control, or protection of environmental resources (see paragraph (f) of this section (Exhibit E)). Existing residential, commercial, or other structures may be included within the boundary only to the extent that underlying lands are needed for project purposes (e.g., for flowage, public recreation, shoreline control, or protection of environmental resources). If the boundary is on land covered by a public survey, ties must be shown on the map at sufficient points to permit accurate platting of the position of the boundary relative to the lines of the public land survey. If the lands are not covered by a public land survey, the best available legal description of the position of the boundary must be provided, including distances and directions from fixed monuments or physical features. The boundary must be described as follows:

(i) Impoundments.

(A) The boundary around a project impoundment must be described by one of the following:

(1) Contour lines, including the contour elevation (preferred method);

(2) Specified courses and distances (metes and bounds);

(3) If the project lands are covered by a public land survey, lines upon or parallel to the lines of the survey; or

(4) Any combination of the above methods.

(B) The boundary must be located no more than 200 feet (horizontal measurement) from the exterior margin of the reservoir, defined by the normal maximum surface elevation, except where deviations may be necessary in describing the boundary according to the above methods or where additional lands are necessary for project purposes, such as public recreation, shoreline control, or protection of environmental resources.

(ii) Continuous features. The boundary around linear (continuous) project features such as access roads, transmission lines, and conduits may be described by specified distances from center lines or offset lines of survey. The width of such corridors must not exceed 200 feet unless good cause is shown for a greater width. Several sections of a continuous feature may be shown on a single sheet with information showing the sequence of contiguous sections.

(iii) Noncontinuous features.

(A) The boundary around noncontinuous project works such as dams, spillways, and powerhouses must be described by one of the following:

(1) Contour lines;

(2) Specified courses and distances;

(3) If the project lands are covered by a public land survey, lines upon or parallel to the lines of the survey; or

(4) Any combination of the above methods.

(B) The boundary must enclose only those lands that are necessary for safe and efficient operation and maintenance of the project or for other specified project purposes, such as public recreation or protection of environmental resources.

(3) Federal lands. Any public lands and reservations of the United States (Federal lands) [see 16 U.S.C. 796(1) and (2)] that are within the project boundary, such as lands administered by the U.S. Forest Service, Bureau of Land Management, or National Park Service, or Indian tribal lands, and the boundaries of those Federal lands, must be identified as such on the map by:

(i) Legal subdivisions of a public land survey of the affected area (a protraction of identified township and section lines is sufficient for this purpose); and

(ii) The Federal agency, identified by symbol or legend, that maintains or manages each identified subdivision of the public land survey within the project boundary; or

(iii) In the absence of a public land survey, the location of the Federal lands according to the distances and directions from fixed monuments or physical features. When a Federal survey monument or a Federal bench mark will be destroyed or rendered unusable by the construction of project works, at least two permanent, marked witness monuments or bench marks must be established at accessible points. The maps show the location (and elevation, for bench marks) of the survey monument or bench mark which will be destroyed or rendered unusable, as well as of the witness monuments or bench marks. Connecting courses and distances from the

witness monuments or bench marks to the original must also be shown.

(iv) The project location must include the most current information pertaining to affected Federal lands as described under § 4.81(b)(5).

(4) Non–Federal lands. For those lands within the project boundary not identified under paragraph (h)(3) of this section, the map must identify by legal subdivision:

(i) Lands owned in fee by the applicant and lands that the applicant plans to acquire in fee; and

(ii) Lands over which the applicant has acquired or plans to acquire rights to occupancy and use other than fee title, including rights acquired or to be acquired by easement or lease.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of October, 2024, I filed the

foregoing Brief with the Clerk of the Court using the CM/ECF System,

which will send notice of such filing to all registered CM/ECF users.

Dated: October 18, 2024

/s/Misha Tseytlin
MISHA TSEYTLIN
TROUTMAN PEPPER
HAMILTON SANDERS LLP
227 W. Monroe Street
Suite 3900
Chicago, IL 60606
(608) 999-1240 (MT)
(312) 759-1939 (fax)
misha.tseytlin@troutman.com