# In the United States Court of Appeals for the District of Columbia Circuit

**Nos. 24-1071 and 24-1238 (consolidated)**

———————

GRAND RIVER DAM AUTHORITY,
*Petitioner,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent.*

———————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————

**BRIEF OF RESPONDENT
FEDERAL ENERGY REGULATORY COMMISSION**

———————

Matthew R. Christiansen
 General Counsel

Robert H. Solomon
 Solicitor

Jason T. Perkins
 Attorney
 jason.perkins@ferc.gov

For Respondent
Federal Energy Regulatory
 Commission
Washington, D.C. 20426

DECEMBER 17, 2024

# CIRCUIT RULE 28(A)(1) CERTIFICATE

### A.     Parties

The parties before this Court are identified in Petitioner's Circuit Rule 28(a)(1) certificate.

### B.     Rulings Under Review

**1.** *Grand River Dam Authority*, Order on Remand, 186 FERC ¶ 61,045 (Jan. 18, 2024) ("Remand Order"), R. 1291, JA____-____;

**2.** *Grand River Dam Authority*, Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, 186 FERC ¶ 62,124 (Mar. 18, 2024), R. 1346, JA____; and

**3.** *Grand River Dam Authority*, Order Addressing Arguments Raised on Rehearing, 187 FERC ¶ 61,211 (June 27, 2024) ("Rehearing Order"), R. 1407, JA____-____.

### C.     Related Cases

The Commission orders challenged in this case concern Petitioner Grand River Dam Authority's Pensacola Project and were issued in response to this Court's remand in *City of Miami, Okla. v. FERC*, 22 F.4th 1039 (D.C. Cir. 2022) (Case Nos. 20-1325 and 20-1446). Counsel is not aware of any related cases pending before this or any other court.

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

**TABLE OF CONTENTS**

Introduction and Statement of Issues ................................................... 1

Statutory and Regulatory Provisions ................................................. 5

Statement of Facts.................................................................5

I.    Statutory and Regulatory Background........................................ 5

    A.    Federal Power Act.............................................. 5

    B.    Flood Control Act of 1944...................................... 7

    C.    The Pensacola Act............................................. 8

II.    The Pensacola Project ................................................. 8

    A.    Project Background and Purposes..................................... 8

    B.    Project Surface Elevations and the Army Corps.............. 9

    C.    The Project's FERC License .......................................... 12

        1.    Current Project Boundary – Exhibit G.................. 12

        2.    Project Boundary Changes – Articles 2 & 3 ........... 14

        3.    Property Rights Requirements – Article 5 ............. 15

III.    The City's Complaint and This Court's *City of Miami* Decision.................................................................. 17

    A.    The 2018 Complaint Proceeding..................................... 17

    B.    This Court's *City of Miami* Decision............................... 19

IV.   The Challenged Remand Orders on Review ............................. 20

    A.    The Remand Order ......................................... 20

         1.   Role of the Army Corps ........................... 21

         2.   The Authority's Responsibility ................ 22

         3.   Evidence of Flooding ............................. 23

         4.   Interpretation of the Pensacola Act......... 26

    B.    The Rehearing Order ....................................... 27

         1.   Remanded Issues ................................. 27

         2.   Other Premature Objections, Including Takings
              Concerns............................................... 28

Summary of Argument....................................................... 29

Argument..................................................................... 32

I.    Standard of Review ................................................ 32

II.   The Commission Reasonably Interpreted the Pensacola Act .. 35

    A.    The Commission Answered the Question Remanded ..... 35

    B.    The Pensacola Act Is Less Definitive Than the
          Authority Believes............................................ 37

    C.    The Commission's Responsibility Was to Reconcile the
          Statutes, if Possible........................................ 38

    D.    The Commission Correctly Found that the Pensacola
          Act and Federal Power Act Section 28 Could Coexist..... 40

     1.     The Authority Fails to Carry Its Heavy Burden of Showing Irreconcilable Statutory Conflict ............. 40

     2.     The Authority's Remaining Claims Are Meritless ................................................................. 42

III.   The Commission Reasonably Interpreted License Article 5 .... 45

    A.    The Commission Reasonably Explained that Article 5 Obligations Are Not Limited by a Project's Existing Boundary ........................................................................ 45

    B.    The Authority Misconstrues the Current Boundary as Immutable ................................................................. 46

     1.     Project Purposes, Not Existing Maps, Define a Licensee's Article 5 Obligations ........................... 46

     2.     Any Necessary Project Boundary Changes Can and Will Be Addressed in Later Proceedings ......... 49

IV.   The Commission Reasonably Evaluated the Evidence of Flooding and Explained the Roles of the Army Corps and the Authority ............................................................................ 52

    A.    The Commission Reasonably Analyzed the Record Evidence Regarding Flooding .......................................... 52

    B.    The Commission Reasonably Explained the Relative Responsibilities of the Army Corps and the Authority ... 55

     1.     The Commission Reasonably Found the Authority Responsible for Obtaining Requisite Property Rights ...................................................................... 55

     2.     The Authority Minimizes and Distorts Its Role as Project Owner and Operator to Avoid Responsibility ......................................................... 56

3. The Army Corps' Flood Control Statutes and Project Agreements Do Not Excuse the Authority From Its FERC Obligations .................................... 58

V. The Authority's Regulatory Takings Claim is Unripe and Lacks Merit ........................................................... 62

Conclusion ............................................................................. 65

# TABLE OF AUTHORITIES

## COURT CASES:

*Ala. Mun. Distribs. Grp. v. FERC,*
      100 F.4th 207 (D.C. Cir. 2024) .................................................. 34

*Biestek v. Berryhill,*
      587 U.S. 97 (2019) .................................................... 34

*Brady v. FERC,*
      416 F.3d 1 (D.C. Cir. 2005) .................................................. 9, 34

*Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.,*
      464 U.S. 89 (1983) ...................................................... 32-33, 44-45

*Chippewa & Flambeau Improvement Co. v. FERC,*
      325 F.3d 353 (D.C. Cir. 2003) ................................................ 47, 51

*City of Clarksville, Tenn. v. FERC,*
      888 F.3d 477 (D.C. Cir. 2018) .................................................. 32

*City of Miami, Okla. v. FERC,*
      22 F.4th 1039 (D.C. Cir. 2022)
      ……………….......................... 1, 3, 10, 19-20, 30-31, 35, 45, 52, 55

*City of Salisbury, N.C. v. FERC,*
      36 F.4th 1164 (D.C. Cir. 2022) .................................................. 46

*Clifton Power Corp. v. FERC,*
      88 F.3d 1258 (D.C. Cir. 1996) .................................................. 6-7

*Duncan's Point Lot Owners Ass'n v. FERC,*
      522 F.3d 371 (D.C. Cir. 2008) .................................................. 33

*E. Hydroelec. Corp. v. FERC,*
      887 F.3d 1197 (11th Cir. 2018) .................................................. 7

*E. Niagara Pub. Power All. & Pub. Power Coal. v. FERC,*
558 F.3d 564 (D.C. Cir. 2009).................................................. 32

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) .........................................................39, 41

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ................................................................. 32

*FERC v. Elec. Power Supply Ass'n,*
577 U.S. 260 (2016) ................................................................. 32

*First Iowa Hydro-Elec. Coop. v. FPC,*
328 U.S. 152 (1946) ................................................................... 5

*FPC v. Union Elec. Co.,*
381 U.S. 90 (1965) ..................................................................... 5

*Fla. Gas Transmission Co. v. FERC,*
604 F.3d 636 (D.C. Cir. 2010).................................................. 54

*Flint Hills Res. Alaska, LLC v. FERC,*
627 F.3d 881 (D.C. Cir. 2010).................................................. 63

*Hunter v. FERC,*
711 F.3d 155 (D.C. Cir. 2013).................................................. 39

*Kansas Cities v. FERC,*
723 F.2d 82 (D.C. Cir. 1983) ............................................. 33-34

*Lingle v. Chevron U.S.A. Inc.,*
544 U.S. 528 (2005) ................................................................. 62

*Loper Bright Enterprises v. Raimondo,*
144 S.Ct. 2244 (2024) ............................................................. 33

*Morton v. Mancari,*
417 U.S. 535 (1974) ................................................................. 36

*Nat'l Fuel Gas Supply Corp. v. FERC,*
811 F.2d 1563 (D.C. Cir. 1987).............................................. 33-34

*Nat'l Lifeline Ass'n v. FCC,*
983 F.3d 498 (D.C. Cir. 2020)................................................... 64

*Nat'l Parks Conservation Ass'n v. FERC,*
6 F.4th 1044 (9th Cir. 2021)..................................................... 36

*Pacific Gas & Elec. Co. v. FERC,*
720 F.2d 78 (D.C. Cir. 1983) ...................................33, 36, 46, 64

*Pacific Gas & Elec. Co. v. FERC,*
113 F.4th 943 (D.C. Cir. 2024) ................................................. 32

*Penn Central Transp. Co. v. New York City,*
438 U.S. 104 (1978) .................................................................. 62

*Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC,*
962 F.2d 27 (D.C. Cir. 1992) .................................................... 50

*Process Gas Consumers Grp. v. FERC,*
292 F.3d 831 (D.C. Cir. 2002).................................................. 34

*Silver v. N.Y. Stock Exchange,*
373 U.S. 341 (1963) .............................................................. 38-39

*TransCanada Power Mktg. Ltd. v. FERC,*
811 F.3d 1 (D.C. Cir. 2015) ...................................................... 63

*Valancourt Books, LLC v. Garland,*
82 F.4th 1222 (D.C. Cir. 2023) ................................................. 64

## <u>ADMINISTRATIVE CASES:</u>

*City of Holyoke Gas & Elec. Dep't,*
109 FERC ¶ 61,206 (2004) ..................................................49, 50

*City of Holyoke Gas & Elec. Dep't,*
  115 FERC ¶ 62,295 (2006) ....................................................... 15

*Grand River Dam Auth.,*
  59 FERC ¶ 62,073 (1992) (1992 License Order).. 10-11, 14, 50-51

*Grand River Dam Auth.,*
  140 FERC ¶ 62,123 (2012) ......................................................... 9

*Grand River Dam Auth.,*
  160 FERC ¶ 61,001 (2017) (2017 Rule Curve Order) . 9-10, 15-16

*Grand River Dam Auth.,*
  Letter Order, Project No. 1494-445 (Apr. 29, 2020),
  *on reh'g*, 172 FERC ¶ 61,255 (2020) (2020 Rehearing Order)
  ................................................................................ 18-19, 42

*Grand River Dam Auth.,*
  186 FERC ¶ 61,045 (2024) (Remand Order),
  *on reh'g*, 187 FERC ¶ 61,211 (2024) (Remand Rehearing Order)
  ........................ 4, 9-10, 12, 15-18, 20-29, 36-48, 50-64

