**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

GRAND RIVER DAM AUTHORITY,
*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*,

CITY OF MIAMI, OKLAHOMA,
*Intervenor for Respondent*,

On Petition for Review of Action of the Federal Energy Regulatory Commission,
186 FERC ¶ 61,045 et al.

**BRIEF OF LEAD AGENCY, INC. AS *AMICUS CURIAE* IN SUPPORT OF
RESPONDENT AND DENIAL OF PETITIONS**

Christophe Courchesne
Environmental Advocacy Clinic
Vermont Law and Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1630
ccourchesne@vermontlaw.edu
*Counsel for Amicus LEAD Agency, Inc.*

**CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES, AND SEPARATE BRIEFING**

Pursuant to D.C. Circuit Rule 28(a)(1), *Amicus* Local Environmental Action Demanded Agency, Inc. (LEAD) submits the following Certificate as to Parties, Rulings, Related Cases, and Separate Briefing.

All parties and amici appearing before this Court are listed in the Petitioner's Brief, with the exception of *Amicus* LEAD and any other *amici* in support of Respondent.

References to the rulings under review and to related cases appear in Respondent's Brief.

Pursuant to D.C. Circuit Rule 29(d), *Amicus* LEAD states that separate briefing is warranted because LEAD is an environmental justice organization dedicated to improving environmental conditions and public health for communities in northeast Oklahoma, and because LEAD provides a unique perspective as an active participant with distinct concerns in the relicensing proceeding for the hydropower project at issue in this case.

Respectfully submitted,

*/s/ Christophe Courchesne*
Christophe Courchesne
*Counsel for Amicus LEAD Agency, Inc.*

## RULE 29 STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4), *Amicus* Local Environmental Action Demanded Agency, Inc. (LEAD) states that no party or party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than LEAD or its counsel contributed money intended to fund preparing or submitting this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and D.C. Circuit Rule 29(b), a motion seeking the Court's leave to file accompanies this brief.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES, AND SEPARATE BRIEFING ................................................................. ii

RULE 29 STATEMENTS ...................................................................... iii

TABLE OF AUTHORITIES .................................................................. vi

GLOSSARY ......................................................................................... viii

IDENTITY AND INTERESTS OF AMICUS CURIAE ......................... 1

INTRODUCTION AND BACKGROUND ............................................. 3

ARGUMENT ........................................................................................ 8

I.      THE AUTHORITY'S REFUSAL TO HONOR ITS OBLIGATIONS UNDER THE PROJECT LICENSE THREATENS THE HEALTH AND SAFETY OF LOCAL COMMUNITIES IN NORTHEAST OKLAHOMA ................................................................................. 9

    A. The Authority's Contention That Only Lands Within the Project Boundary Could Possibly Be Necessary or Appropriate for Operation of the Project Is Self-Serving and Dangerous ..................... 9

    B. The Commission's Interpretation of Standard Article 5 Is Supported by Past Precedent ................................................................. 11

II.     THE AUTHORITY IS ADVANCING A DANGEROUS AND EXTREME INTERPRETATION OF THE PENSACOLA ACT THAT IS UNGROUNDED IN THE STATUTE ................................................ 14

    A. The Federal Power Act Precludes Application of the Pensacola Act to the Authority's Existing License ...................................................... 14

    B. Even if the Pensacola Act Did Apply to the Existing License, the Act Does Not Bar the Commission From Enforcing the Authority's License Obligations Under Standard Article 5 ................ 16

III.   THE COURT SHOULD NOT CREDIT THE AUTHORITY'S DEFLECTION OF RESPONSIBILITY ONTO THE ARMY CORPS OF ENGINEERS ..................................................................................... 20

    A. The Commission Did Not "Refuse" to Answer This Court's Question on the Corps' Responsibility ................................................. 21

    B. The Corps' Authority to Acquire Properties Around the Project Does Not Diminish the Authority's Obligations Pursuant to Standard Article 5 ................................................................................... 22

CONCLUSION ...................................................................................................24

CERTIFICATE OF COMPLIANCE .......................................................................26

CERTIFICATE OF SERVICE ................................................................................26

# TABLE OF AUTHORITIES

**Cases**

*City of Miami v. FERC*, 22 F.4th 1039 (D.C. Cir. 2020). .............................. 6, 7, 21

*Pacific Gas & Elec. Co. v. FERC*, 720 F.2d 78 (D.C. Cir. 1983) ...........................15

*Scenic Hudson Preservation Conference v. Callaway*, 370 F. Supp. 162 (S.D.N.Y. 1973) ...................................................................................................16

**Statutes and Regulations**

16 U.S.C. § 822 ...................................................................................................15

42 U.S.C. §§ 9601 *et seq.*......................................................................................5

National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat 1198 (2019)................................. 6, 7, 8, 14, 15, 16, 17, 18, 20

Pub. L. No. 75–761, § 2, 52 Stat. 1215 (1938). .........................................................3

Pub. L. No. 77–228, § 4, 55 Stat. 638 (1941). ..........................................................3

**Regulatory Documents**

*Appalachian Power Co.*, 112 FERC ¶ 61,026 (2005) ...............................................12