*Marsh Valley Hydroelectric Co.,*
  64 FERC ¶ 61,120 (1993) ......................................................... 48

*Penn. Power & Light Co.,*
  21 FERC ¶ 61,429 (1980) ................................................... 49, 51

*Pub. Util. Dist. No. 1 of Chelan Cnty. Wash.,*
  119 FERC ¶ 61,055 (2007) ......................................................... 6

*Sacramento Mun. Util. Dist.,*
  178 FERC ¶ 61,112 (2022) ........................................... 26, 46-49

*Standardized Conditions for Inclusion in Preliminary Permits and Licenses Issued Under Part I of the Federal Power Act,*
  Order No. 540, 54 FPC 1792 (1975) .......................................... 14

**STATUTES:**

Federal

Administrative Procedure Act

5 U.S.C. § 706(2)(A) .................................................................. 32

Federal Power Act

Section 3, 16 U.S.C. § 796 ............................................... 47-48, 51

Section 4, 16 U.S.C. § 797 ........................................................ 6

Section 6, 16 U.S.C. § 799 ........................................................ 6

Section 10, 16 U.S.C. § 803 ................................................15, 22

Section 15, 16 U.S.C. § 808 ...................................................... 6

Section 28, 16 U.S.C. § 822 ...................................6, 20, 26, 35-36

Section 31, 16 U.S.C. § 823b ................................................. 6-7

Section 306, 16 U.S.C. § 825e .................................................. 6

Section 313, 16 U.S.C. § 825*l* ........................................34, 54, 63

Flood Control Act of 1938

Section 2, Pub. L. No. 75-761, 52 Stat. 1215 ........................... 61

Flood Control Act of 1941

Section 3, Pub. L. No. 77-228, 55 Stat. 638 ............................. 61

Flood Control Act of 1944

33 U.S.C. § 709 ..................................................................... 7, 59

National Defense Author. Act for Fiscal Year 2020 (Pensacola Act)
  Section 7612, Pub. L. No. 116-92, 133 Stat. 2312
  ……………….......................................................8, 26, 35, 40-41

Pub. L. No. 113-177 (American Falls Reservoir, 2014)
  Section 1, 128 Stat. 1911........................................................ 41

Water Infrastructure Improvements for the Nation Act (2016)
  Section 1321(c), Pub. L. No. 114-322, 130 Stat. 1705..........22, 61

State
Oklahoma Stat. Ann., Title 82 Waters and Water Rights (West)
  Sections 861, 862.......................................................... 8

## REGULATIONS:

Title 18, Conservation of Power and Water Resources
  18 C.F.R. § 4.41(h).................................................... 47

  18 C.F.R. § 12.4 ........................................................ 7

  18 C.F.R. § 385.206 ................................................... 7

Title 33, Navigation and Navigable Waters
  33 C.F.R. § 208.11 ................................................... 7-8

  33 C.F.R. § 208.25 ............................................... 7, 11

## OTHER AUTHORITIES:

  116th Congress, S. Amdt. 711 to S.1790, *reprinted in*
  165 Cong. Rec. S3719-20 (daily ed. June 18, 2019).................. 61

# GLOSSARY

| | |
|---|---|
| 1992 License Order | *Grand River Dam Auth.*, Order Issuing New License, 59 FERC ¶ 62,073 (1992) |
| Army Corps | U.S. Army Corps of Engineers |
| Authority | Petitioner Grand River Dam Authority |
| Br. | Opening brief of Petitioner Grand River Dam Authority |
| City | Intervenor for Respondent City of Miami, Oklahoma |
| Commission or FERC | Federal Energy Regulatory Commission |
| Flood pool and flood pool operations | The water levels of Grand Lake that occur during flood conditions, *i.e.* between 745 feet and 755 feet in elevation, and the related Project operations carried out by the Authority at the direction of the Army Corps at such times |
| Lake or Grand Lake | Grand Lake O' the Cherokees, the reservoir created by the Pensacola Project |
| Pensacola Project or Dam | The Pensacola Hydroelectric Project, licensed by the Commission in FERC Docket No. P-1494, most recently relicensed in 1992 |
| Remand Order | *Grand River Dam Authority*, Order on Remand, 186 FERC ¶ 61,045 (Jan. 18, 2024), R. 1291, JA____-____ |
| Remand Rehearing Order | *Grand River Dam Authority*, Order Addressing Arguments Raised on Rehearing, 187 FERC ¶ 61,211 (June 27, 2024), R. 1407, JA____-____ |

| | |
|---|---|
| Rule curve | The seasonally variable water levels at which the Authority must keep the surface of Grand Lake under normal conditions |
| Water Control Manual, Agreement, and Letter of Understanding | The operational protocols and agreements promulgated in 1992 outlining the flood control operational relationship between the Army Corps and the Authority, including: 1992 *Water Control Manual for the Pensacola Reservoir*, R. 231, JA____-____ 1992 *Water Control Agreement: Pensacola Reservoir, Grand (Neosho) River, Oklahoma*, R. 231, JA____-____ 1992 *Letter of Understanding: Pensacola Dam and Reservoir*, R. 231, JA____-____ |

# In the United States Court of Appeals for the District of Columbia Circuit

## Nos. 24-1071 and 24-1238 (consolidated)

_____

GRAND RIVER DAM AUTHORITY,
*Petitioner*,

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

_____

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

_____

## BRIEF OF RESPONDENT
## FEDERAL ENERGY REGULATORY COMMISSION

_____

## INTRODUCTION AND STATEMENT OF ISSUES

This case returns to the Court after a 2022 remand to the Federal Energy Regulatory Commission (FERC or Commission). *See City of Miami, Okla. v. FERC*, 22 F.4th 1039 (D.C. Cir. 2022). It concerns the operations and effects of the Pensacola Dam, located on the Grand (Neosho) River in northeast Oklahoma, which impounds a large storage reservoir called the Grand Lake O' the Cherokees (Grand Lake).

Hundreds of residential, commercial, and municipally-owned properties in the City of Miami, Oklahoma (City) are located upstream from the dam and near the Lake. *See infra* p. 13 (map). The City's concerns about periodic encroachments of flood waters from Grand Lake on its own land and that of its residents led to *City of Miami* and the Commission proceedings on remand at issue here.

As background, Petitioner Grand River Dam Authority (Authority) operates the dam and the reservoir (collectively, Project or Pensacola Project) in accordance with a license from the Commission. The Authority uses Grand Lake for several purposes, including power generation, recreation, flood control, and water supply. The license requires the Authority to keep the surface area of Grand Lake at specific levels, and to obtain rights—including the right to flood land—over all land that it needs to operate the Project. That obligation, and the City's allegations of non-compliance with it, gave rise to the City's complaint against the Authority filed in 2018.

Another important entity here is the U.S. Army Corps of Engineers (Army Corps). Regarding flood control, Grand Lake is located in the middle of a system of large reservoirs in the greater

Arkansas River Basin. These reservoirs form a flood control system whose water releases for flood control purposes are directed by the Army Corps and carried out by the Authority. Pursuant to statute, a Project-specific regulation, and an agreement with the Authority, the Army Corps directs the Authority's releases of water from the dam when the Lake level rises into an elevation range known as the "flood pool," a range that begins about a foot higher than normal Lake levels.

After the Commission denied the City's 2018 complaint about flooding concerns, in *City of Miami*, this Court granted the City's petitions for review and remanded for further proceedings. 22 F.4th at 1042-44. It found the City's evidence of flooding "powerful" and found "crucial" statutory language "ambiguous." *Id.* at 1043. The Court gave four specific instructions to the Commission: determine the role of the Army Corps regarding the flooding in the City; determine the responsibility the dam-operating Authority bears if *it* caused flooding in the City; analyze the evidence of flooding the City produced; and interpret the relevant provisions of a floor amendment to the National Defense Authorization Act for Fiscal Year 2020, more commonly known as the Pensacola Act. *Id.* at 1041-42, 1044.

On remand, the Commission addressed all aspects of the Court's remand in detail. The Commission found that the Army Corps' role is limited to directing flood operations at the Project at certain times. It found that the Authority has a FERC-imposed license obligation to acquire and maintain adequate property rights to accomplish all project purposes, including flood control. After analyzing all of the record evidence, the Commission agreed with how the Court read the City's evidence of flooding. And it found that the Pensacola Act does not limit the Commission's authority to address property rights obligations under the current Project license. *Grand River Dam Authority*, Order on Remand, 186 FERC ¶ 61,045, at PP 1-2, 67-68 (Jan. 18, 2024) (R. 1291) (Remand Order), JA____-____, ____, *on reh'g*, Order Addressing Arguments Raised on Rehearing, 187 FERC ¶ 61,211, at PP 2, 23 (June 27, 2024) (R. 1407) (Remand Rehearing Order), JA____, ____.

The Authority appeals all of these determinations, and adds additional concerns related to ongoing proceedings.

*The issues presented for review are:*

1. Did the Commission reasonably respond to the Court's remand in interpreting the Pensacola Act and Article 5 of the Authority's license

when it determined that the Authority must obtain adequate property rights to accomplish all project purposes, including flood control?

2. Did the Commission reasonably respond to the Court's remand in analyzing evidence of flooding around the City and delineating the respective responsibilities of the Authority and the Army Corps that relate to that flooding?

## STATUTORY AND REGULATORY PROVISIONS

Pertinent statutes, regulations, and license terms and conditions are reproduced in the separately-filed Addendum to this brief.

## STATEMENT OF FACTS

## I. STATUTORY AND REGULATORY BACKGROUND

### A. Federal Power Act

Part I of the Federal Power Act, 16 U.S.C. §§ 796-823g, constitutes a "complete scheme of national regulation" that "promote[s] the comprehensive development of the water resources of the Nation." *First Iowa Hydro-Elec. Coop. v. FPC*, 328 U.S. 152, 180 (1946). It provides a means of federal control over uses of the nation's water resources that the federal government has an interest in overseeing— including, "very prominently," hydroelectric power. *FPC v. Union Elec. Co.*, 381 U.S. 90, 98 (1965).

To this end, the Commission issues licenses for the construction, maintenance, and operation of project works necessary to generate power from waterways that fall under federal jurisdiction. 16 U.S.C. § 797(e). These licenses typically last for decades, perhaps as long as 50 years. *See* 16 U.S.C. §§ 799, 808(e). Thus, the Commission may reserve the authority to adjust license terms to conform to changed circumstances or new information. *See, e.g., Pub. Util. Dist. No. 1 of Chelan Cnty. Wash.*, 119 FERC ¶ 61,055, at PP 18-21 (2007) (noting that particular lands may at some point be "needed for project purposes" and thus belong within "the project boundary"). But—under section 28 of the Federal Power Act—once issued, the terms and conditions of individual licenses are generally not subject to legislative revision. *See* 16 U.S.C. § 822.