*Brazos River Auth.*, Order on Petition for Declaratory Order, 124 FERC ¶ 61253 (2008) ...............................................................................................13

*City of Holyoke Gas & Elec. Dept.*, 109 FERC ¶ 61,206 (2006) .................... 10, 19

*Grand River Dam Auth.*, 59 FERC ¶ 62,073 (1992). .................................................5

*Grand River Dam Auth.*, 67 FERC ¶ 62,131, *vacated*, *Grand River Dam Auth.*, 67 FERC ¶ 62,239 (1994)........................................................................19

*Grand River Dam Auth.*, 77 FERC ¶ 61,251 (1996) .......................................11, 19

*Grand River Dam Auth.*, 146 FERC ¶ 62,060 (2014) ............................................19

*Grand River Dam Auth.*, 156 FERC ¶ 61,106 (2016) ............................................19

*Grand River Dam Auth.*, 160 FERC ¶ 61,001 (2017) ......................................11, 19

*Grand River Dam Auth.*, Order Addressing Arguments Raised on Rehearing, 187 FERC ¶ 61,211 (2024) .................................................. 10, 13, 18, 19, 22, 23

*Grand River Dam Auth.*, Order on Remand, 186 FERC ¶ 61,045 (2024) ................................................................................... 3, 7, 12, 16, 21, 22

*Grand River Dam Auth.,* Letter Order, Project No. 1494-445 (Apr. 29, 2020), *on reh'g*, 172 FERC ¶ 61,255 (Sept. 17, 2020). ...................................................6

*Menominee Co. N.E.W. Hydro, Inc.*, 74 FERC ¶ 61,023 (1996) .............................12

*New York Irrigation District, et al.*, Order Denying Rehearing and Lifting
  Stay, 58 FERC ¶ 61271 (1992) ................................................................ 12, 13
*PacifiCorp*, 80 FERC ¶ 61,334 (1997) ...............................................................13
*Public Utility District No. 1 of Chelan County, Washington*, 15 FERC
  ¶ 62,168 (1981) ................................................................................................12
*Sacramento Mun. Util. Dist.*, 178 FERC ¶ 61,112 (2022)............................. 10, 19
*Union Elec. Co.*, 137 FERC ¶ 61,114 (2011) ....................................................13

## Regulations

Form L-3, Terms and Conditions of License for Constructed Major Project
  Affecting Navigable Waters of the United States, Article 5, 54 F.P.C.
  1817, 1818 (1975). ........................................................................................6, 10

## Other Authorities

Area History – Timeline, L.E.A.D. Agency, Inc.,
  https://www.leadagency.org/history. .................................................................4, 5
Dale Denwalt, *CONCERNS ON THE RISE: Upstream from Grand Lake
  Dam, Residents Worry About Toxic Floods*, Oklahoman (Dec. 12, 2023)....2, 20
H.R. Rep. No. 116–333 pt. 2 (2019) (Conf. Rep.)...................................................18
Ross Milloy, *Picher Journal; Waste From Old Mines Leaves Piles of
  Problems*, NY Times (Jul. 21, 2000)....................................................................5
Sarah Mervosh, *A Senator's Lake House vs. a Town Fighting Flooding*, NY
  Times (Aug. 27, 2019). ........................................................................................6

# GLOSSARY

| | |
|---|---|
| **Commission** | Respondent Federal Energy Regulatory Commission |
| **Corps** | U.S. Army Corps of Engineers |
| **Authority** | Petitioner Grand River Dam Authority |
| **LEAD** | Amicus Local Environmental Action Demanded Agency, Inc. |
| **Miami** | Intervenor for Respondent City of Miami, Oklahoma |
| **Order on Remand** | Order on Remand, Grand River Dam Auth., Project No. 1494-468, 186 FERC ¶ 61,045 (2024) |
| **Pensacola Act** | Section 7612 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat 1198 (2019) |
| **Project** | Pensacola Hydroelectric Project, No. 1494, located on the Grand (Neosho) River in Craig, Delaware, Mayes, and Ottawa Counties, Oklahoma |
| **Rehearing Order** | *Grand River Dam Auth.*, Order Addressing Arguments Raised on Rehearing, Project No. 1494-468, 187 FERC ¶ 61,211 (2024) |
| **Standard Article 5** | Form L-3, Terms and Conditions of License for Constructed Major Project Affecting Navigable Waters of the United States, Article 5, 54 F.P.C. 1817 (1975) |

**IDENTITY AND INTERESTS OF AMICUS CURIAE**

Local Environmental Action Demanded Agency, Inc. (LEAD) is a non-profit 501(c)(3), native-led environmental justice organization incorporated in 1997. It actively supports the Grand Riverkeeper, an advocate for the upper Grand River watershed, including Grand Lake and its tributaries, as well as the Tar Creekkeeper, who is dedicated to safeguarding the Tar Creek watershed from its origin in Kansas to its convergence with the Neosho River in the City of Miami, Oklahoma. The members of LEAD reside and work within the watershed, with a significant presence in the City of Miami and other regions at risk of flooding exacerbated by the Pensacola Project (Project), which is at issue in this case. LEAD is an active participant in the Project's relicensing, and Petitioner Grand River Dam Authority (Authority) could seek to rely on a favorable outcome in this case to bolster its erroneous arguments in that proceeding before the Federal Energy Regulatory Commission (Commission) that the Authority is not responsible for the Project's impacts on surrounding communities.