The Federal Power Act also contains a complaint procedure whereby any "person" or "municipality" may file a complaint with the Commission to raise concerns about anything that a licensee has done, or failed to do, in contravention of the Act. 16 U.S.C. § 825e. In such a proceeding, after notice and opportunity for public hearing, the Commission may, as necessary, issue orders to require compliance with

its licenses. 16 U.S.C. § 823b; *Clifton Power Corp. v. FERC*, 88 F.3d 1258, 1263 (D.C. Cir. 1996); *see also* 18 C.F.R. § 385.206 (prescribing procedures for filing and answering complaints). And in cases where a licensee violates a compliance order, the Commission is empowered to revoke the license, and to assess civil penalties. *See* 16 U.S.C. § 823b(b)-(c); 18 C.F.R. § 12.4(d); *E. Hydroelec. Corp. v. FERC*, 887 F.3d 1197, 1201-03 (11th Cir. 2018) (affirming revocation of a project's license given non-compliance with Commission orders and license conditions).

## B. Flood Control Act of 1944

Building on earlier enactments, the Flood Control Act of 1944 directs the Secretary of the Army to "prescribe regulations for the use of storage allocated for flood control or navigation at all reservoirs constructed wholly or in part with Federal funds." 33 U.S.C. § 709. The "operation of any such project shall be in accordance with such regulations." *Id.* Therefore, the Army Corps has promulgated regulations specific to the "operation of the Pensacola Dam . . . in the interest of flood control." 33 C.F.R. § 208.25. These regulations work in

tandem with the Commission's licensing requirements and authorities. 33 C.F.R. § 208.11(b)(3).

For non-federal projects like the Pensacola Project, the Army Corps also develops and documents a "water control plan" in consultation with the project owner. *Id.* § 208.11(d)(4). The water control plan is designed to ensure "compatibility with other project purposes" besides flood control. *See id.*

### C.    The Pensacola Act

In addition, Congress has specifically addressed the Pensacola Project in recent legislation. Known as the Pensacola Act, section 7612 of the National Defense Authorization Act for Fiscal Year 2020 contains provisions regarding the Commission's oversight of the Pensacola Project. *See* Pub. L. No. 116-92, § 7612, 133 Stat. 1198, 2312-14, Addendum at A29-A31. These provisions, discussed below, address the scope of the Project and the Commission's licensing authority over it.

## II.    THE PENSACOLA PROJECT

### A.    Project Background and Purposes

The Authority is an agency of the State of Oklahoma, created by the Oklahoma state legislature. Br. iii; 82 Okla. Stat. Ann. §§ 861, 862 (West). The Pensacola Project consists of a 105-megawatt power-

producing dam and the 46,500-acre Grand Lake reservoir located on the Grand River.  Remand Order PP 3-5, JA____-____.[1]

Grand Lake extends 66 miles upstream of the dam, through portions of Craig, Delaware, Mayes, and Ottawa Counties.  *Id.*  It is a multi-purpose reservoir used for power generation, recreation, flood control, and water supply—"a very popular recreation area for boating and fishing" with "resorts, residences, parks, and docks" nearby. *Id.* P 6, JA____; *see also Brady v. FERC*, 416 F.3d 1 (D.C. Cir. 2005) (affirming FERC orders regarding Grand Lake's "carrying capacity" of boats).  Accordingly, the Project's operational requirements balance "a broad range of interests at Grand Lake, including prevention of flooding, protection and enhancement of fish and wildlife, and recreational boating." *Grand River Dam Auth.*, 140 FERC ¶ 62,123, at P 17 (2012).

## B.  Project Surface Elevations and the Army Corps

During normal operations, and to balance the multiple uses of the reservoir, the Authority adjusts the Lake's surface elevation seasonally

---

[1] Above Grand Lake, the river is called the Neosho River; below Pensacola Dam, it is called Grand River.  The record of this case refers to the river variably as the Grand River, the Neosho River, and the Grand/Neosho River.  Remand Order P 3 n.5, JA____.

within a range of two feet. *Grand River Dam Auth.*, 160 FERC

¶ 61,001, at PP 4, 8 (2017) (2017 Rule Curve Order). This normal

operating range is between 742 feet above sea level and 744 feet above

sea level, according to a Project-specific local unit of measurement.

FERC Notice of Relicensing Application at 2 (issued June 5, 2023),

R. 1054, JA____; Remand Order PP 5 n.8 (explaining "Pensacola

Datum"), JA____-____. The schedule for changing surface elevations

within this two-foot normal range from season to season is known as

the "rule curve." Remand Order PP 11, 13, JA____-____; *City of Miami*,

22 F.4th at 1041 n.1. The "normal maximum elevation" for the Lake is

744 feet. Remand Order P 13, JA____.

Flood storage at the Project is provided when the surface elevation

of the Lake is within a higher range—between 745 feet above sea level

and 755 feet above sea level. *Id.* P 7, JA____. This range is known as

the "flood pool" of the Project. *See id.* P 7, 13, 18 (distinguishing

between the "normal" and "conservation pool" elevations below 745 feet

and the higher "flood pool" elevations at 745 feet and above), JA____,

____, ____. The flood pool ends two feet below the top of the dam, which

has an elevation of 757 feet. *See Grand River Dam Auth.*, Order Issuing

New License, 59 FERC ¶ 62,073, at 63,234 (1992) (1992 License Order) (noting "crest elevation").

When the Lake reaches the flood pool range at 745 feet, water releases are directed by the Army Corps' District Engineer. *See* 33 C.F.R. § 208.25(a). These directions are guided by regulation and are outlined in detailed operational protocols and agreements promulgated around the time of the Project's 1992 relicensing. *See, e.g.,* Authority Reh'g Request at 29-30, 39 n.128, 54 (referencing these documents), R. 1315, JA____, ____, ____; Record of FERC Staff Telephone Call with Army Corps (Mar. 6, 2018), R. 231.[2] The Army Corps' goal in directing flood pool releases is to "reduce as much as practicable the flood damage below the reservoir and to limit the pool stage to elevation 755 at the dam." § 208.25(a). But to ensure "the structural safety of Pensacola Dam," surface regulation "above elevation

---

[2] These include an Army Corps Water Control Manual for the Project, and two agreements between the Army Corps and the Authority—a Letter of Understanding and a Water Control Agreement—all promulgated in 1992. *See* R. 231 at PDF pp. 8-90 (1992 Water Control Manual), JA____-____; *id.* at PDF pp. 106-10 (1992 Letter of Understanding), JA____-____; *id.* at PDF pp. 111-14 (1992 Water Control Agreement)), JA____-____.

755.0" is the Authority's responsibility.  *See* 1992 Letter of

Understanding at 1, JA____; 1992 Water Control Manual at Table 7-1

and p. 9-3, JA____, ____.

## C.    The Project's FERC License

The Authority operates the Project pursuant to a FERC license

granted in 1992, whose term has been extended to May 25, 2025.

*See* Remand Order P 3 (describing Project and license history and

noting pending relicensing application), JA____.  Several provisions of

the current license are particularly relevant to this appeal.

### 1.    Current Project Boundary – Exhibit G

First, the license defines the Project's current boundary.  That

boundary is reflected in the drawings included in the Project license at

Exhibit G.  *Id.* P 46, JA____.  Generally speaking, the Project boundary

is set at the 750-foot contour line, to encompass Grand Lake and a

narrow strip of land around its perimeter.  *Id.*  But because it is set at

the midpoint elevation of the flood pool range, the current boundary

"does not include the entire flood pool."  *See id.*; *see also id.* P 37 n.70

(describing in general terms the lands and facilities included within the

current project boundary), JA____.  That general boundary is illustrated

in the map below.



2018 Revised Study Plan at 5 (Figure 1-1.2), R. 227, JA____.

## 2.    Project Boundary Changes – Articles 2 & 3

Second, Articles 2 and 3 address project boundary changes under the present license.  As noted, that license was originally issued in 1992, and, except for several pages of Pensacola Project-specific articles, it incorporated the standard license articles the Commission had previously promulgated.  *See* 1992 License Order, 59 FERC ¶ 62,073, at 63,227 (Ordering P (D)) (citing the Commission's Form L-3 (1975)).[3] Articles 2 and 3 together allow either the Authority *or* the Commission to initiate changes to the "project area and project works" set forth in the "approved exhibits" that are part of the license.  *See* Articles 2 and 3, Addendum A62.  If "the Commission deems it necessary or desirable that said approved exhibits, or any of them, be changed," it may direct the Authority to submit changes that "upon approval by the Commission, shall become a part of the license."  Article 2, Addendum A62.

---

[3] The full license text of Articles 1 through 5 are reproduced for convenience in the separate Addendum, pages A62-A63, and appear at *Standardized Conditions for Inclusion in Preliminary Permits and Licenses Issued Under Part I of the Federal Power Act*, Order No. 540, 54 FPC 1792, 1817-19 (1975) (Terms and Conditions of License for Constructed Major Project Affecting Navigable Waters of the United States, Form L-3 (Revised Oct. 1975)).

### 3. Property Rights Requirements – Article 5

Third, Article 5 of the license requires that, within five years of the license issuance date (*i.e.*, by April 24, 1997), the Authority must acquire title in fee or the right to use in perpetuity all lands, other than United States lands, necessary or appropriate for the construction, maintenance, and operation of the Project. *See* Article 5, Addendum A63; Remand Order P 8, JA____. Put differently, Article 5 requires the Authority to obtain "project property sufficient to accomplish all project purposes." *See City of Holyoke Gas & Elec. Dep't*, 115 FERC ¶ 62,295 & n.8 (2006). As noted above, flood control is a Project purpose and operation of the Project includes flood control operations. Remand Order P 54, JA____-____.

Over time, the Authority has acquired thousands of acres of low-lying lands outside the project boundary for flood control purposes, in response to state court decisions. *Id*. PP 15 & n.33, 55 & nn.120-121, JA____-____, ____; Complaint PP 33-34 (filed Dec. 26, 2018), R. 1, JA____-____. (Under Federal Power Act section 10(c), 16 U.S.C. § 803(c), federal licensing does not indemnify the Authority against property damage claims; the Authority is liable for any damages caused

by its operation of the Project. *See* 2017 Rule Curve Order, 160 FERC

¶ 61,001 at P 57; Remand Order P 15 & n.30, JA____.) As of the City's

complaint, the Authority owned lands in fee simple below the 750 feet

level. *See* Complaint P 15 n.20, JA____; Remand Rehearing Order P 28,

JA____.

Since then, and pursuant to Congressional direction, the Army

Corps has transferred all the flowage easements that it held to the

Authority. Remand Order P 51 & n.110, JA____; Remand Rehearing

Order P 28, JA____-____. Thus, as of the Remand Rehearing Order

challenged here, the Authority owned and maintained some easements

for project operations beyond the current Project boundary of 750 feet.