Upholding the Commission's power to hold the Authority accountable is vitally important to safeguarding our water resources and protecting the health of our communities. Before the Commission and in many other venues, LEAD has consistently advocated for addressing the environmental and public health issues affecting the Tar Creek watershed, an area profoundly impacted by decades of

mining in the Tri-State Mining District.[1] The Tar Creek Superfund Site, in particular, remains heavily contaminated with heavy metals, posing severe risks to both ecological systems and human health.

These longstanding environmental challenges are exacerbated by the Authority's ongoing refusal to maintain appropriate water levels at the Project's reservoir. The Authority's inaction undermines effective control of toxic runoff and sediment, perpetuating the dispersal of harmful contaminants throughout the watershed. Addressing the flooding concerns at issue in this case is critical to mitigating the adverse effects of pollution and safeguarding the well-being of the surrounding communities.

---

[1] *See Grand River Dam Auth.*, LEAD Comments in Response to Draft License Application, Project No. 1494-438 (Apr. 3, 2023, Accession No. 20230403-5069); *Grand River Dam Auth.*, LEAD Comments in Response to Updated Study Report Summary, Project No. 1494-438 (Nov. 29, 2022, Accession No. 20221129-5170); *Grand River Dam Auth.*, LEAD Comments Regarding Authority Sedimentation Study, Project No. 1494-438 (Feb. 3, 2022, Accession No. 20220203-5035); *Grand River Dam Auth.*, LEAD Comments to the Amendment to Application for Relicensing, Project No. 1494-448 (Jul. 29, 2019, Accession No. 20190729-5149). *See also* Dale Denwalt, *CONCERNS ON THE RISE: Upstream from Grand Lake Dam, Residents Worry About Toxic Floods*, OKLAHOMAN (Dec. 12, 2023), https://www.oklahoman.com/story/news/2023/12/12/grand-lake-dam-oklahoma-upstream-residents-worry-about-toxic-floods/71811352007/.

## INTRODUCTION AND BACKGROUND

Communities in northeast Oklahoma have borne the consequences of environmental injustice for far too long.

In 1938, Congress authorized the Pensacola Project for "flood control." Pub. L. No. 75–761, § 2, 52 Stat. 1215, 1218 (1938). The Authority received the Original License to operate the project in 1939, under the Federal Power Commission. *Grand River Dam Auth.*, Order on Remand, Project No. 1494-468, 186 FERC ¶ 61,045, at P 3 (2024) (Order on Remand).[2]

Despite flood control serving as the Project's clear and primary purpose, the Project's operation has subjected Oklahomans in surrounding communities to flooding and the resulting significant environmental damage since the dam was erected. Historical data, dating back to the 1940s, demonstrates that the Project has, in fact, exacerbated upstream flooding—harming communities throughout northeast Oklahoma. Order on Remand at P 63.

---

[2] In 1941, Congress authorized the construction of the Project, once again for "flood control." Pub. L. No. 77–228, § 4, 55 Stat. 638, 645 (1941).


*Flooding in City of Miami, Oklahoma, May 30, 2019*
*Photo: J. Pat Carter*

Residents' concerns over flooding caused by the Project's operations are only exacerbated by the Project's proximity to the nearby Tar Creek Superfund site. Rebecca Jim, a founder of LEAD, witnessed these issues firsthand when she returned to the Tar Creek area in the late 1970s. At that time, acidic mine water laden with toxic heavy metals had already begun leaching into surface waters, marking the onset of an environmental crisis that continues to threaten the health and safety of the community today.[3] The Tar Creek ran a sickening, rusty, reddish-orange. The Environmental Protection Agency and the State of Oklahoma took

[3] Area History – Timeline, L.E.A.D. AGENCY, INC., https://www.leadagency.org/history.

notice of these incredibly concerning developments, and in 1983, the area was designated as a Superfund site under the Comprehensive Environmental Response, Compensation and Liability Act.[4]

The Authority received a new license from the Commission to operate the Project in 1992. *Grand River Dam Auth.*, 59 FERC ¶ 62,073 (1992). Once again, the Project's impacts on toxic flooding in surrounding communities came to the forefront. In 1993, one study found that 34 percent of children tested in nearby Picher, Oklahoma had blood lead levels exceeding "the point at which there is a risk of brain or nervous system damage."[5] Again, *more than one-third of children tested in a surrounding community had elevated blood lead levels*. In response to these public health and environmental concerns, LEAD was founded in 1997 to advocate for the remediation of these environmental harms plaguing northeast Oklahoma.[6]

The City of Miami, Oklahoma (Miami) filed a complaint before the Commission in 2018 to protect upstream communities from the risks of toxic flooding exacerbated by the Project. Miami argued that the Authority had been in violation of its project license for 27 years, citing its failure to acquire properties

---

[4] 42 U.S.C. §§ 9601 *et seq.*
[5] Ross Milloy, *Picher Journal; Waste From Old Mines Leaves Piles of Problems*, NY Times (Jul. 21, 2000), https://www.nytimes.com/2000/07/21/us/picher-journal-waste-from-old-mines-leaves-piles-of-problems.html.
[6] Area History, *supra* note 3.