Remand Order P 55 & n.121, JA____; *see also* Remand Rehearing Order

P 28 n.70 (describing the Corps' flowage easements in general terms),

JA____. However, proceedings still pending before the Commission are

exploring the precise extent of the properties that are periodically

subject to flooding due to the existence of the Project. *See* Remand

Rehearing Order P 20 & n.47 (directing the filing of a further report,

including a parcel-by-parcel analysis), JA____-____.

## III. THE CITY'S COMPLAINT AND THIS COURT'S *CITY OF MIAMI* DECISION

### A. The 2018 Complaint Proceeding

In late 2018, the City filed a complaint at the Commission, arguing that, "for more than two decades, [the Authority] has flagrantly violated its license by flooding about 13,000 acres of land for which it has no easements." Complaint PP 1, 48, JA____, ____. Its concern about the "unauthorized flooding of private lands" extended to "lands outside the project boundary" that were "also outside the lands for which the Corps of Engineers had acquired flowage easements." *Id.* P 51, JA____. And the City supported its complaint with several Oklahoma state court decisions finding the Authority liable for repeated flooding of private property outside the project boundary. Remand Order P 15 & n.30 (collecting cases, including *Perry v. Grand River Dam Auth.*, 344 P.3d 1 (Okla. Civ. App. 2013)), JA____.

Regarding the Authority's license obligations, the City argued that License Article 5 requires ownership or control of all lands and facilities needed for Project purposes, including the acquisition of flowage easements to account for backwater flooding effects attributable to

Project operation.[4]  Complaint PP 49-50, JA____-____.  It contended

that the Authority had evaded this obligation by misrepresenting the

impact of Project operations, misinterpreting the extent of its obligation

to acquire land rights, and denying that it was required to comply with

License Article 5.  *See id.* PP 51, 57, 59, JA____, ____, ____.  The City

also contended that the Commission's authority to enforce compliance

with Article 5 is not limited by the current project boundary.  *Id.* P 53,

JA____-____.  It asked the Commission to order the Authority "to

acquire as promptly as possible flowage easements with respect to all

lands flooded by Project operations."  *Id.* P 81, JA____.

The Commission denied relief in two orders issued in 2020

(collectively, the 2020 Orders).  The Commission reasoned that, at in

the absence of substantial evidence that Project operations cause the

upstream flooding at issue, it did not have a basis to require the

Authority to add land to the Project boundary or to obtain additional

easements.  Letter Order at 3, Project No. 1494-445 (Apr. 29, 2020)

---

[4] Backwater effects refer to the rise in water levels upstream of a
bridge or structure due to the obstruction of flow caused by the
structure itself.  *See* Remand Order P 61 & n.135, JA____.

(R. 148) (2020 Letter Order), JA____, *on reh'g*, *Grand River Dam Auth.*, 172 FERC ¶ 61,255, at PP 12-13 (Sept. 17, 2020) (R. 190) (2020 Rehearing Order), JA____-____.  The Commission also found that the Pensacola Act precluded the requested relief; for this reason, the agency found that it could not require the Authority to bring additional land into the Project boundary.  2020 Rehearing Order P 18, JA____-____.

## B.    This Court's *City of Miami* Decision

On review, the *City of Miami* Court granted the petitions and remanded with instructions.  First, the Court found that the Commission had failed to explore the Army Corps' "alleged responsibility" for flooding above the dam.  22 F.4th at 1042-43. Second, it found that the 2020 Orders failed to answer the question of "whether Article 5 of the license obliges the Authority—putting aside the Corps' role—to acquire rights (either ownership or easements)" regarding flooding in the City.  *Id.* at 1043.  Third, the *City of Miami* Court rejected the idea that the Commission could defer consideration of claims about alleged violations of an existing license, for later consideration in a future relicensing proceeding.  *Id.*  The City's

evidence was "powerful" and needed to be analyzed alongside "claims that the Authority is violating an existing license." *Id.*

Finally, the Court found the Pensacola Act's "crucial language" to be "ambiguous." *Id.* "It is unclear to us whether the amendment strips FERC of authority to enforce the existing license or that FERC's authority to impose new conditions on future licenses is limited," especially given that section 28 of the Federal Power Act states that later Congressional action "shall not 'affect any license'" already issued. *Id.* at 1043-44 (quoting, in part, 16 U.S.C. § 822).

Given these findings, the Court remanded the case to the Commission to address those four issues: "[1] determine the role of the Corps in this imbroglio, [2] the responsibility the Authority bears if it caused flooding in the City, [3] analyze the evidence [the City] has produced, and [4] . . . interpret the Pensacola Act" and its effect on Commission authority. *Id.* at 1044.

## IV. THE CHALLENGED REMAND ORDERS ON REVIEW

### A. The Remand Order

After receiving further party filings, the Commission addressed each aspect of the Court's remand instructions in the Remand Order. *See* PP 25-29 (summarizing R. 564, R. 574, R. 582, R. 588, R. 599),

JA____-____; *id.* PP 33-68 (discussing and deciding each issue presented), JA____-____.

## 1. Role of the Army Corps

First, the Commission found that the role of the Army Corps was limited to directing flood operations at the Project, per the provisions of the Flood Control Act of 1944 and its implementing regulation, and as outlined in the 1992 Water Control Agreement between the Authority and the Army Corps. *Id.* PP 46 & n.90, 67, JA____, ____. The Water Control Agreement establishes that the Army Corps will direct the Authority to store and release water as needed when the Lake is between 745 feet and 755 feet in elevation. *Id.* P 47, JA____-____. In short, the Army Corps "directs the flood operations at the project," while the Authority "is responsible for the physical operations of the flood control facilities." *Id.* P 50, JA____.

The Commission also reviewed historical circumstances and Army Corps documents and studies. Those documents concluded, in part, that "there is clearly flooding outside the easement area which is caused by Grand Lake and Pensacola Dam." *Id*. P 48, JA____. But despite

Army Corps interest in purchasing additional flowage easements, that effort did not receive Congressional funding. *Id.*

And the Commission found that recent statements by the Army Corps confirmed that it is the Authority that has responsibility to obtain "all the flowage easements" needed, "even for flood control operations." *Id.* P 50, JA____. Indeed, the Army Corps transferred its flowage easements to the Authority, which now actively manages activities in the flowage easement area. *Id.* P 51 (citing, in part, Water Infrastructure Improvements for the Nation Act, Pub. L. No. 114-322, § 1321(c)(1), 130 Stat. 1705 (2016), Addendum A35), JA____.

## 2. The Authority's Responsibility

Second, the Commission determined that License Article 5 requires the Authority to acquire adequate property rights in perpetuity to accomplish all Project purposes, including flood control. *Id.* P 54 & n.115, 67, JA____-____, ____; *see also* Addendum A63 (text of Article 5). That Article reflects the Commission's statutory obligation "to require licensees to hold property rights over all land needed for" their project. Remand Order P 54 (citing Federal Power Act section 10(a), 16 U.S.C. § 803(a)), JA____. Those property rights "typically overlap" with the

project boundary reflected in Commission records, but the Commission found that the Authority's Article 5 obligation "is separate and distinct" from the extent of the current project boundary. *Id.*, JA____. That obligation includes the responsibility for obtaining any necessary "flowage easements to accommodate flood control." *Id.*, JA____-____.

### 3. Evidence of Flooding

Third, the Commission analyzed the evidence of flooding in the record and found it sufficient to conclude that the Project has increased flooding around the City. *Id.* PP 56-64, JA____-____. This evidence included expert reports and a hydrologic modeling study submitted by the City (the City's Study). *Id.* P 57, JA____.[5] The record evidence also included a model required by Commission staff as part of the relicensing effort and submitted by the Authority (the Mead & Hunt model). *Id.* PP 60-61, 63, JA____-____.

The Commission found these pieces of evidence consistent in an important regard: both confirmed that high water surface elevations

_____

[5] This study is referred to in the record as the Tetra Tech Study, for the consulting firm that produced it. *E.g.*, Remand Order P 57 (citing City of Miami July 22, 2016 Submission, R. 216, JA____), JA____.

are to be expected above the dam in historic flood conditions. *Id.* PP 59-61, JA\_\_\_\_-\_\_\_\_. The City's reports and Study considered "with-dam scenarios and without-dam scenarios" to isolate the effect of the dam itself on upstream conditions. *Id.* PP 58-59, JA\_\_\_\_-\_\_\_\_. The City's Study indicated that the existence of the dam led to a "3.5 foot to 5.9 foot incremental increase in flooding" under historic flood conditions, given Army Corps records reflecting conditions prior to dam construction. *Id.* PP 57-59, JA\_\_\_\_-\_\_\_\_. This meant that, according to the City's Study, "the total area flooded in the vicinity of the City exceeded the existing easements by" nearly 13,000 acres or more. *Id.* P 57, JA\_\_\_\_.

The Authority's Mead & Hunt model produced "similar water surface elevations for the with-dam condition as the [City's Study] did for historic storms of similar return period," and therefore validated the City's Study results in that regard. *Id.* P 61 & n.137 (comparing Updated Study Report, R. 642, Appendix 2 at 23, JA\_\_\_\_, to the City's Study, Table 5.12 at 45, JA\_\_\_\_), JA\_\_\_\_. However, the Mead & Hunt model did not estimate "a without-dam scenario," and thus it could not itself "be used to quantify the backwater effects caused by the existence

of the project." *Id.*; *see also* Complaint Exh. B at 8-9, *Dalrymple v. Grand River Dam Auth.*, Case No. CJ 94-444 (Okla. Dist. Ct. Nov. 5, 1999) (describing the mechanics of a backwater effect), JA____-____.

But a 1998 study performed by the Army Corps (Army Corps Study) also examined backwater effects and found "an incremental increase in flooding of up to 1.6 feet at the City." Remand Order P 62, JA____; *see also* Reh'g Request, Attach. 24 at 9-11 (presenting narrative findings of Army Corps Study), R. 1315, JA____-____.

Given all this, the Commission concluded that the evidence provided in the City's Complaint, specifically the City's Study, confirmed by the Authority's Mead & Hunt model, was sufficient to conclude that the project has increased flooding around the City of Miami beyond the extent of existing flowage easements. Remand Order PP 63, 68, JA____, ____.

Because the precise extent of the property rights needed under License Article 5 could not be determined based on that record, the Commission directed the Authority to file a further report following a specified methodology that would identify "each parcel or lot on lands upstream of the Pensacola Dam affected by flooding" and compare that

analysis to the Authority's "existing property rights."  *Id.* PP 65-66, JA____-____.

### 4.    Interpretation of the Pensacola Act

Finally, the Commission interpreted section 28 of the Federal Power Act, 16 U.S.C. § 822, and the later-enacted Pensacola Act, and concluded that the two statutes are not inherently inconsistent with one another.  Remand Order PP 37-39, JA____-____.  While the Pensacola Act provides that "the project shall not extend to any land or water outside the project boundary," *see* § 7612(b)(3)(A), 133 Stat. 2313, Addendum A30, Federal Power Act section 28 provides that "no . . . alteration, amendment, or repeal" of the Act "shall affect any license theretofore issued under" its provisions, 16 U.S.C. § 822.