"necessary or appropriate" for the Project's operation within the required five-year period following the license issuance. Form L-3, Terms and Conditions of License for Constructed Major Project Affecting Navigable Waters of the United States, Article 5, 54 F.P.C. 1817, 1818 (1975) (Standard Article 5).

In the interim, Congress passed the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat 1198 (2019). At issue here is Section 7612 of the law, more widely known as the Pensacola Act. *Id.* at § 7612 (Pensacola Act).[7]

Initially, the Commission rejected Miami's Complaint. *Grand River Dam Auth.,* Letter Order, Project No. 1494-445 (Apr. 29, 2020), *on reh'g*, 172 FERC ¶ 61,255 at P 12–13 (Sept. 17, 2020). Thereafter, Miami petitioned this Court for review, and this Court granted the petition and remanded several issues back to the Commission for determination. *City of Miami v. FERC*, 22 F.4th 1039 (D.C. Cir. 2020). This Court instructed the Commission to: "[1] determine the role of the [Army Corps of Engineers (Corps)] in this imbroglio, [2] the responsibility the

---

[7] The Pensacola Act was included in a must-pass defense spending bill in an attempt to limit the Commission's authority to require that the Authority honor its obligations under the project license. Sarah Mervosh, *A Senator's Lake House vs. a Town Fighting Flooding*, NY TIMES (Aug. 27, 2019). Former Oklahoma Senator Jim Inhofe, then chairman of the Senate Armed Services Committee, leveraged his position to insert the Pensacola Act into such an important bill in order to ensure boating access for local residents. *Id.* Senator Inhofe also owned a lakefront vacation property on the reservoir created by the Project. *Id.*

Authority bears if it caused flooding in the City, [3] analyze the evidence [of flooding that Miami] has produced, and [4] . . . interpret the Pensacola Act" and how it impacts the Commission's authority in this case. *Id.* at 1044. In its Order on Remand, the Commission found that Standard Article 5 of the Authority's project license unequivocally requires the Authority to acquire land necessary and appropriate for project operations, regardless of the project boundary or the Corps' role. Order on Remand at P 54. The Commission also found that the Pensacola Act does not apply to the Authority's existing license. Order on Remand at P 38. Finally, addressing the Authority's argument that the Corps should be responsible, the Commission found that the Corps' authority to acquire lands for flood control is not exclusive, and that the Corps' role is limited to directing flood operations at the Project, while the Authority is responsible for physical operations. Order on Remand at P 52. The Authority then petitioned this Court for review.

Before this Court now rests an opportunity to require that the Authority, the Project's operator, honor its obligations under the project license to acquire lands necessary and appropriate for project operations, including flood control. The lands at issue here sit upstream of the Project, where concerns over toxic flooding plague surrounding residents. Under the Authority's reading of Standard Article 5 and the Federal Power Act, even lands *permanently inundated with toxic heavy metals* because of project operations would fall outside the Commission's regulatory

7

authority. Such disregard for project impacts on surrounding communities is unacceptable. The Authority's interpretation of its license obligations flouts the intent of the Federal Power Act and unjustly seeks to avoid the Authority's responsibilities for harms that the Project causes in upstream communities. This Court should not reward the Authority's refusal to accept its obligations to the public.

## ARGUMENT

The Court should deny the petitions and affirm the Authority's obligations to acquire lands necessary and appropriate for operation of the Pensacola Project pursuant to Standard Article 5 of the project license. Contrary to the Authority's arguments, the Pensacola Act does not apply to the Authority's existing license, and the Act would not in any event preclude the Commission from requiring the Authority to fulfill its obligations pursuant to Standard Article 5. Likewise, the Corps' authority to acquire lands surrounding the Project for flood control is not exclusive and does not obviate the Authority's license obligations under Article 5 to acquire lands necessary and appropriate for project operations, including flood control.

## I. THE AUTHORITY'S REFUSAL TO HONOR ITS OBLIGATIONS UNDER THE PROJECT LICENSE THREATENS THE HEALTH AND SAFETY OF LOCAL COMMUNITIES IN NORTHEAST OKLAHOMA

The Authority's legally-unmoored interpretation of its license obligations is incredibly damaging to local communities. The Authority has been and is an obligation pursuant to Standard Article 5 of its project license to acquire lands that are necessary and appropriate for project operations, regardless of the project boundary. This obligation is supported by past precedent, which the Commission's Orders on Remand properly followed.

### A. The Authority's Contention That Only Lands Within the Project Boundary Could Possibly Be Necessary or Appropriate for Operation of the Project Is Self-Serving and Dangerous

The Authority's obligation to acquire lands necessary or appropriate for project operations is not dependent on the project boundary. For the Court to rule otherwise would violate the plain language of Standard Article 5, undermine the Commission's power to regulate the Project, and completely dismiss the concerns of nearby communities who are actually impacted by the Project's operation.