This led the Commission to find that "co-existence is the most reasonable reading of the two statutory texts" since, under Federal Power Act section 28, the Pensacola Act would apply to "licenses issued after 2019," though not the current Project license.  Remand Order P 39, JA____.  Because neither the text nor the legislative history of the Pensacola Act expressly indicated "that section 28 should not apply in

full," the Commission refused to find that section 28's limitations had been impliedly repealed. *Id.* P 41, JA____.

## B. The Rehearing Order

The Authority requested agency rehearing, challenging all of the above conclusions and raising several other claims. *See* Reh'g Request at i-iii, 4-9, R. 1315, JA____-____, ____-____.

### 1. Remanded Issues

On agency rehearing, the Commission continued to reach the same conclusions. Remand Rehearing Order P 2, JA____. License Article 5 enables "the Commission, through the licensee, to carry out its regulatory responsibilities with respect to the project" and its effects on the public interest. *See id.* P 7, JA____. This means that the Commission has the authority, pursuant to Article 5, to direct the Authority to acquire any additional property rights necessary to address flood control issues at the Project. *Id.* P 23, JA____. That authority "is not limited by the Pensacola Act." *Id.* And the Commission further explained that a current project boundary is "an administrative tool"—it is not a substantive limit on a licensee's Article 5 obligations. *Id.* P 30 & n.80 (citing, in part, *Sacramento Mun. Util. Dist.*, 178 FERC ¶ 61,112, at P 23 (2022)), JA____-____.

The Commission also continued to find that flooding around the City had increased since Project construction. *Id.* P 23, JA____. Although the Authority argued that flood control operations are the responsibility of the Army Corps, the Commission noted that such operations are carried out by the Authority itself. *Id.* P 46, JA____-____. And the *City of Miami* Court "did not distinguish between flood control and other operations" in instructing the Commission to analyze the record evidence regarding flooding. *Id.* P 47, JA____.

### 2. Other Premature Objections, Including Takings Concerns

The Commission stressed, however, that it "has not ordered [the Authority] to acquire additional property rights" as of the Remand Rehearing Order; instead, the Commission ordered the Authority to submit a report detailing whether, and to what extent, it holds property rights necessary to fulfill project purposes, including flood control. *Id.* PP 23, 30 & n.83, JA____, ____. This rendered the Authority's "concerns regarding the scope, process, or impact associated with acquiring additional land . . . premature" as of the orders challenged here. *Id.* PP 23, 49, 56, JA____, ____, ____.

In particular, to the extent the Authority raised Takings Clause concerns related to "the potential impact of a future acquisition of additional property rights," the Commission found that concern "premature." *Id.* P 56, JA____. Until the Commission acts upon the information presented in the Authority's report, "it is unclear what, if any, final actions the Commission will require [the Authority] to take." *Id.* P 45 n.138, JA____. But in any event, the Commission disagreed that a direction to prepare a report constituted "an actual present or imminent injury that would potentially violate the Takings Clause," and noted that the Authority had "voluntarily accepted a license that included Article 5" obligations. *Id.* P 56, JA____.[6]

## SUMMARY OF ARGUMENT

On remand, the Commission squarely addressed all of the issues returned to it by *City of Miami*. After analyzing and explaining the relevant statutes and authorities, it found that despite the existence of

---

[6] The Authority also raised arguments about the economic, equitable, and due process effects of enforcing Article 5 obligations, and the timeliness of the City's Complaint, to which the Commission responded in the Remand Rehearing Order. *See* PP 48-54, JA____-____. However, the Authority has not maintained those arguments on appeal. *See* Br. iv, 29-66.

Project-specific legislation, the Commission retained authority to enforce Article 5 of the Project's current license. In adopting the Pensacola Act, Congress could have—but did not—clearly displace the license protections of section 28 of the Federal Power Act. Rather, the Commission found that the Pensacola Act's "ambiguous" terms, *see City of Miami*, 22 F.4th at 1043, can co-exist with section 28. The Authority's contrary arguments erroneously assume that such co-existence is impossible.

Nor do the terms of Article 5 itself—i.e., the Authority's clear responsibility to obtain and maintain all property rights necessary for Project purposes—somehow stop at the Project's current boundary. Only by elevating that concept well beyond its actual purpose and by misinterpreting Commission processes does the Authority argue otherwise.

The Commission also analyzed and explained the relevant evidence regarding the Project's flooding of nearby lands. Multiple studies in the record either demonstrated or helped confirm that the Project's operations cause flooding that stretches beyond the extent of

currently-held flowage easements.  As the Court observed, this evidence

is "powerful."  *City of Miami*, 22 F.4th at 1043.  It cannot be ignored.

The Commission further analyzed and explained the relative roles

of the Army Corps and the Authority in conducting Project flood control

operations.  All aspects of the record, the parties' arguments, and

relevant legal authorities received close scrutiny.  These sources

indicate that the Authority carries out the Army Corps' flood control

directions, but they also indicate that the Authority has received the

Army Corps' flowage easements and retains responsibility for flood

control releases when waters approach the top of the dam.  Flood

control is undoubtedly a Project purpose, and one to which the

Authority's Article 5 license obligations apply.  Here too, the

Commission acted reasonably on the basis of substantial evidence.

But, having stopped short of determining the exact geographic

extent of needed property rights, the Commission explained that the

Authority's takings concerns were premature.  In any event, should the

Court reach them now, they lack merit.

Because the Commission's orders on remand were reasonable and reasonably explained in all respects, this Court should deny the petitions for review.

## ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews Commission actions under the Administrative Procedure Act's narrow arbitrary and capricious standard. 5 U.S.C. § 706(2)(A); *E. Niagara Pub. Power All. & Pub. Power Coal. v. FERC*, 558 F.3d 564, 567 (D.C. Cir. 2009). Under that standard, the question is not "whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Rather, this standard merely requires that agency action "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

When addressing a question of statutory interpretation, this Court "begin[s] with the text." *City of Clarksville, Tennessee v. FERC*, 888 F.3d 477, 482-83 (D.C. Cir. 2018). That text, along with statutory structure and context, may answer the interpretive question. *See*, *e.g.*, *Pacific Gas & Elec. Co. v. FERC*, 113 F.4th 943, 949 (D.C. Cir. 2024). But, in general, an agency's statutory interpretation, if "reasonable and

defensible" and not "inconsistent with a statutory mandate," should be upheld. *Bureau of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 97 (1983). Indeed, while it "cannot bind a court," the agency's interpretation "may be especially informative" if based on "factual premises within" the agency's expertise. *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244, 2267 (2024) (quoting, in part, *Bureau*, 464 U.S. at 98 & n.8).

The arbitrary and capricious standard also applies to interpretive and compliance decisions under hydroelectric licenses, which will be upheld where "FERC's manner of enforcing the license was reasonable and in accordance with law." *Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008). License articles are industry-specific (and sometimes licensee-specific) regulatory documents, whose interpretation is informed by agency expertise. *See Pacific Gas & Elec. Co. v. FERC*, 720 F.2d 78, 84 (D.C. Cir. 1983) (affording deference to FERC when construing license conditions). In this context, the Court accords "great weight to the judgment of the expert agency that deals with" industry-specific legal terms "on a daily basis." *See Kansas Cities v. FERC*, 723 F.2d 82, 87 (D.C. Cir. 1983)

(addressing interpretation of Commission-jurisdictional contracts); *Nat'l Fuel Gas Supply Corp. v. FERC*, 811 F.2d 1563, 1570-71 (D.C. Cir. 1987) (same regarding settlement agreement that FERC approved).

On factual questions, the Commission's findings of fact are conclusive if supported by substantial evidence. 16 U.S.C. § 825*l*(b). But "the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). This "deferential review does not ask whether record evidence could support the petitioner's view of the issue, but whether it supports [FERC's] ultimate decision." *Ala. Mun. Distribs. Grp. v. FERC*, 100 F.4th 207, 211 (D.C. Cir. 2024) (citation and quotation marks omitted).

Finally, the Commission's determinations on remand are reviewed to ensure that they are responsive to the Court's mandate. *See*, *e.g.*, *Process Gas Consumers Grp. v. FERC*, 292 F.3d 831, 840 (D.C. Cir. 2002). In sum, "so long as FERC's decisions are not arbitrary or capricious, or lacking in substantial evidence," this Court does not "alter the Commission's judgment." *Brady*, 416 F.3d at 10-11 (affirming the Commission's judgment concerning the balancing of public uses at the Pensacola Project).

## II. THE COMMISSION REASONABLY INTERPRETED THE PENSACOLA ACT

### A. The Commission Answered the Question Remanded

The *City of Miami* Court instructed the Commission to "interpret the Pensacola Act" and decide whether it limits Commission "authority to enforce the existing license or . . . impose new conditions on future licenses." 22 F.4th at 1043-44. The Court found "particularly relevant" the Pensacola Act provision stating that "[t]he licensing jurisdiction of the Commission for the project shall not extend to any land or water outside the project boundary." *Id.* at 1042 (quoting § 7612(b)(3)(A), 133 Stat. 2313, Addendum A30).

However, the Court also found that "crucial language . . . ambiguous." *Id.* at 1043. And it found that the Commission had not fully considered how that language interacted with the limitations of section 28 of the Federal Power Act—which provides that later Congressional "changes shall not 'affect any license' issued under the Act." *Id.* at 1043-44 (quoting 16 U.S.C. § 822).

Indeed, Section 28 states that Congress's "right to alter, amend, or repeal this chapter is expressly reserved; but no such alteration, amendment, or repeal shall affect any license theretofore issued under

the provisions of this chapter, or the rights of any licensee thereunder."
16 U.S.C. § 822, Addendum A10.  That multi-part provision "protect[s]
reliance interests based on existing licenses, whether those interests
include the rights of the licensee *or obligations imposed by the*
*Commission to protect the public interest.*"  Remand Order P 40
(emphasis added), JA____.  Importantly, the terms the Commission
adopts for licenses are intended to be stable and secure for the term of
the license.  *See Pac. Gas & Elec.*, 720 F.2d at 82-83 (discussing
importance of "secure licenses").  And changes to the "tangible aspects
of a project" such as "physical changes" to its layout are generally
considered material amendments to a license.  *See Nat'l Parks*
*Conservation Ass'n v. FERC*, 6 F.4th 1044, 1053-55 (9th Cir. 2021).