The Authority's interpretation of its obligations under its project license is not only legally flawed, it also is unconscionably damaging to surrounding communities in northeast Oklahoma. Standard Article 5 of the project license that the Authority voluntarily accepted reads:

> The Licensee, within five years from the date of issuance of the license, *shall acquire* title in fee or the right to use in perpetuity all lands, other than lands of the United States, *necessary or appropriate* for the construction, maintenance, and operation of the project. The Licensee or its successors and assigns shall, during the period of the license, *retain the possession of all project property covered by the license as issued or as later amended, including the project area, the project works, and all franchises, easements, water rights, and rights of occupancy and use….*

Standard Article 5 (emphasis added). Neither the above-quoted text of Standard Article 5, nor the remainder of the article that follows, make even one reference to the term "project boundary." *Id.* In light of the text of Standard Article 5, the Authority's contention that the provision applies only to lands within the project boundary is remarkably puzzling.

As an "administrative tool" the project boundary does not limit the Authority's obligations to acquire lands necessary and appropriate for operation of the Project. *Grand River Dam Auth.*, Order Addressing Arguments Raised on Rehearing, Project No. 1494-468, 187 FERC ¶ 61,211, at P 30 (June 27, 2024) (Rehearing Order) (citing *Sacramento Mun. Util. Dist.*, 178 FERC ¶ 61,112, at P 23 (2022)). As the Commission has previously held, "Article 5 imposes an *ongoing obligation that applies to changes in the scope of the project property*. The transferee will be required to obtain sufficient interests in land that are *or may become* part of the project." *City of Holyoke Gas & Elec. Dept.*, 109 FERC ¶ 61,206, at P 8 (2006) (emphasis added) .

Here, the logical scope of the project property has changed because of the Authority's management decisions. The Authority has modified the rule curve for the Project several times since the License was approved—including two permanent changes and many temporary variances.[8] The 'rule curve' for the Project represents the "water levels at which the Authority must keep the surface of Grand Lake under normal conditions." Respondent's Brief at xiii. These amendments to the rule curve show that higher reservoir levels affecting flooding impacts on surrounding lands and therefore implicate the Authority's obligations under Standard Article 5.

Under the Authority's interpretation of Standard Article 5 and the Federal Power Act, even lands permanently inundated with toxic floodwaters because of project operations would fall outside the Commission's regulatory authority. Such a perverse outcome defies the intent of Standard Article 5, and of the Federal Power Act itself.

## B. The Commission's Interpretation of Standard Article 5 Is Supported by Past Precedent

The Commission's interpretation of the Authority's license obligations pursuant to Standard Article 5 in its Orders on Remand was not, as the Authority

---

[8] *See Grand River Dam Auth.*, 77 FERC ¶ 61,251, at P 62,001 (1996) (amending license to modify the operating rule curve for the Project); *Grand River Dam Auth.*, 160 FERC ¶ 61,001, at P 8 (2017) (amending license to permanently alter Article 401's reservoir elevation rule curve requirements for the Project).

contends, a departure from Commission precedent. Instead, the Commission confirmed longstanding precedent that Standard Article 5 imposes an ongoing obligation to acquire property necessary or appropriate for project operations—an obligation unrelated to the 'project boundary.'

The Commission's interpretation of Standard Article 5 is supported by past precedent. As the Commission's Order on Remand noted, the Commission "has stated on numerous occasions that standard license Article 5 requires licensees to acquire adequate property rights in perpetuity to accomplish all project purposes." Order on Remand at P 54 (referencing *Appalachian Power Co.*, 112 FERC ¶ 61,026, at P 89 (2005); *Menominee Co. N.E.W. Hydro, Inc.*, 74 FERC ¶ 61,023, at 61,066 (1996); *Public Utility District No. 1 of Chelan County, Washington*, 15 FERC ¶ 62,168, at 63,279 (1981)). As the Commission has held previously:

> [A]rticle 5 requires a licensee, by five years after issuance of its license, to acquire and retain title in fee to, or the right to use in perpetuity, project property sufficient to accomplish all project purposes; such rights must accommodate the licensee's obligations for the current license term as well as the obligations of future licensees, and provide sufficient rights in project property to enable the Commission, through the licensees, to carry out its regulatory responsibilities with respect to the project;

*New York Irrigation District et al.*, Order Denying Rehearing and Lifting Stay, 58 FERC ¶ 61271 (1992).

But the Authority's "holding of fee simple title in project property does not ipso facto satisfy the requirements of article 5." *Id.* at P 1. According to longstanding Commission precedent, "[t]he Commission's ability to require its licensee to obtain additional property interests is *not dependent on whether the property in question is inside or outside of the pre-existing project boundary*." *PacifiCorp*, 80 FERC ¶ 61,334, at 62,113–14 (1997) (emphasis added). For example, the Commission "often require[s] licensees to retain an undeveloped buffer strip between the project reservoir and any areas that are to be developed, in order to protect public recreation and other environmental values." *Brazos River Auth.*, Order on Petition for Declaratory Order, 124 FERC ¶ 61253 at P 6 (2008).