On remand, the Commission found that the Pensacola Act does
not limit the Commission's authority over the existing license given the
terms of Federal Power Act section 28.  Remand Order PP 36-39,
JA____-____.  While the Commission had previously assumed (pre-
remand) that the two statutes were inconsistent it found after further
review that they were "capable of co-existence."  *Id.* P 39 (quoting
*Morton v. Mancari*, 417 U.S. 535, 551 (1974)), JA____.  In fact, "such co-

existence is the most reasonable reading of the two statutory texts" because the Pensacola Act lacks "any express indication" that Congress intended to depart from section 28's preservation of existing license rights and obligations. *See id.* PP 39-41, JA____-____.

The Commission found that "applying the Pensacola Act to the existing license would substantially undercut [the Authority's] obligation under the license to obtain all necessary property rights required for project purposes." Remand Rehearing Order P 41, JA____. Applying it to the complaint proceeding would therefore override Article 5 of the current license, contrary to section 28. *Id.* P 41 & n.118, JA____. That result was not compelled by the text of the Pensacola Act, and therefore the Commission refused to read into that Act an exception to Federal Power Act section 28 or assume that it must have been repealed by implication. *Id.* PP 42-43, JA____-____.

## B. The Pensacola Act Is Less Definitive Than the Authority Believes

Although the Court has already found the crucial language of the Pensacola Act ambiguous, the Authority now contends that it is clear. In the Authority's reading, there is "no doubt" about the Pensacola Act's meaning since it "*unambiguously defines* the necessary project lands

and prohibits FERC from requiring" acquisition of additional property. Br. 24 (emphasis added). The "plain text" and "evident purpose" of the Pensacola Act, as perceived by the Authority, compels the particular end result the Authority seeks. *See id.* at 24, 30, 32.

But as the Commission explained, despite the statute's invocation of the term "project boundary," the Pensacola Act "does not specify what the project boundary encompasses." Remand Order P 37 & n.70, JA____. It makes no mention of Federal Power Act section 28 or the reliance interests motivating that section. *Id.* PP 40-43, JA____-____. And the Pensacola Act contains no clear indication "that the new provisions apply to the current license," which Congress could have made explicit, "but it did not." Remand Rehearing Order P 43, JA____.

## C. The Commission's Responsibility Was to Reconcile the Statutes, if Possible

In this context, then, it was the Commission's responsibility to determine whether there was any statutory analysis that "reconciles the operation of both statutory schemes with one another rather than holding one completely ousted." Remand Order P 39 & n.78 (quoting *Silver v. N.Y. Stock Exchange*, 373 U.S. 341, 357 (1963)), JA____. The "guiding principle to reconciliation" is that implied repeals are found

"only to the minimum extent necessary"—not anytime there could be statutory conflict. *Silver*, 373 U.S. at 357; *see also id.* at 347, 360-61, 365-67 (finding that securities laws and antitrust laws may co-exist in certain circumstances).

The Commission therefore asked whether the Pensacola Act and Federal Power Act section 28 were "irreconcilably conflicting" such that the more "specific legislation overrides general provisions" of law. Remand Order P 39 & nn.74, 78 (quoting in part *Watt v. Alaska*, 451 U.S. 259, 266 (1981)), JA____-____. And now before this Court, the Authority carries "the heavy burden of showing" that the "two statutes cannot be harmonized, and that one displaces the other" because of "'a clearly expressed congressional intention' that such a result should follow." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation omitted); *see also Hunter v. FERC*, 711 F.3d 155, 159-60 (D.C. Cir. 2013) (finding that Commission failed to overcome "heavy burden" to demonstrate implied repeal).

### D. The Commission Correctly Found that the Pensacola Act and Federal Power Act Section 28 Could Coexist

#### 1. The Authority Fails to Carry Its Heavy Burden of Showing Irreconcilable Statutory Conflict

The Authority's arguments, however, fail to carry this burden. For its main argument, the Authority points to the "principle that specific laws trump those of general applicability." Br. 35. It also suggests that giving effect to Federal Power Act section 28 yields "constitutionally impossible" results. *See id.* at 34-36.

Neither contention has merit. As noted, the Commission found that it could give effect to both section 28 and the Pensacola Act. Remand Order P 39 & n.78, JA____. Section 28 reflects "Congress's unmistakable intent" to "protect existing licenses from subsequent legislative modification." *Id.* P 41, JA____. Rather than provide a "clear statement of . . . intent" to depart from that understanding, the "Pensacola Act does not explicitly address, much less entirely cover, the protections in section 28." *Id.*, JA____-____. (Indeed, despite containing numerous exceptions and qualifications regarding various other federal laws in nearby portions of the Pensacola Act, the provisions speaking to the Commission's purview over land and water "outside the project

boundary" have no such language.  *Compare* § 7612(b)(3)(A)-(B) *with, e.g.*, *id.* at (b)(1), (b)(2)(A), (e)(1)-(3) and (5)-(8), Addendum A29-A31.)

Of course, Congress "knows how to override" existing laws by using prefatory phrases like "[n]otwithstanding any other provision of law." *Epic Systems*, 584 U.S. at 514 (quoting 15 U.S.C. § 1226(a)(2)).[7] "The fact that we have nothing like that here is further evidence that" the statutes do not irreconcilably conflict.  *See id.*  And so the Commission reasonably concluded that it could give effect to both statutes; one does not displace the other.  Remand Order P 39 & n.78, JA____; Remand Rehearing Order P 42, JA____.  It found that "section 28 precludes the Pensacola Act's application to the existing license, but the Act would apply to the Commission's authority with respect to licenses issued after 2019."  Remand Rehearing Order P 42, JA____.

The Commission also distinguished other situations where Congress more clearly provided for certain procedures or regulatory outcomes regarding specific projects.  Although those project-specific

---

[7] *E.g.*, Pub. L. No. 113-177, 128 Stat. 1911 (2014) (reinstating a license and extending a particular project deadline "[n]otwithstanding the time period specified in section 13 of the Federal Power Act (16 U.S.C. 806)"), Addendum A32.

statutes had not been interpreted by a court alongside Federal Power
Act section 28, the Commission explained that, in any event, they were
distinguishable from the Pensacola Act. That is because no existing
license was then in effect, or because Congress's project-specific statute
imposed mere administrative or procedural changes (*e.g.*, extensions of
statutory deadlines) rather than substantive amendments. Remand
Rehearing Order P 40 & n.112 (citing, in part, 2020 Rehearing Order,
172 FERC ¶ 61,255 at P 20, JA____-____), JA____.

Thus, it is irrelevant here that Congress sometimes exercises
control over federal lands that happen to be within a FERC project's
boundary, or that Congress has passed an omnibus public lands statute.
*See* Br. 37 (citing Swan Lake Hydroelectric Project Boundary Correction
Act, Pub. L. No. 115-200, 132 Stat. 1527 (2018) and entire Omnibus
Public Land Management Act of 2009, Pub. L. No. 111-11, 123 Stat.
991). Those situations do not shed light on this one.

### 2.     The Authority's Remaining Claims Are Meritless

Furthermore, the Authority's claim that the Pensacola Act
amends neither the Federal Power Act nor the Project's FERC license—
thus rendering section 28 inapplicable—does not withstand scrutiny.

*See* Br. 36-40.  The Authority fails to explain what other "licensing jurisdiction" or authority—besides that granted by the Federal Power Act—the Commission would possess over the Project.  The Commission thus reasonably read the Pensacola Act as a "substantive amendment[] affecting the Commission's authority" under the licensing provisions of the Federal Power Act.  *See* Remand Order PP 42-44, JA____-____.

And if the Pensacola Act does not intend to alter any license conditions (*see* Br. 39-40), then it is not clear why the Authority thinks that the Act would operate as a defense to the City's complaint.  As explained below, License Article 5 imposes an obligation to obtain all necessary property rights required for project purposes, and Article 2 empowers the Commission to initiate project boundary changes reflecting such property rights acquisitions.  *See infra* pp. 45-51; *see also* Br. 43-44 (acknowledging, in passing, that the Commission "may direct the licensee to obtain additional property rights" in certain circumstances).  The Authority's reading of Pensacola Act subsection (b)(3) would override the terms of the license itself and substantially undercut the Authority's current obligations under it.  *See* Remand

Order P 43, JA____; Remand Rehearing Order P 41, JA____.  Section 28 therefore applies.

The Authority further accuses the Commission of believing that Congress could never provide an exception from Federal Power Act section 28.  *See* Br. 34-35, 37.  And it also claims that the Commission misjudged the effective date of the Act.  *Id.* at 24, 33-34.

But the Commission reasonably rejected these arguments.  "Had Congress wished to apply the restrictions in the Pensacola Act as of the date of enactment of the legislation or intended that the new provisions apply to the current license, it could have made that explicit, but it did not."  Remand Rehearing Order P 43, JA____.

In short, the Commission's "interpretation reasonably reconciles the relevant provisions of the two statutes by preserving section 28's protection of existing licenses while also giving meaning to the Pensacola Act."  *Id.* P 42, JA____.  It is the "most reasonable reading of the two statutory texts" given administrative process possibilities, and it should therefore be affirmed.  *See* Remand Order P 39, JA____; *Bureau of Alcohol, Tobacco & Firearms*, 464 U.S. at 98 n.8 (describing

as "influential" agency interpretations based on "factual premises within its expertise").

## III. THE COMMISSION REASONABLY INTERPRETED LICENSE ARTICLE 5

### A. The Commission Reasonably Explained That Article 5 Obligations Are Not Limited by a Project's Existing Boundary

On remand, the Commission was instructed to answer "whether Article 5 of the license obliges the Authority—putting aside the Corps' role—to acquire rights (either ownership or easements)" regarding flooding in the City. *City of Miami*, 22 F.4th at 1043. The Commission answered yes—Article 5 of the Project's License requires the Authority to acquire adequate property rights in perpetuity to accomplish all Project purposes, including flowage easements to accommodate flood control. *See* Remand Order P 54 & n.115, 67, JA____-____, ____.

Although a project boundary can be an important "administrative tool," the "requirements under Article 5 are not necessarily limited to this project boundary as described in the license at the time the license is issued." Remand Rehearing Order P 30, JA____. Article 5 requires the Authority to obtain property rights for "all lands, other than lands of the United States, necessary or appropriate for the construction,

maintenance, and operation of the project" and retain them for the life of the license. *Id.*; Addendum A63. The Commission's reasonable interpretation of its license requirement merits respect. *See City of Salisbury, N.C. v. FERC*, 36 F.4th 1164, 1167 (D.C. Cir. 2022) (citing *Pac. Gas & Elec.*, 720 F.2d at 84).

## B. The Authority Misconstrues the Current Project Boundary as Immutable

### 1. Project Purposes, Not Existing Maps, Define a Licensee's Article 5 Obligations

The Authority's principal argument regarding License Article 5 is that it cannot impose an ongoing obligation for a licensee to acquire land outside of the currently-effective project boundary. Br. 25. In other words, the project boundary *itself* conclusively defines the land rights that are statutorily "necessary or appropriate" for the project—and with it, the geographic limits of the Commission's authority over the licensee. *See id.* at 25-26, 40-43, 47-48.