Furthermore, the Authority is not required to incorporate purchased lands into the project boundary. As the Commission noted in its Rehearing Order, "[n]othing in the language of Article 5 limits its application to lands within the project boundary in the license nor does it require that lands for which rights have been acquired after licensing be included in the project boundary." Rehearing Order at P 30.[9] The Authority's license requires it to acquire all lands necessary for project operation, regardless of whether they are within the project boundary.

---

[9] *See also Union Elec. Co.*, 137 FERC ¶ 61,114, at P 25 (2011) (holding that inclusion of lands within project boundary "*does not itself create or alter property rights*") (emphasis added).

13

## II.  THE AUTHORITY IS ADVANCING A DANGEROUS AND EXTREME INTERPRETATION OF THE PENSACOLA ACT THAT IS UNGROUNDED IN THE STATUTE

The Authority argues that the Pensacola Act effectively ends the conversation before this Court because, as the Authority claims, the Act dissolves any obligations to acquire necessary or appropriate lands that Standard Article 5 might impose. Such an irresponsible—and, frankly, cruel—interpretation of the Authority's obligations cannot stand. The Pensacola Act does not apply to the Authority's existing project license, and even if it did, the Act would not preclude the Commission from requiring the Authority to acquire lands necessary and appropriate for project operations pursuant to Standard Article 5 of the Authority's project license.

### A.  The Federal Power Act Precludes Application of the Pensacola Act to the Authority's Existing License

The Commission remains free to enforce the Authority's license obligations as the Pensacola Act does not alter the Commission's authority under the Authority's existing license.

The Federal Power Act itself precludes application of the Pensacola Act to the Authority's existing project license. Section 28 of the Federal Power Act provides: "The right to alter, amend, or repeal this chapter is expressly reserved; but no such alteration, amendment, or repeal shall affect any license theretofore issued under the provisions of this chapter, or the rights of any licensee

14

thereunder." 16 U.S.C. § 822 (Section 28). Section 28 demonstrates congressional intent to restrict future Congresses from amending the Federal Power Act in a manner that adversely affects existing licenses. *Pacific Gas & Elec. Co. v. FERC*, 720 F.2d 78, 83 (D.C. Cir. 1983).

The Authority argues that Section 28 should not apply because the Pensacola Act does not explicitly amend the Federal Power Act, Petitioner's Brief at 36, but that assertion is unsound and self-serving. As the Commission notes, the only authority that the Commission possesses over the Project was granted by the Federal Power Act. Respondent's Brief at 43. Thus, if the Pensacola Act purports to limit the Commission's authority over the Project, the Act logically serves as an alteration affecting a license issued under the Federal Power Act, and Section 28 should apply. The Authority seeks to escape this logical reality by claiming that the Pensacola Act does not alter a license issued under the Federal Power Act. Petitioner's Brief at 39–40. However, as the Commission noted, "if the Pensacola Act does not intend to alter any license conditions[…], then it is not clear why the Authority thinks that the Act would operate as a defense to the City's complaint." Respondent's Brief at 43.

The Pensacola Act is precisely the kind of "ex post facto law-making relating specifically to FPC license requirements" that Section 28 precludes. *Scenic Hudson Preservation Conference v. Callaway*, 370 F. Supp. 162, 171 (S.D.N.Y.

1973). As the Commission noted in its Order on Remand, "applying the Pensacola Act to the existing license for the Pensacola Project," in the manner the Petitioner argues, "would substantively alter [the Authority]'s obligation to obtain all necessary property rights required for project purposes." Order on Remand at P 43. Because the Authority's interpretation of the Pensacola Act seeks to alter the Authority's obligations under its Federal Power Act license, Section 28 precludes this outcome, and the Pensacola Act does not apply to the Authority's existing license. Thus, the Pensacola Act cannot limit the Authority's obligations under its existing license because the Pensacola Act simply does not apply to the existing license.

**B.**   **Even if the Pensacola Act Did Apply to the Existing License, the Act Does Not Bar the Commission From Enforcing the Authority's License Obligations Under Standard Article 5**

In the future, the Pensacola Act would not absolutely bar the Commission from requiring the Authority to acquire properties necessary and appropriate for project purposes, including flood control. The plain language of the Pensacola Act itself, as well as the Act's legislative history, demonstrate Congressional intent to leave the Commission with the authority to compel management of the Project in a manner that protects the public. The Authority's interpretation of the Pensacola Act is extremely threatening to human and environmental health in local communities, and is not grounded in the statute itself.

The Pensacola Act itself provides an exception on the limits the Act purports to impose on the Commission: "the project shall remain subject to the Commission's rules and regulations for project safety and protection of human health." Pensacola Act, § 7612(b)(2)(B). Despite the notably broad language of this exception, it serves as a guardrail, including for the Commission's authority to regulate the rule curve for the Project—which the Act otherwise purports to limit. As changing the rule curve for the Project can introduce an added risk of flooding—in this case, toxic flooding—it is then consistent with the Pensacola Act that any alterations to the rule curve would not be immune from the Commission's continuing authority to regulate the Project for project safety and protection of human health. Thus, the rule curve changes approved for the Project during its current license—and the resulting changes in the Project's flooding impacts— empower the Commission under the Pensacola Act to regulate the Project as necessary to ensure project safety and the protection of human health, responsive to changes in the Project's logical scope.[10] The Pensacola Act expressly provides this exception, which the Authority never mentions in its briefing.