The Commission reasonably rejected this mistaken argument. A project boundary is an "administrative tool" that "as a matter of administrative convenience, . . . define[s] those lands, waters, and facilities that comprise a project." Remand Rehearing Order P 30 & n.80 (quoting, in part, *Sacramento Mun. Util. Dist.*, 178 FERC ¶ 61,112

46

at P 23 (2022)), JA____. It constitutes a Commission finding, at a particular time on the basis of record evidence, regarding what lands, waters, and facilities are necessary or appropriate components of a power project. *See id.*; Remand Order P 54 & n.119 (Commission "determin[es] the project boundary on a case-by-case basis"), JA____; 18 C.F.R. § 4.41(h)(2) (outlining project application mapping requirements applicable to "lands necessary for . . . project purposes"). Indeed, by "enacting the 'necessary or appropriate' standard" in Federal Power Act section 3(11), 16 U.S.C. § 796(11), "Congress invested the Commission with significant discretion" for case-by-case adjudication regarding project scope. *See Chippewa & Flambeau Improvement Co. v. FERC*, 325 F.3d 353, 355-56, 358 (D.C. Cir. 2003).

But the project boundary itself "does not set the limit of the Commission's authority to require a licensee to fulfill its obligations under a license." Remand Rehearing Order P 30 n.80, JA____. The project boundary is an administrative construct that "does not itself create or alter property rights," and so the "Commission's ability to require its licensee to obtain additional property interests is not dependent on whether the property in question is inside or outside of

the pre-existing project boundary." *Id.* n.82 (quoting, in part, *PacifiCorp*, 80 FERC ¶ 61,334, at 62,113-14 (1997)), JA____-____.[8] This means that "the project boundary is not dispositive to our inquiry . . . under Article 5." Remand Order P 64 n.142, JA____.

Rather, license obligations are "separate and distinct," and in relevant part those obligations are driven by project purposes, not by existing maps. *See id.* P 54, JA____. Under 16 U.S.C. § 796(11), Addendum A2, "the relevant question is whether the [properties] are necessary or appropriate to maintain and operate the project. If so, then they are part of the complete unit of development and" should be part of the project. *See Marsh Valley Hydroelectric Co.*, 64 FERC ¶ 61,120, at 61,953 (1993) (finding that a particular project needed to include an upstream dam and canal that provided the water used to generate electricity).

In fact, even in the unusual circumstance where two adjacent FERC-licensed projects end up having "overlapping project boundaries,"

---

[8] *See also PacifiCorp*, 80 FERC ¶ 61,334 at 62,114 & n.24 (citing 16 U.S.C. § 802(a)(1) and License Articles 2 and 3 in explaining "the Commission's authority to expand the project boundary").

that is "not a jurisdictional or functional issue" that undermines either Commission authority or licensee responsibilities. *See Sacramento*, 178 FERC ¶ 61,112 at P 23. It is merely an "administrative issue" that the Commission may direct licensees to rectify when the record indicates a mismatch between project purposes and extant project boundaries. *See id.* PP 22-23. The Authority therefore significantly overstates the importance and finality of the Project's current boundary.

### 2. Any Necessary Project Boundary Changes Can and Will Be Addressed in Later Proceedings

This confusion over the precedential weight of a project boundary also extends to the Authority's description of Commission processes. At times, the Authority generally asserts that "[l]and that is not identified in the license and project boundary cannot be necessary for a project purpose." Br. 47. But the Authority also admits (in passing) that the Commission may sometimes determine that additional property rights are needed. *See id.* 43-44 (citing, in part, *City of Holyoke Gas & Elec. Dep't*, 109 FERC ¶ 61,206 (2004), and *Penn. Power & Light Co.*, 21 FERC ¶ 61,429 (1980)). And so the Authority resorts to arguing that the Commission has allegedly changed "established

procedure" regarding project boundary changes and acquisitions of property rights.  *See id.* 49.

There should be no such procedural confusion here, given the posture of this case and the license terms the Authority has accepted. The Commission explained that, if necessary, any project boundary amendment here lies in the future after appropriate antecedent fact-finding.  Remand Rehearing Order P 30 & n.83, JA____-____; Remand Order PP 64-65 & nn.142, 144, JA____-____.  Regardless of whether any newly-identified properties needed for project purposes are "inside or outside of the project boundary" at present, the Commission retains authority to "direct the licensee to obtain any additional property rights" and "amend the boundary as appropriate."  *City of Holyoke*, 109 FERC ¶ 61,206, at P 17; *see also Platte River Whooping Crane Critical Habitat Maint. Tr. v. FERC*, 962 F.2d 27, 32 (D.C. Cir. 1992) (explaining that licenses may contain "an express reservation of modification authority" given changed circumstances).  Under Articles 2, 3 and 5 of the Commission's standard license terms (which apply here and have been accepted by the Authority), either the Commission *or* a licensee can propose to revisit the geographic extent of a project

boundary when needed.  *See* Addendum A62-A63, *adopted by* 1992

License Order, 59 FERC ¶ 62,073, at Ordering P (D); *PacifiCorp*,

80 FERC ¶ 61,334 at 62,114 & n.24; *see also* Reh'g Request at 40-41

(collecting citations to Commission orders on Project boundary changes,

including 126 FERC ¶ 62,249 (2009)), JA____-____.

In short, the Commission has significant discretion in case-by-case

adjudication to determine what properties are "necessary or

appropriate" for the Pensacola Project.  *See Chippewa*, 325 F.3d at 357-

58; 16 U.S.C. § 796(11), Addendum A2.  It also retains authority to

enforce the common-sense terms of Article 5 which—consistent with the

orders cited by the Authority here—indicate that a "project boundary

should encompass at a minimum all lands on which flowage rights

would be needed for [a] reservoir under reasonably predictable flood

conditions."  *See* Remand Order P 54 n.117 (quoting *Penn. Power*,

21 FERC ¶ 61,429 at 62,009), JA____-____.  The Authority's arguments

to the contrary are unavailing.

## IV. THE COMMISSION REASONABLY EVALUATED THE EVIDENCE OF FLOODING AND EXPLAINED THE ROLES OF THE ARMY CORPS AND THE AUTHORITY

### A. The Commission Reasonably Analyzed the Record Evidence Regarding Flooding

The *City of Miami* Court directed the Commission to analyze "the evidence that Pensacola Dam's operation has caused the flooding in the City." 22 F.4th at 1043. The Court found that evidence "powerful." *Id.*

On remand, the Commission agreed. It found that the evidence provided in the City's Complaint, as corroborated by other record evidence, indicated that the project has increased flooding around the City of Miami beyond the extent of existing flowage easements. *See* Remand Order PP 63, 68, JA____, ____. In the Commission's judgment, "the record includes sufficient information to conclude that the project causes flooding," as the City had maintained for years. *Id.* PP 63-64, JA____-____.

The Authority's only evidentiary objection is that the Commission allegedly overlooked study findings that the Authority finds relevant. Br. 51-53. It claims that an "H&H Modeling Study" from 2018

exculpates the Authority since "natural events" and "the Corps' flood control operations" are what cause the disputed flooding. *Id.* 51.[9]

This objection is misplaced and misleading. The Authority cites to a 2018 report produced by the consultants at Mead & Hunt, Br. 52 (citing "H&H Modeling Study," Revised Study Plan, R. 227, Attachment A, JA____), but it ignores that the same consultant group updated its study in 2022, which the Commission analyzed (calling it the Mead & Hunt model). *See* Remand Order P 61 & n.133 (citing Updated Study Report, R. 642, Appendix 2, JA____); *see also* Reh'g Request at 113-14 (citing the 2022 Mead & Hunt model), JA____-____; *supra* pp. 23-25 (discussing various studies analyzed by the Commission).

The Commission explained that the Mead & Hunt analysis, offered by the Authority, was useful in that it confirmed the "with-dam" water elevations produced in the City's evidentiary submissions. Remand Order PP 61, 63, JA____, ____. But the Mead & Hunt analysis "did not include the scenario necessary to quantify the backwater effects caused by the existence of the project" in historic flood conditions.

---

[9] The role of the Army Corps is addressed below. *See infra* pp. 55-61.

Remand Rehearing Order P 45, JA____.  That is, it did not include a comparison indicating the differences between "with-dam" and "without-dam" conditions that, in the Commission's expert judgment, revealed that the presence of the dam itself causes several feet of flooding that exceeds the limits of existing flowage easements.  *See* Remand Order PP 61, 63, JA____, ____; Remand Rehearing Order P 45, JA____.

To be sure, rainfall comes from nature.  But the dam did not, and the evidence indicated that its existence contributes to flooding harming the City.  *See* Remand Order P 63, JA____; Remand Rehearing Order PP 44-47, JA____-____.  Because the Commission engaged with all the record evidence and reasonably explained its conclusions, its factual finding on causation is conclusive.  *See* 16 U.S.C § 825*l*(b); *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010) (refusing to "second-guess the Commission's technical judgment" if substantial evidence "supports the Commission's ultimate decision").

### B. The Commission Reasonably Explained the Relative Responsibilities of the Army Corps and the Authority

#### 1. The Commission Reasonably Found the Authority Responsible for Obtaining Requisite Property Rights

The *City of Miami* Court also directed the Commission to "determine the role of the Corps in this imbroglio." 22 F.4th at 1044. On remand, the Commission determined that the Army Corps directs flood operations at the Project, as outlined in statute, regulation, and by agreement. *See* Remand Order PP 50-51 & nn.105-111, JA____-____; *id.* P 67, JA____. The Authority, meanwhile, "is responsible for the physical operations of the flood control facilities." *Id.* P 50, JA____.

This relationship is the same "regardless of whether the Corps or the licensee holds rights to the property affected by those operations." Remand Rehearing Order P 26, JA____. And it has been known for years that additional flowage easements would be needed for the Project due to flood control operations. *See* Remand Order PP 47-48, JA____-____. But despite that knowledge, the Army Corps and the Authority have pointed fingers at one another regarding responsibility for obtaining the requisite property rights. *Id.* PP 49-50, JA____; *see*

*also* Revised Study Plan, Attachment B, Responses to Comments at 3, R. 227 (presenting the two entities' positions side-by-side), JA____.

Given the Court's remand, the Commission had to choose which position was correct—the Army Corps' or the Authority's. The Commission sided with the Army Corps' position, noting that pursuant to recent statute, the Army Corps transferred its flowage easements to the Authority, which "actively manag[es] activities occurring in the flowage easement area." Remand Order P 51, JA____. Thus, "the Corps no longer has jurisdiction or enforcement duties over the flowage easements associated with the project," and, in the absence of any exclusive responsibility visited upon the Army Corps, nothing prevented "the Commission from requiring [the Authority] to obtain such easements if needed for project purposes" under the license. *See id.*; *see also* Remand Rehearing Order P 28 (explaining that "the Corps' authority to obtain additional land rights is non-exclusive"), JA____.