Furthermore, as the Commission noted, legislative history supports this understanding of the Pensacola Act. "[A]n amendment initially introduced as part

---

[10] *See supra* note 8 (amendments to the operating rule curve for the Project since the Project's 1992 relicensing).

of the consideration of the eventual Pensacola Act specifically stated that 'the

project licensee shall not have any obligation to obtain or enhance those flowage

rights' necessary for flood control, but this provision was removed in the final

version that was enacted by Congress." Rehearing Order at P 28 (citing H.R. Rep.

No. 116–333 pt. 2 (2019) (Conf. Rep.)). Congress declined to extend the transfer of

power that the Authority contends would preclude the Commission from enforcing

the Authority's obligations under Standard Article 5. Thus, both the plain text of

the Pensacola Act and Congressional intent illustrated by the Act's legislative

history establish that the Pensacola Act does not limit the Commission's authority

to require the Authority to acquire flowage rights if those rights are necessary for

the Project's operation.

With this further context, the Authority's focus on the "project boundary"

remains misguided, as it is solely an administrative tool and does not limit what

lands can be acquired for the Project's operation. *See supra* at 9. Likewise, the

Authority's talismanic resort to the term 'project boundary' as dispositive of its

license obligations is odd considering that the Pensacola Act never defines the term

'project boundary.' Under these circumstances, 'project boundary' should be

afforded its usual meaning. As the Commission has noted previously, the "project

boundary is intended, as a matter of administrative convenience, to define those

lands, waters, and facilities that comprise a project, but it does not set the limit of

the Commission's authority to require a licensee to fulfill its obligations under a license." *Sacramento Mun. Util. Dist.*, 178 FERC at P 23. If the Commission "requires additional control in order to accomplish project purposes, or amends the license to expand or add a project purpose, it can direct the licensee to obtain any additional property rights, whether inside or outside of the project boundary, and amend the boundary as appropriate." *City of Holyoke Gas & Elec. Dept.*, 109 FERC at P 17. Quite simply, the project boundary has no real-world impact on what lands are necessary to operate the Project, or the Authority's obligation under its license to acquire those lands.

The Commission's power to compel acquisition of the lands at issue here is vital given the history and context of the Project. As the Commission noted, "since the issuance of the relicensing order in 1992, there have been numerous complaints and orders addressing flooding issues." Rehearing Order at n. 154 (citing *Grand River Dam Auth.*, 67 FERC ¶ 62,131, *vacated*, *Grand River Dam Auth.*, 67 FERC ¶ 62,239 (1994); *Grand River Dam Auth.*, 77 FERC ¶ 61,251 (1996); *Grand River Dam Auth.*, 146 FERC ¶ 62,060 (2014); *Grand River Dam Auth.*, 156 FERC ¶ 61,106 (2016); *Grand River Dam Auth.*, 160 FERC ¶ 61,001 (2017)). In this specific case, the toxic flooding at issue poses a genuine risk to human health in surrounding communities given the Project's proximity to the nearby Tar Creek Superfund site. This Project is subject to watershed-wide concerns from the

accumulation of 140 years' worth of toxic heavy metals from the entire Tri-State Mining District, exacerbated by the Project's operations.[11] The effects of these heavy metals have already been profound on both the environment and human health in northeast Oklahoma.[12] As LEAD has noted many times throughout the relicensing process, flooding from the Project contaminates surrounding communities with toxic mining runoff, and inundates private, state, and tribal lands with highly toxic heavy metals.[13]

Nothing in the plain language or legislative history of the Pensacola Act obviates the Authority's obligation to acquire lands necessary for project operations under its existing license; indeed, the Act's human health exception confirms the Commission's power to enforce that obligation.

## III. THE COURT SHOULD NOT CREDIT THE AUTHORITY'S DEFLECTION OF RESPONSIBILITY ONTO THE ARMY CORPS OF ENGINEERS

The Authority attempts to use the Corps as a smokescreen to avoid the obligations that the Authority voluntarily agreed to by accepting its project license.

---

[11] *See* Denwalt, *supra* note 1 (describing residents' concerns over the accumulation of more than 100 years' worth of toxic heavy metals exacerbated by the Project's operation at exceedingly higher levels).

[12] *See supra* note 5 (emphasizing elevated blood lead levels in children in communities surrounding the Project).

[13] *See supra* note 1 (outlining LEAD's comments before the Commission regarding the Project's impacts on interested communities, and their implications for relicensing).

The Commission spoke directly to the Corps' responsibility at the Project in its Orders on Remand. The Corps is responsible for overseeing flood operations at the Project, and directing releases during flood conditions, while the Authority is responsible for managing project operations. The Corps' authority to acquire property surrounding the Project for flood control is not exclusive and does not absolve the Authority of its license obligations.

### A. The Commission Did Not "Refuse" to Answer This Court's Question on the Corps' Responsibility

The Authority mischaracterizes the Commission's Orders as a "refusal" to answer the Court's question regarding the Corps' responsibility for flooding upstream of the Project. On remand, this Court instructed the Commission to "determine the role of the Corps" in this matter. *City of Miami*, 22 F.4th at 1044. The Commission explicitly answered this Court's question, both in the Order on Remand, and the Rehearing Order.