> ## 2. The Authority Minimizes and Distorts Its Role as Project Owner and Operator to Avoid Responsibility

But the Authority resists these conclusions, arguing that the Commission failed to pin responsibility for all flooding-related problems

on the Army Corps. *See* Br. 53. It suggests that, despite its role as Project owner and operator, "this is all the Corps' doing." *See id.* In particular, the Authority believes that only the Army Corps is responsible for property acquisition above the 750-foot threshold at the Project, and it accuses the Commission of a "failure to consider" the relevant evidence. *See id.* at 54, 56, 58-59; *see also id.* at 27.

The challenged orders belie these claims. The Commission explained that Army Corps issues flood control directions that the Authority physically carries out. Remand Rehearing Order P 26, JA____-____. And thus the two entities are effectively acting as part of a cooperative venture when the Lake level reaches the flood pool stage, between 745 and 755 feet in elevation. *See id.* P 26 & nn. 57-61, JA____-____. Beyond that, the Authority is then "solely responsible for releases above 755 feet." *Id.*; *see also* 1992 Water Control Manual at 9-3, R. 231, JA____; 1992 Letter of Understanding at 1, JA____.

While control over the land needed for flood control was historically split between the Authority and the Army Corps, recently that control has been shifted to the Authority, which has acquired additional property rights in low-lying lands. *See* Remand Rehearing

Order P 28, JA____-____; Remand Order P 55 n.121, JA____.

Releases "made for flood control" at the Army Corps' direction at the

dam may also be "used for [power] generation" by the Authority,

making these purposes related. *See* Remand Order PP 7, 54, JA____,

____; Remand Rehearing Order P 33, JA____. And flood control is a

purpose of the project under the FERC license. *See* Remand Order

PP 50 & n.106, JA____; *id.* PP 54-55 & n.116, JA____-____.

The Authority therefore has an Article 5 obligation under that

license to acquire and maintain adequate property rights for all

purposes, even if the Army Corps plays a part in how the Authority

carries out one of those purposes. *See supra* 45-51, 55-58.

> **3. The Army Corps' Flood Control Statutes and Project Agreements Do Not Excuse the Authority from Its FERC Obligations**

The Authority then pivots to a different argument, claiming that

regardless of the facts regarding its cooperation with the Army Corps at

the Project, legal authorities place all responsibility on the Army Corps.

In this vein, the Authority contends that pursuant to several Acts of

Congress from 1938, 1941, 1944, and more recent years, "the Corps'

ongoing obligation to acquire additional property" is an "exclusive

responsibility." Br. 64-65; *see also id.* at 27-28, 58, 61. The Authority further argues that the Commission has lost sight of "its own lack of authority . . . over flood control"—only the Army Corps may "regulate regarding flood control." *Id.* at 60-61.

The Commission analyzed all relevant authorities and found that "nothing in the Corps' authority to acquire land needed for flood control operations is exclusive or undermines the Commission's authority to require [the Authority] . . . to obtain necessary land rights to address flood control issues." Remand Rehearing Order P 25, JA____. True, some of the early statutes regarding the Project, including those passed in 1938 and 1941, "allowed the Corps to acquire land needed for flood control operations." *Id.* But pursuant to section 7 of the Flood Control Act of 1944 (33 U.S.C. § 709), the Army Corps' Pensacola regulations identify its limited role in reducing Lake levels when they are between 745 and 755 feet, an arrangement further confirmed by the 1992 agreements between the Army Corps and the Authority. Remand Rehearing Order P 26, nn.55-59, JA____-____. These and other sources do not "grant the Corps exclusive authority" with regard to property rights acquisition, *id.* P 27, JA____-____, and more recent acts "further

demonstrate[] that the Corps' authority to obtain additional land rights is non-exclusive." *Id.* P 28, JA____-____.

The Authority's core argument (*see* Br. 65) is that the property acquisition requirements of the 1938 and 1941 Acts remain in effect and amount to exclusive Army Corps responsibility to acquire land necessary for flood control operations. But the Commission and the Army Corps disagreed. Remand Rehearing Order PP 26 n.60, 27-28, JA____-____. Both found that under "the 1944 Flood Control Act[,] the responsibility for acquiring the necessary project lands for authorized flood control purposes falls upon the project owner, not the Corps." *Id.* P 26 n.60 (quoting Army Corps July 26, 2018 Letter, JA____), JA____.[10]

_____

[10] The Army Corps' position was explained in a series of letters filed at FERC in 2018-2019, referred to in the record by their dates. *See* Army Corps July 26, 2018 Letter, FERC Accession No. 20180727-5008 (explaining that "the project owner is responsible for acquiring all real property interests needed for all authorized project purposes, including flood control"), *reprinted in* R. 227, JA____; Jan. 8, 2019 and Oct. 14, 2018 Army Corps Letters, *included in* R. 582 at Attachments A and B, JA____-____, ____-____; *see also* April 3, 2018 Army Corps Letter, FERC Docket No. P-1494-438, Accession No. 20180403-5204, *available at* https://elibrary.ferc.gov/eLibrary/filelist?accession_number =20180403-5204&optimized=false.

Notably, the Authority does not present any language from the 1938 and 1941 enactments that explicitly confers (on the Army Corps) the exclusive jurisdiction the Authority asserts. *See* Br. 8-9, 58. Under the cited authorities, Congress "authorized and directed" the then-Secretary of War to acquire necessary property rights or reimburse State or local entities for such acquisitions, but this language does not *exclude* other entities from contributing. *See* Pub. L. No. 75-761 at § 2, 52 Stat. 1215-16 (1938 Act), Addendum A16-A17; *see also* Pub. L. No. 77-228 at § 3, 55 Stat. 639, 645 (1941 Act including "the reservoirs in the Grand (Neosho) River Basin"), Addendum A19, A25. From these acts, and more recent Congressional action in 2016 and 2019, the Commission found the Army Corps' authority "non-exclusive." Remand Rehearing Order P 28, JA____; Remand Order PP 51 & n.109, 52 & n.112 (discussing the 2016 and 2019 developments), JA____-____.[11] Its finding was reasonable and is amply supported by the record here.

---

[11] Citing Pub. L. No. 114-322, § 1321(c), 130 Stat. 1705-06 (2016), Addendum A35-A36; S. Amdt. 711 to S.1790, *reprinted in* 165 Cong. Rec. S3660 at S3719-S3720 (daily ed. June 18, 2019)), Addendum A60-A61.

## V.  THE AUTHORITY'S REGULATORY TAKINGS CLAIM IS UNRIPE AND LACKS MERIT

Finally, the Authority devotes a portion of its brief to a claim the Commission found premature and deferred to later proceedings.  The Authority claims that the Takings Clause of the Fifth Amendment to the U.S. Constitution is implicated here, and that the Commission's action "threatens to impose a regulatory taking by upsetting [the Authority's] reasonable expectations."  Br. 56-57 (citing, in part, *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124-25 (1978)).

But this sort of claim requires specific "economic injuries" and entails "essentially ad hoc, factual" determinations about them based "upon the particular circumstances" of the individual case.  *Penn Central*, 438 U.S. at 124.  A record that "tells us nothing about the actual burden imposed on property rights" sheds no light on the issue.  *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005).

Here, the Commission explained that the Authority's concerns are premature as it has not yet been directed "to acquire any additional land rights."  Remand Rehearing Order P 56, JA____.  So far, the Authority has "only been directed to *prepare a report* of flooding impacts

in the area surrounding the project." *Id.* (emphasis added).[12]  Until that

fact-finding effort has been completed and results in final Commission

action, "it is unclear what, if any, final actions the Commission will

require [the Authority] to take." *Id.* P 45 n.138, JA____.

Thus, the Authority's concern about possible interference with its

economic expectations is unfit for resolution now—i.e., it is not ripe and

should be deferred until the facts are fully developed in later

proceedings.  *See Flint Hills Res. Alaska, LLC v. FERC*, 627 F.3d 881,

889 (D.C. Cir. 2010) (collecting ripeness cases, including *Devia v. NRC*,

492 F.3d 421 (D.C. Cir. 2007)); *TransCanada Power Mktg. Ltd. v.*

*FERC*, 811 F.3d 1, 9 (D.C. Cir. 2015) (argument about economic costs to

licensee that were "not yet certain" was "not yet ripe," in judicial review

of Commission orders under 16 U.S.C. § 825*l*(b) (citing *OMYA, Inc. v.*

*FERC*, 111 F.3d 179 (D.C. Cir. 1997)).

But even if the Court were to reach this claim now, it fails on the

merits.  The Commission explained that the Authority "voluntarily

---

[12] The Authority's report was filed on November 13, 2024, and it will be addressed in further proceedings.  *See* Flood Frequency Analysis and Envelope Curve Report, FERC Docket No. P-1494-477 (Accession No. 20241113-5030).

accepted a [FERC-issued] license that included Article 5" obligations and that "requiring compliance with that article would not constitute a taking." Remand Rehearing Order P 56, JA____. Indeed, this Court has explained that when an owner of property voluntarily participates in a regulated market, it accepts that the regulatory regime they have entered may affect their property and economic interests. *See Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 515 (D.C. Cir. 2020).

Given the Commission's broad authority to impose license conditions, *see, e.g., Pac. Gas & Elec.*, 720 F.2d at 83-84, there is no takings problem when a licensee voluntarily accepts reasonable conditions designed to protect the public interest. *See Valancourt Books, LLC v. Garland,* 82 F.4th 1222, 1232 (D.C. Cir. 2023) (finding that "consenting to the agency's requirements for a license" or entering "a voluntary exchange for a governmental benefit" poses "no takings problem"). The Authority's reasonable expectations should *include* full compliance with its license obligations; they would not be upset by requiring that compliance. *See* Remand Rehearing Order P 56, JA____.

## CONCLUSION

For the foregoing reasons, the Court should deny the petitions for review.

Respectfully submitted,

Matthew R. Christiansen
General Counsel

Robert H. Solomon
Solicitor

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

Federal Energy Regulatory Commission
Washington, D.C.  20426
Tel.: (202) 502-6413
Fax: (202) 273-0901
Email: jason.perkins@ferc.gov

December 17, 2024

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Circuit Rule 32(e), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,980 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

I further certify that this brief complies with the type-face requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Century Schoolbook 14-point font using Microsoft Word.

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney

Federal Energy Regulatory Commission
Washington, D.C.  20426
Tel.: (202) 502-6413
Fax: (202) 273-0901
Email: jason.perkins@ferc.gov

December 17, 2024

## CERTIFICATE OF SERVICE

I hereby certify that, on December 17, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Jason T. Perkins*
Jason T. Perkins
Attorney