In its Order on Remand, the Commission noted that the Corps maintains that the Authority is responsible for acquiring flowage easements at the Project, including for flood control. Order on Remand at P 50. As the Commission stated, the Corps "directs the flood operations at the project, while the Authority is responsible for the physical operations of the flood control facilities." *Id.* Finally, the Commission found, unequivocally, "that the Corps' role is limited to the directing flood operations at the project, per the provisions of the Flood Control

Act and as outlined in the 1992 Water Control Agreement between [the Authority] and the Corps." *Id.* at P 52.

In its Rehearing Order, the Commission found, once again, "that nothing in the Corps' authority to acquire land needed for flood control operations is exclusive or undermines the Commission's authority to require the Authority, under Article 5 of its current license, to obtain necessary land rights to address flood control issues." Rehearing Order at P 25. As the Commission noted, "the Corps directs the flood operations at the project, while the Authority is responsible for the physical operations of the flood control facilities, and the Corps has exercised this control regardless of whether the Corps or the licensee holds rights to the property affected by those operations." *Id.* at P 26.

Neither the Order on Remand nor the Rehearing Order even remotely represent a 'refusal' on the Commission's part to answer this Court's question. As the Commission has determined, the Authority's and the Corps' responsibilities both include flood control, but the Authority's obligations under Article 5 remain.

**B.** **The Corps' Authority to Acquire Properties Around the Project Does Not Diminish the Authority's Obligations Pursuant to Standard Article 5.**

The role of the Corps at the Project does not diminish the Authority's obligations pursuant to the Project License. At best, the Corps' control over the Project is limited to directing the Authority to release floodwaters, while the

Authority remains responsible for the actual physical operation of the Project. Furthermore, the Corps' authority to acquire property for project purposes— including flood control—is nonexclusive, and does not diminish the Authority's obligations pursuant to Standard Article 5 of its project license.

None of the laws governing the Corps "require the Corps to purchase additional easements nor do they grant the Corps exclusive authority to do so." Rehearing Order at P 27. The Commission has concluded, unequivocally, that "the Corps' authority to obtain additional land rights is non-exclusive." *Id.* at P 28.

The Authority itself does not even believe the Corps' authority to acquire lands surrounding the Project for flood control is exclusive. As the Commission noted in its Rehearing Order, "[the Authority] has acquired thousands of acres of additional land to address flooding concerns."[14] The Authority has no problem with these limited land purchases to accommodate continual rule curve adjustments, as the Authority has a structural incentive to raise reservoir levels, produce more electricity, and make more money. But in this case, the Authority does not want to bear responsibility for its actions, and seeks to pass the bill off to the Corps. The

---

[14] Rehearing Order at n. 98 (citing the Authority's Jan. 14, 2013 filing: "To date, [the Authority] has acquired over 3,671.32 acres of land in Ottawa County, Oklahoma."; citing the Authority's Oct. 16, 2007 filing: "On February 13, 2007, [the Authority's] Board of Directors Approved a Resolution, which provided for the acquisition of flood lands in Ottawa County. … As a result of the Resolution, [the Authority] has begun the process of additional flood land acquisition …").

structural incentive discussed above demonstrates the importance of the Corps' and the Authority's nonexclusive responsibilities: the Authority requested, received, and profited from rule curve changes that in turn inundated lands beyond the 1992 project boundary. The Corps, and U.S. taxpayers, should not be left to foot the bill after the Authority benefitted from the Project's operation. And most importantly, local communities in northeast Oklahoma should not be left—while the Authority denies its responsibilities—to deal with the damages from flooding caused by the Project. The Corps' role does not dispense with the Authority's obligations pursuant to its project license.

*　　*　　*

The Court should reject the Authority's effort—through these petitions—to evade its rightful responsibility to deal with the flooding caused by its Project. Denying the Authority's petitions will uphold the Commission's power to secure a measure of justice for the burdened upstream communities of northeast Oklahoma.

## CONCLUSION

For the foregoing reasons, *Amicus* LEAD urges this Court to deny the petitions for review.

Respectfully submitted,

**LEAD AGENCY, INC.**

By its attorney,

/s/ Christophe Courchesne
Christophe Courchesne
Environmental Advocacy Clinic
Vermont Law and Graduate School
PO Box 96, 164 Chelsea Street
South Royalton, VT 05068
(802) 831-1630 (main)
(802) 831-1631 (fax)
ccourchesne@vermontlaw.edu

*With* Environmental Advocacy Clinic Student Attorneys Evan Kern, Lauren Carita, and Matthew Dederer

Dated: December 20, 2024

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,387 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced 14-point roman-style typeface (Times New Roman) using Microsoft Word.

/s/ Christophe Courchesne
Christophe Courchesne
*Counsel for Amicus LEAD Agency, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 20, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system, which served a copy of the document on all counsel of record in the case.

/s/ Christophe Courchesne
Christophe Courchesne
*Counsel for Amicus LEAD Agency, Inc.*