ORAL ARGUMENT NOT YET SCHEDULED

Nos. 24-1071, 24-1238 (cons.)

# United States Court of Appeals for the District of Columbia Circuit

GRAND RIVER DAM AUTHORITY

*Petitioner,*

*v.*

FEDERAL ENERGY REGULATORY COMMISSION,

*Respondent,*

CITY OF MIAMI, OKLAHOMA,

*Respondent-Intervenor.*

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

## INITIAL BRIEF FOR RESPONDENT-INTERVENOR

Craig Gannett
Walker Stanovsky
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue
Suite 3300
Seattle, WA 98104
craiggannett@dwt.com
walkerstanovsky@dwt.com

David M. Gossett
*Counsel of Record*
Shannon E. O'Neil
DAVIS WRIGHT TREMAINE LLP
1301 K Street, NW
Suite 500 East
Washington, DC 20005
(202) 973-4200
davidgossett@dwt.com
shannononeil@dwt.com

*Counsel for Respondent-Intervenor*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    PARTIES

Except for Local Environmental Action Demanded Agency, Inc., whose unopposed motion to participate as *amicus curiae* in support of Respondent this Court granted on December 31, 2024, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief of Petitioner.

### B.    RULINGS UNDER REVIEW

References to the rulings at issue appear in the Brief of Petitioner.

### C.    RELATED CASES

As noted in the Briefs of Petitioner and Respondent, on January 18, 2022, this Court granted Respondent-Intervenor's petitions for review of earlier orders in the underlying agency proceeding. *See City of Miami v. FERC*, 22 F.4th 1039 (D.C. Cir. 2022) (Nos. 20-1325 & 20-1446). Respondent-Intervenor is aware of no other related cases.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES .................................................................................i

TABLE OF AUTHORITIES ....................................................................v

GLOSSARY ...........................................................................................ix

STATUTES AND REGULATIONS ........................................................1

INTRODUCTION....................................................................................1

STATEMENT ..........................................................................................2

SUMMARY OF ARGUMENT ................................................................7

ARGUMENT ...........................................................................................9

I.    FERC Correctly Determined That Under The
Authority's Current License The Authority Must
Acquire Adequate Property Rights To Accomplish All
Project Purposes, Including Flood Control. ...........................9

    A.    FERC reasonably interpreted Article 5 consistent
with its plain language, regulatory purpose, and
prior agency precedent. ............................................. 10

        1.    FERC interpreted Article 5 consistent with
its plain language.............................................. 10

        2.    FERC's interpretation of Article 5 is
consistent with its regulatory purpose. .............. 12

        3.    FERC followed its precedent in interpreting
Article 5. ........................................................... 14

    B.    FERC's assessment of the record evidence of
flooding supports its application of Article 5 .............. 17

II.    The Authority Cannot Dodge Its Responsibility To
Secure Rights To Property Flooded By The Project
By Blaming The Corps. ....................................................... 19

A. As FERC held, the Authority must acquire sufficient rights to lands affected by Project-related flooding even though the Corps directs the Authority's operations during flood conditions. ................................................................ 20

B. None of the legal authorities cited by the Authority absolve it of the obligation to acquire sufficient rights to all Project lands. ........................... 22

C. The Corps' responsibilities for the Project under the Original License do not absolve the Authority of compliance with the 1992 License. .......................... 24

III. Requiring Compliance With Article 5 Does Not Amount To A Taking. ............................................. 27

IV. FERC Correctly Held That The Pensacola Act Has No Effect On The 1992 License ............................................ 29

A. Section 28 generally precludes the application of new laws to alter obligations under previously issued licenses. ............................................. 31

1. Section 28 precludes new laws that alter, amend, or repeal any provision of the Federal Power Act from changing obligations under existing licenses. .................... 31

2. Any law that modifies a licensee's obligations under its Federal Power Act license is an "alteration, amendment, or repeal" of the Federal Power Act for purposes of Section 28 ......................................... 33

3. Section 28 applies unless a new law expressly or implicitly precludes its application. ......................................... 35

B. Interpreted in light of Section 28, the Pensacola Act applies only to future Project licenses .................. 37

iii

1.    FERC correctly concluded that the
      Pensacola Act is solely prospective.....................37

2.    The Authority's counterarguments have no
      merit. .................................................................41

CONCLUSION ..................................................................................45

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
    LIMITATION .........................................................................46

CERTIFICATE OF SERVICE ..............................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*City of Lowell v. ENEL N. Am., Inc.*,
   796 F. Supp. 2d 225 (D. Mass. 2011) ................................................. 27

*City of Miami v. FERC*,
   22 F.4th 1039 (D.C. Cir. 2022) .................... 1, 2, 6, 18, 19, 22, 29, 41, 42

*Clarion River Power Co. v. Smith*,
   59 F.2d 861 (D.C. Cir. 1932) .............................................................. 27

*Domtar Maine Corp. v. FERC*,
   347 F.3d 304 (D.C. Cir. 2003) ........................................................... 17

*Dorsey v. United States*,
   567 U.S. 260 (2012) .............................................................. 32, 34, 35

*Epic Sys. Corp. v. Lewis*,
   584 U.S. 497 (2018) .......................................................................... 35, 40

*Matsushita Elec. Indus. Co. v. Epstein*,
   516 U.S. 367 (1996) .......................................................................... 36

*Montana Power Co. v. FPC*,
   445 F.2d 739 (D.C. Cir. 1970) .......................................................... 31, 32

*Morton v. Mancari*,
   417 U.S. 535 (1974) .............................................................. 36, 40, 43

*NextEra Energy Res., LLC v. FERC*,
   118 F.4th 361 (D.C. Cir. 2024) .......................................................... 12

*Pac. Gas & Elec. Co. v. FERC*,
   720 F.2d 78 (D.C. Cir. 1983) ............................................................. 32

*Portland Gen. Elec. Co. v. FPC*,
   328 F.2d 165 (9th Cir. 1964) ............................................................. 28

*Posadas v. Nat'l City Bank of N.Y.,*
  296 U.S. 497 (1936)...........................................................................34

**State Cases**

*Grand River Dam Auth. v. Bd. of Educ. of Town of*
  *Wyandotte, Independent School Dist. No. 1,*
  147 P.2d 1003 (Okla. 1943)..............................................................29

**Federal Statutes**

Congressional Accountability Act,
  Pub. L. No. 111-60, 123 Stat. 1995 (2009)........................................44

Federal Power Act

  Section 3(2), 16 U.S.C. § 796(2) .....................................................38

  Section 3(11), 16 U.S.C. § 796(11) ..................................................14

  Section 4(e), 16 U.S.C. § 797(e)........................................................39

  Section 10(a), 16 U.S.C. § 803(a) ...............................................14, 24

  Section 10(c), 16 U.S.C. § 803(c)...........................................18, 22, 26

  Section 10(e)(1), 16 U.S.C. § 803(e)(1)..............................................39

  Section 28, 16 U.S.C. § 822...........................................................30-45

Federal Water Power Act, Chapter 285, pt. I, § 28,
  41 Stat. 1077 (1920).........................................................................35

Flood Control Act of 1938, Pub. L. No. 75-761, § 2,
  52 Stat. 1215 ...................................................................................23

National Defense Authorization Act for Fiscal Year 2020,
  Pub. L. No. 116-92, § 7612, 133 Stat. 1198 ..............................2, 38, 39

Water Infrastructure Improvements for the Nation Act,
  Pub. L. No. 114-322, § 1321(c)(1), 130 Stat. 1705 (2016) .................23

**Regulations**

33 C.F.R. § 208.11(b)(3)(i)(B)(2) ................................................................. 18

**Administrative Materials**

*American Falls Reservoir District*
    *No. 2*, 128 FERC ¶ 61,125 (2009) ....................................................... 44

Form L-3, Terms and Conditions of License for Constructed
    Major Project Affecting Navigable Waters of the United
    States, Article 5, 54 F.P.C. 1792 (1975) ................................................ 4

*Grand River Dam Auth.*, Order Authorizing Issuance of
    License for Major Project, Project No. 1494 (1939) ..................... 2-3, 25

*Grand River Dam Auth.*, Order Issuing New License
    (Major Project), 59 FERC ¶ 62,073 (1992) ................................. 3-4, 26

*Grand River Dam Auth.*,
    126 FERC ¶ 62,249 (2009) ................................................................ 16

*Grand River Dam Auth.*,
    135 FERC ¶ 62,233 (2011) ...................................................... 5, 6, 16

*Grand River Dam Auth.*,
    138 FERC ¶ 62,091 (2012) ................................................................ 16

*Grand River Dam Auth.*,
    139 FERC ¶ 62,093 (2012) ................................................................ 17

*Grand River Dam Auth.*,
    141 FERC ¶ 62,042 (2012) ................................................................ 17

*Grand River Dam Auth.*,
    144 FERC ¶ 62,001 (2013) ................................................................ 17

*Grand River Dam Auth.*,
    146 FERC ¶ 62,060 (2014) ................................................................ 17

*Grand River Dam Auth.*,
    168 FERC ¶ 62,145 (2019) .................................................................. 3

*Grand River Dam Auth.*,
    186 FERC ¶ 61,045 (2024).... 2, 6-8, 10, 13, 18-21, 30-33, 36-38, 41, 43

*Grand River Dam Auth.*,
    187 FERC ¶ 61,211 (2024)....... 2, 7, 10-11, 20, 30-32, 37-38, 40, 41, 43

*Marsh Valley Hydroelectric Co.*,
    64 FERC ¶ 61,120 (1993) .................................................................. 14

*New England Power Co.*,
    9 FERC ¶ 61,322 (1979) .................................................................... 11

*PacifiCorp*,
    105 FERC ¶ 61,237 (2003) ................................................................ 15

*Public Utility District No. 1 of Chelan
    County, Washington*, 119 FERC ¶ 61,055 (2007) ........................ 15, 17

*Wisconsin Valley Improvement Co.*,
    80 FERC ¶ 61,054 (1997) .................................................................. 39

## Other Authorities

Sarah Mervosh, *A Senator's Lake House vs. a Town
    Fighting Flooding*, N.Y. Times (Aug. 27, 2019),
    https://www.nytimes.com/2019/08/27/us/grand-
    lake-oklahoma-inhofe.html ................................................................. 5

# GLOSSARY

| | |
|---|---|
| **1992 License** | *Grand River Dam Auth.,* Order Issuing New License, 59 FERC ¶ 62,073 (1992), as subsequently amended |
| **2018 Complaint** | Formal Complaint of the City of Miami, Oklahoma, Project No. 1494-445 (filed Dec. 26, 2018), JA__ |
| **Article 5** | Form L-3, Terms and Conditions of License for Constructed Major Project Affecting Navigable Waters of the United States, Article 5, 54 F.P.C. 1792 (1975), incorporated by reference in the 1992 License |
| **Authority** | Petitioner Grand River Dam Authority |
| **Br.** | Brief |
| **City** | Respondent-Intervenor City of Miami, Oklahoma |
| **Commission,** *or* **FERC** | Federal Energy Regulatory Commission |
| **Corps** | United States Army Corps of Engineers |
| **FPC** | Federal Power Commission, predecessor to FERC |
| **Grand Lake O' the Cherokees,** *or* **Grand Lake** | The reservoir created by the Project |
| **Original License** | *Grand River Dam Auth.*, Order Authorizing Issuance of License for Major Project, Project No. 1494 (1939) |

| | |
|---|---|
| **Pensacola Act** | Section 7612 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat. 1198, 2312 |
| **Project** | The Pensacola Hydroelectric Project, licensed by the Commission in FERC Docket No. P-1494, most recently relicensed in the 1992 License |
| **Remand Order** | *Grand River Dam Authority*, Order on Remand, 186 FERC ¶ 61,045 (Jan. 18, 2024), R. 1291, JA__ |
| **Remand Rehearing Order** | *Grand River Dam Authority*, Order Addressing Arguments Raised on Rehearing, 187 FERC ¶ 61,211 (June 27, 2024), R. 1407, JA__ |
| **Section 28** | Section 28 of the Federal Power Act, 16 U.S.C. § 822 |

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the Brief of Petitioner Grand River Dam Authority (Authority) and Addendum for Respondent Federal Energy Regulatory Commission (FERC).

## INTRODUCTION

The Authority continues to violate the plain terms of its FERC-issued license for the Pensacola Hydroelectric Project (Project), resulting in decades of flooding in the City of Miami, Oklahoma (the City) and the surrounding area. The Authority refuses to accept the determinations of FERC and this Court regarding its responsibility for this longstanding and ongoing harm. Instead, it continues its campaign of distraction by ascribing all responsibility to the U.S. Army Corps of Engineers (Corps) and hiding behind slapdash legislation that does not insulate the Authority from liability.

This Court's prior decision in this saga, *City of Miami v. FERC*, 22 F.4th 1039 (D.C. Cir. 2022), remanded FERC's earlier orders denying the City relief. The Court ordered FERC on remand to analyze the City's "extensive" and "powerful" evidence showing that the Project has caused flooding in and around the City, and to (1) assess the Authority's

responsibility for the flooding; (2) determine the role of the Corps; and (3) interpret Section 7612 of the National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat. 1198, 2312 (Pensacola Act). *Id.* at 1043.

FERC's January 18, 2024 Order, *Grand River Dam Auth.*, 186 FERC ¶ 61,045 (2024), R.1291 (Remand Order), JA__, and subsequent Order Addressing Arguments Raised on Rehearing, 187 FERC ¶ 61,211 (2024), R.1407 (Remand Rehearing Order), JA__, thoroughly and correctly addressed these legal and factual issues—and placed responsibility for remedying the City's flooding on the Authority, where that responsibility belongs. Those orders should be upheld.

## STATEMENT

The City adopts FERC's Statement and provides the following additional information to assist the Court.

1.    In 1938, the Authority, an agency of the State of Oklahoma, began construction of the Project. A year later, the Federal Power Commission (FPC), predecessor to FERC, issued an original license under the Federal Power Act authorizing the Authority to construct, operate, and maintain the Project. *See Grand River Dam Auth.*, Order

Authorizing Issuance of License for Major Project, Project No. 1494 at 9 (1939) (Original License), JA__. After the Original License expired, FERC issued a second license in 1992, which (as later amended) authorizes and governs the Project's operation today. *See Grand River Dam Auth.*, Order Issuing New License (Major Project), 59 FERC ¶ 62,073 (1992) (1992 License), R.191, JA__.

That license was set to expire in 2022. *See* 1992 License at 63,225, JA__. To accommodate the Project's relicensing, FERC extended the 1992 License, which currently expires on May 31, 2025. *Grand River Dam Auth.*, 168 FERC ¶ 62,145, at P 35 & Ordering Paragraph (B) (2019). The Authority submitted its final application for a new license on May 30, 2023, which is pending.

2.   The Authority operates the Project dam in such a way that water backs up onto upstream land that the Authority has no legal right to flood. The City, its residents, and neighboring Tribes and communities upstream of the Project have suffered extensive, uncompensated damage from this unauthorized flooding. For decades, the City complained about this flooding to the Authority and to FERC, without success.

3

In 2018, the City filed the Complaint at issue in this litigation with FERC. *See* Formal Complaint of the City of Miami, Oklahoma, Project No. 1494-445 (filed Dec. 26, 2018), R.1 (2018 Complaint), JA__. The 2018 Complaint explained that the Authority is in violation of Article 5 of its 1992 License because the Authority has failed to acquire rights to substantial acreage at the upper reaches of the Project's reservoir (Grand Lake O' the Cherokees, or Grand Lake) and along the Neosho River near the City of Miami that are repeatedly subject to unauthorized flooding due to the Authority's operation of the Project. *Id.* at 12-13, JA__; *see also* 1992 License, Ordering Paragraph (D), JA__ (incorporating Form L-3 conditions, including Article 5, by reference).[1]

In its Answer, the Authority contested the extent of the flooding, denied its responsibility to acquire flowage easements addressing that flooding, and urged FERC to dismiss the 2018 Complaint. *See* Answer of

---

[1]     Article 5 mandates that "[t]he Licensee, within five years from the date of issuance of the license, shall acquire title in fee or the right to use in perpetuity all lands, other than lands of the United States, necessary or appropriate for the construction, maintenance, and operation of the project." Form L-3, Terms and Conditions of License for Constructed Major Project Affecting Navigable Waters of the United States, Article 5, 54 F.P.C. 1792, 1817 (1975).

Grand River Dam Authority to the Complaint of the City of Miami, R.9, JA__.

3.    In 2019, while the City's Complaint was pending, language directed at the Project was slipped into a 1,700-page congressional bill related to national defense. This late-hour addition was made without the benefit of any public hearings or consideration by either the Senate or House committees with jurisdiction over the Federal Power Act. Although Petitioner and Respondent now refer to this provision as the Pensacola Act, the provision is also commonly referred to as the Inhofe Amendment, after Senator James Inhofe—the late Oklahoma Senator who then chaired the Senate Armed Services Committee and who owned property on Grand Lake. *See* Sarah Mervosh, *A Senator's Lake House vs. a Town Fighting Flooding*, N.Y. TIMES (Aug. 27, 2019), https://www. nytimes.com/2019/08/27/us/grand-lake-oklahoma-inhofe.html.

4.    On April 29, 2020, FERC denied the City's Complaint, concluding in a letter order with minimal analysis that the Authority had not violated Article 5. *Grand River Dam Authority*, Project No. 1494-445 (Apr. 29, 2020), R.148, JA__. The Commission subsequently upheld this

position on rehearing. *Grand River Dam Authority*, Project No. 1494-453, 172 FERC ¶ 61,255 (2020), R.190, JA__.

This Court granted the City's petitions for review of those orders. The Court remanded to FERC to analyze the evidence provided by the City in the 2018 Complaint; determine the Authority's responsibility for the flooding in and around the City under Article 5 of the 1992 License; ascertain the role of the Corps; and interpret the Pensacola Act. *See* 22 F.4th at 1042-44.

5.    In its Remand Order, issued January 18, 2024, FERC found that the Project has increased flooding in and around the City. *See* Remand Order at P 2, JA__. Further, and in response to the specific mandates of this Court, *see* 22 F.4th at 1044, FERC determined that Article 5 requires the Authority to acquire adequate property rights in perpetuity to accomplish all Project purposes, including flood control; the Corps' role in directing flood operations does not absolve the Authority of its responsibilities as a FERC licensee to acquire those property rights; and the Pensacola Act, interpreted in light of Section 28 of the Federal Power Act, has no application to the Authority's obligations under the 1992 License. *See* Remand Order at PP 67, 68, JA__.

The evidence provided by the City in the 2018 Complaint detailed how the Authority's operation of the Project—frequently at or near the highest allowable water levels—has increased upstream flooding, and how the Authority has failed to acquire all necessary property rights to those flooded lands as required by the 1992 License. In reaching its conclusions in the Remand Order, FERC scrutinized this evidence and determined that flooding around the City has worsened due to the existence and operation of the Project. *See* Remand Order at PP 56, 63, JA__.

On rehearing, FERC upheld its earlier findings and conclusions. *See id.* at P 23, JA__.

## SUMMARY OF ARGUMENT

FERC correctly determined that the Authority must acquire adequate property rights to fulfill all Project purposes, including flood control. Article 5 mandates that a "Licensee … acquire … the right to use … all lands … necessary or appropriate for the … operation of the project." Form L-3 Article 5, 54 F.P.C. at 1817, JA__. As FERC explained, a licensee's obligations under Article 5 are not limited to the project boundary. *See* Remand Rehearing Order at P 30, JA__. Article 5 does not

7

say those obligations are so restricted; limiting the scope of Article 5 to the project boundary would be inconsistent with that provision's regulatory purpose, and this interpretation of Article 5 is consistent with FERC precedent. And FERC was plainly correct in concluding that, under Article 5, the Authority is responsible for and must address the City's flooding. *See* Section I, *infra*.

The Authority's attempt to deflect responsibility for remedying that flooding to the Corps is unfounded. As FERC held, under Article 5 the Authority must acquire necessary property rights to address Project-related flooding irrespective of the Corps' role in directing flood operations. *See* Remand Order at P 54, JA__. This interpretation aligns with the plain language of Article 5, the terms of the Authority's 1992 License and its Original License, and the Corps' understanding of its role. *See* Section II, *infra*. And requiring compliance with Article 5 does not amount to a taking. *See* Section III, *infra*.

The Authority's attempted reliance on the Pensacola Act to evade its obligations under the 1992 License similarly falls short. Section 28 of the Federal Power Act establishes a baseline rule that new federal statutes do not alter licensees' Federal Power Act obligations under their

8

existing licenses. A later federal statute can expressly or implicitly trump Section 28, but FERC appropriately concluded that the Pensacola Act does not, and thus applies only to any new license that the Authority may obtain to operate the Project. *See* Section IV, *infra*.

Ultimately, FERC's orders are consistent with its statutory mandate to protect life, health, and property, and the Authority's corresponding obligations under Article 5 are clear. The Court should affirm FERC's orders and deny the Authority's petitions for review, ensuring that the City and surrounding communities receive necessary protections from Project-related flooding.

## ARGUMENT

I. **FERC Correctly Determined That Under The Authority's Current License The Authority Must Acquire Adequate Property Rights To Accomplish All Project Purposes, Including Flood Control.**

The Authority asserts that Article 5 does not obligate it to acquire lands outside the existing project boundary. At best, this demonstrates the Authority's fundamental misunderstanding of the Article's requirements and the Authority's responsibilities as a licensee. At worst, it showcases the Authority's decades of refusing responsibility for the harm caused by its Project.

9

**A.    FERC reasonably interpreted Article 5 consistent with its plain language, regulatory purpose, and prior agency precedent.**

FERC interpreted Article 5 (standard in hydropower licenses since 1975) to mandate that the Authority acquire property rights to all lands flooded by the operation of the Project, even if that property is outside the current project boundary. *See* Remand Order at P 54 & n.119, JA__; *see also* Remand Rehearing Order at P 31, JA__. That interpretation of Article 5 is consistent with the language and purpose of Article 5 and the Federal Power Act, as well as prior FERC precedent.

**1.    FERC interpreted Article 5 consistent with its plain language.**

FERC held that the "requirements under Article 5 are not necessarily limited to [the] project boundary as described in the license at the time the license is issued." Remand Rehearing Order at P 30, JA__. That interpretation is entirely consistent with the plain language of Article 5, which mandates that a "Licensee, within five years from the date of issuance of the license, shall acquire title in fee or the right to use in perpetuity *all lands*, other than lands of the United States, *necessary or appropriate for the* construction, maintenance, and *operation of the project*." Form L-3 Article 5, 54 F.P.C. at 1817, JA__ (emphasis added).

Nothing in Article 5 suggests that the Authority's obligations end at the project boundary. Rather, by the plain terms of the provision, those obligations extend to "*all*" land "necessary or appropriate for … operation of the project," with no mention of the project boundary. Where, as here, FERC determines that lands outside the current project boundary are "necessary" or "appropriate" for the Project's operation, Article 5 obligates the licensee to acquire rights to those lands.

Likewise, nothing in Article 5 supports the Authority's assertion that FERC cannot "exercis[e] authority outside of the … current project boundary," Authority Br. 32. And for good reason: A project boundary is merely an administrative tool. *See* Remand Rehearing Order at P 30, JA__. It does not limit a licensee's statutory obligations but rather provides a geographic approximation of the minimum FERC must regulate under the Federal Power Act. *See* Remand Rehearing Order at P 30 n.80, JA__ (citing *Sacramento Mun. Util. Dist.*, 178 FERC ¶ 61,112 at P 23 (2022)).

Thus, if it becomes evident that additional property rights are required for project purposes, FERC may mandate adjustment of the project boundary to reflect that reality. *See New England Power Co.*, 9

11

FERC ¶ 61,322, at 61,681 (1979) ("The project boundary should be revised to encompass highwater levels, *i.e.*, all lands on which waters flow when the reservoir is at full pond (including increase in the water level in upstream reaches because of backwater effects), and all other land which is necessary for project purposes.").

Indeed, though they now argue to the contrary, the Authority has previously acknowledged that FERC may amend a project boundary during a license term when it determines that lands outside the project boundary are, in fact, "part of the project" for purposes of Article 5. *See* Rehearing Request at 80 & n.301, R. 1315, JA__ (citing *Phila. Corp.*, 61 FERC ¶ 61,045, at 61,207-08 (1992) (requiring license amendment to revise project boundary to include rockfill dam that was not historically "part of the project" but that FERC determined was "sufficiently related to the efficient hydraulic operation of the project")).

### 2.    FERC's interpretation of Article 5 is consistent with its regulatory purpose.

Applying Article 5 independent of the project boundary is entirely consistent with Article 5's regulatory purpose. *See NextEra Energy Res., LLC v. FERC*, 118 F.4th 361, 371 (D.C. Cir. 2024) (favoring textual

interpretations "that would advance statutory or regulatory goals over ones that would frustrate them").

As FERC explained, interpreting Article 5 to require licensees to have sufficient property rights "to accomplish all project purposes," irrespective of the project boundary, "reflects the requirement that the licensee have sufficient control over project lands and works to enable the Commission, through the licensee, to carry out its regulatory responsibilities with respect to the project." Remand Order at P 43 & n.86, JA__ (citing *City of Holyoke Gas & Elec. Dept.*, 115 FERC ¶ 62,295 (2006)). Indeed, the standard hydropower license articles—including Article 5—were specifically established to ensure that the governing rules for hydropower projects under FERC's jurisdiction are consistent with FERC's statutory mandates. *See Standardized Conditions For Inclusion In Preliminary Permits And Licenses Issued Under Part I Of The Federal Power Act*, 54 F.P.C. 1792, 1793-94 (1975).

Interpreting Article 5 independent of the project boundary effectuates the Federal Power Act, which defines a "project" to include "all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or

13

appropriate in the maintenance and operation" of the overall project development. 16 U.S.C. § 796(11). Like Article 5, the Federal Power Act does not limit a licensee's obligations to the project boundary. "Under section 3(11) of the [Federal Power Act, 16 U.S.C. § 796(11)], the relevant question is whether [features at issue] are necessary or appropriate to maintain and operate the project. If so, then they are part of the complete unit of development and are project works." *Marsh Valley Hydroelectric Co.*, 64 FERC ¶ 61,120, at 61,953 (1993). A licensee must possess sufficient rights in project property irrespective of the project boundary because otherwise FERC would be unable to determine that the project operations are consistent with the public interest—FERC's overarching mandate under Section 10(a) of the Federal Power Act. *See* 16 U.S.C. § 803(a).

### 3. FERC followed its precedent in interpreting Article 5.

FERC's interpretation of Article 5 to mandate that licensees acquire property affected by a project irrespective of the project boundary is also entirely consistent with its prior interpretations of that provision—not, as the Authority suggests, "novel." *See* Authority Br. 5, 25.

14

In *Public Utility District No. 1 of Chelan County, Washington*, 119 FERC ¶ 61,055 (2007), for example, a licensee contested its ongoing obligation under a similar provision in its license to notify FERC of lands not in the existing project boundary that turned out to require ongoing maintenance to serve an identified project purpose (in that case, wildlife habitat improvements). *Id.* at PP 18-19. FERC denied the request, explaining that such lands "are needed for project purposes," and "[a[ll facilities, lands, and waters needed to carry out project purposes *should* be within the project boundary" because "[t]he establishment of a project boundary makes it *easier* for [FERC], the licensee, and other interested parties to understand the geographic scope of a project." *Id.* at PP 20-21 (emphasis added).

Similarly, in *PacifiCorp*, 105 FERC ¶ 61,237 (2003), FERC issued a new license for a project located partially on lands administered by the Forest Service and the Bureau of Land Management. *Id.* at P 1. FERC simultaneously approved a settlement agreement addressing issues associated with issuance of the new license raised by various state and federal agencies, and it incorporated the terms of that settlement as conditions to the license. *See id.* at P 47. FERC noted that some of those

incorporated settlement provisions "contemplate[d] the possibility that the licensee may undertake actions, such as mitigation measures, outside of the present project boundary. If any such actions become required, the licensee will have to request an amendment of the license to include within the project boundary the lands on which those measures will occur." *Id.* at P 114.

Indeed, the Authority even concedes that FERC has on several occasions required and approved boundary amendments submitted by the Authority *for this Project*, where necessary "to update the project boundary maps depicting all lands necessary and appropriate for the Pensacola Project." Authority Br. 14. In requiring these revisions, FERC reiterated that "*At a minimum*, the project boundary must include the water areas and lands up to the 750-foot contour." *Grand River Dam Auth.*, 126 FERC ¶ 62,249, at P 7 (2009) (emphasis added). And FERC expressly noted its right to require further amendments "to insure the project boundary includes lands necessary for project purposes." *Id.* at Ordering Paragraph (D). The Authority has requested, and FERC has approved, at least six such amendments to the project boundary. *See Grand River Dam Authority*, 135 FERC ¶ 62,233 (2011); *Grand River*

16

*Dam Authority*, 138 FERC ¶ 62,091 (2012); *Grand River Dam Authority*, 139 FERC ¶ 62,093 (2012); *Grand River Dam Authority*, 141 FERC ¶ 62,042 (2012); *Grand River Dam Authority*, 144 FERC ¶ 62,001 (2013); *Grand River Dam Authority*, 146 FERC ¶ 62,060 (2014).

The point is that FERC has consistently held that the project boundary does not *limit* the extent of a licensee's legal obligations under its license, but rather attempts to *reflect* those obligations. Those legal obligations exist independent of the project boundary, which is merely an administrative convenience. *Chelan*, 119 FERC ¶ 61,055, at P 20. This Court has repeatedly "reject[ed the] invitation to overturn" FERC orders consistent with the agency's prior precedent, *see Domtar Maine Corp. v. FERC*, 347 F.3d 304, 311 (D.C. Cir. 2003) (quoting *United Mun. Distribs. Grp. v. FERC*, 732 F.2d 202, 211–12 (D.C. Cir. 1984)), and should reject it here too.

## B. FERC's assessment of the record evidence of flooding supports its application of Article 5.

FERC also was plainly correct in concluding that the Authority's actions with respect to the Project cause the City's flooding, and warrant requiring the Authority to take remedial measures pursuant to Article 5. The "powerful" and "extensive" evidence provided by the City in the 2018

Complaint detailed how the Project's operations have contributed to increased water levels, leading to flooding that is both more frequent and more severe. *See* 22 F.4th at 1043. As this Court directed, *see id.* at 1044, FERC closely examined this evidence in assessing the Project's effect on flooding upstream. *See* Remand Order at P 63, JA__ ("In sum, based on review of the evidence provided in the 2018 Complaint, … we conclude that the flooding around the City of Miami has increased since construction of the project.").

FERC's review of the entire record confirmed that the Project has exacerbated flooding around the City. FERC's regulatory duty to protect life, health, and property, *see* Federal Power Act Section 10(c), 16 U.S.C. § 803(c); *see also* 33 C.F.R. § 208.11(b)(3)(i)(B)(2), is appropriately satisfied by requiring the Authority to identify and acquire the necessary property rights to comply with Article 5 of the 1992 License. Having reaped the benefits of that license for decades, the Authority cannot now claim to be harmed by being required to fulfill a fundamental responsibility under that license.

Contrary to the Authority's histrionics, *see* Authority Br. 56-57, it is important to recognize the limits of what FERC ordered here. It did

18

not determine what property the Authority must purchase, nor what type of rights to that property. It only required the Authority to take certain intermediate steps that may lead to such an order. In particular, by mandating that the Authority "file a report that analyzes the lands affected by flooding upstream of the project," Remand Order at P 68, JA__, FERC has requested the necessary information to make the long-overdue determination regarding the true extent of property rights necessary for Project operation. Nothing in the Remand Order alters the terms of the 1992 License. Instead, it mandates that the Authority belatedly fulfill an existing obligation under the 1992 License, starting with necessary fact-finding to determine the extent of additional property rights required to serve all Project purposes.

## II. The Authority Cannot Dodge Its Responsibility To Secure Rights To Property Flooded By The Project By Blaming The Corps.

This Court's 2022 remand noted that the Commission had never adequately addressed the role and potential responsibility of the Corps for the City's flooding. *See* 22 F.4th at 1042 ("[W]e are completely at sea regarding the role of the Corps of Engineers, which may be the *deus ex machina* of this play."). On remand, the Commission did so—and

correctly held that the Corps' limited role in no way insulates the Authority from its obligations under Article 5.

### A. As FERC held, the Authority must acquire sufficient rights to lands affected by Project-related flooding even though the Corps directs the Authority's operations during flood conditions.

FERC's orders explain that the Corps' role "is limited to directing flood operations at the [P]roject," while "Article 5 requires [the Authority] to acquire adequate property rights in perpetuity to accomplish all project purposes, including flood control." Remand Order at P 67, JA__; Remand Rehearing Order at P 19, JA__. In contrast to the Corp's administrative role, the Authority "is responsible for the physical operations of the flood control facilities." *Id.* at P 50, JA__; *see also* Remand Rehearing Order at P 46, JA__ ("[The Authority] carries out flood control operations at the direction of the Corps.").

FERC further stressed that the Corps' right to direct the Authority's operations during flooding does not insulate the Authority from its license obligations to obtain appropriate rights to land affected by those operations. As FERC explained, "Article 5 requires licensees to acquire adequate property rights in perpetuity to accomplish all project purposes. Here, flood control is a project purpose and operation of the

project includes flood control operations, *even if directed by the Corps* ….
If additional property rights are needed for project purposes, the
Commission may require such lands to be included in the project
boundary." Remand Order at P 54, JA__ (emphasis added, footnotes
omitted).

That interpretation of Article 5 comports with its plain text. *See*
Part I.A.1, *supra*. As FERC noted, it is also the Corps' understanding of
these respective roles. *See* Remand Order at P 50 n.105, JA__ ("[T]he
Corps's position … [is] that it is the responsibility of GRDA to obtain all
the flowage easements, even for flood control operations."); *see also* Army
Corps July 26, 2018 Letter, FERC Accession No. 20180727-5008 ("the
project owner is responsible for acquiring all real property interests
needed for all authorized project purposes, including flood control")
(reprinted in R. 227, JA__). The Authority contends that FERC cannot
require it to acquire rights to property flooded by the Project above
elevation 750 due to the Corps' supposedly "exclusive" jurisdiction or
obligation to do so. *See* Authority Br. 27. But as FERC explained, the
Corps' powers and respective obligations do not forestall the Authority's
duty and ability to comply with Article 5. And in delineating the Corps',

21

FERC's, and the Authority's respective responsibilities and obligations, FERC satisfied this Court's mandate to "determine the role of the Corps in this imbroglio." 22 F.4th at 1044.

### B. None of the legal authorities cited by the Authority absolve it of the obligation to acquire sufficient rights to all Project lands.

The Authority argues that "history" favors its position and establishes that it has no responsibility to address flooding when the Authority operates the Project as instructed by the Corps. *See* Authority Br. 57-58. The Authority cites a slew of Corps-specific statutes, *see* Authority Br. 8-9, as well as the Corps' flood-control regulations and Water Control Manual for the Project, *see* Authority Br. 11-12 (citing 33 C.F.R. § 208.25; *1992 Water Control Manual for the Pensacola Reservoir*, R. 231, JA__. But none of these authorities eliminates FERC's ability to regulate the Project for the protection of life, health, and property, Federal Power Act Section 10(c), 16 U.S.C. § 803(c), including by mandating that the Authority obtain property rights to lands flooded by the Project.

Ignoring the responsibilities it agreed to in accepting the Project license, the Authority contends that the 1938 and 1941 Flood Control

Acts supersede FERC's power to enforce Article 5 because the Acts "remain in effect and impose an ongoing responsibility on the Corps to acquire those properties that are necessary for its flood control operations." Authority Br. 63. But these legal authorities do not purport to make the Corps' powers or obligations to acquire property exclusive.

The 1938 Flood Control Act on which the Authority relies, for example, explicitly contemplates that *either* the War Department *or* entities like the Authority might acquire the lands needed for authorized projects. *See* Authority Br. 58; Flood Control Act of 1938, Pub. L. No. 75-761 § 2, 52 Stat. 1215, 1215-16, ("title to all lands, easements, and rights-of-way for [any authorized dam and reservoir] project shall be acquired by the United States *or* by States, political subdivisions thereof or other responsible local agencies and conveyed to the United States") (emphasis added). Congress did not prohibit others from acquiring such lands when it empowered the Corps to do so; nor did it undermine FERC's ability to require licensees to acquire flowage easements. To the contrary, 2016 legislation directed the Corps to convey its flowage easements to the Authority "for flood control purposes." Water Infrastructure

Improvements for the Nation Act, Pub. L. No. 114-322, § 1321(c)(1), 130 Stat. 1705 (2016).

The statutes, regulations, and administrative documents cited by the Authority address the Corps' flood-control obligations, but none limits FERC's independent authority to shape and enforce the 1992 License to balance the effects of flood-control operations with the many other values and requirements implicated by the Project. *See* Federal Power Act §§ 10(a)(1), (a)(2)(B), 16 U.S.C. §§ 803(a)(1), (a)(2)(B) (requiring FERC to issue licenses that appropriately balance all project purposes and consider, among other things, the recommendations of the federal and state agencies "exercising administration over flood control" at a project). Most importantly, nothing in these authorities minimizes the Authority's Article 5 obligation to acquire property rights commensurate with the lands the Project floods.

### C. The Corps' responsibilities for the Project under the Original License do not absolve the Authority of compliance with the 1992 License.

The Authority refers to its original 1939 License, which required the United States to secure "the necessary flowage rights above" elevation 750 before the Authority was "required to impound any water

above" that elevation, Original License at 10, to argue that the responsibility for obtaining property rights for flood control operations lies with the Corps, not the Authority. Authority Br. 10 (citing Original License). This argument is makeweight.

For starters, this argument is based on an incorrect interpretation of the Original License. The Corps' obligation under that license to secure essential flowage rights above elevation 750 and the Authority's obligation under that license to obtain all necessary property rights for flood control operations were not mutually exclusive. The Original License required the Authority to acquire "all necessary lands, easements, and rights-of-way up to elevation 750." Original License at 10. FERC could not have required this if the Authority were correct that the Corps has exclusive authority over all flood-related matters, given that the flood pool includes lands at elevations above 745 feet Pensacola Datum.

This understanding aligns with Article 14 of the Original License. While Article 14 placed flood control operations under the control of the Secretary of War, *id.* at 11, the Article simultaneously subjected "the operation of the project by the Licensee"—including using, storing, and

25

discharging waters—to regulation by the FPC "at all times," for the safety of the project and the protection of life, health, and property. *Id.* The FPC's jurisdiction over the Authority "at all times" derived directly from Federal Power Act Section 10(c). *See* 16 U.S.C. § 803(c) (Federal Power Act licenses are subject to the condition that "the licensee … shall conform to such rules and regulations as the Commission may from time to time prescribe for the protection of life, health, and property"). Nothing has since reduced FERC's jurisdiction.

In any event, even if the Authority were correct that the Original License relieved it of the obligation to acquire the necessary property rights for safe project operation, this argument is no longer valid. Neither the 1992 License as issued, nor any amendment to that license, contains such a provision. *See* 1992 License, at Ordering Paragraphs, JA__.

That absence shows that the Authority's obligation to operate as directed by the Corps no longer depends on the adequacy of flowage rights acquired for the Project. Instead, the Authority currently operates under an agreement with the Corps committing the Authority to operate the dam for flood control purposes pursuant to the Corps' direction. *See 1992 Water Control Agreement: Pensacola Reservoir, Grand (Neosho) River,*

*Oklahoma*, R. 231, JA__. That agreement does not relieve the Authority

from complying with Article 5 of its 1992 License. Indeed, no agreement

between the Authority and the Corps could do so. *See City of Lowell v.*

*ENEL N. Am., Inc.*, 796 F. Supp. 2d 225, 229 (D. Mass. 2011) (citing

*Linweave, Inc.,* 23 FERC ¶ 61,391 (1983)) (private agreements "may in

no way encumber the licensee's performance of its duties as a licensee").

## III.  Requiring Compliance With Article 5 Does Not Amount To A Taking.

The Authority argues that it would violate the Takings Clause for

FERC to require the Authority to address flooding in the City—and in

particular for FERC to require the Authority "to acquire land because a

different party"—the Corps—purportedly "caused flooding on that land."

Authority Br. 54; *id.* at 56. Nonsense.

The grant of a license under the Federal Power Act is a privilege

justified only on the basis "of the benefit to inure to the public." *Clarion*

*River Power Co. v. Smith*, 59 F.2d 861, 863 (D.C. Cir. 1932). Rather than

acting as a responsible steward of this benefit, the Authority, in

continuously attempting to shift responsibility for decades of devastating

flooding to "natural events" or the Corps, *see* Authority Br. 51-53, has

instead treated the health and welfare of the upstream citizenry as

27

collateral damage to facilitate high reservoir levels and even higher profits.

The Authority argues that "FERC has broken with decades of precedent by reading Standard Article 5 as requiring Licensee to acquire non-project land." Authority Br. 49. Even if the invocation of "non-project land" were not itself misleading, *see* Section I.A.2—and even if FERC had at this point in these proceedings actually directed the Authority to acquire any property—the Authority's argument confuses FERC's long delay in enforcing the Authority's existing legal obligations for precedent. FERC's *actual* precedent, *see* Section I.A.3, *supra*, demonstrates that the agency routinely requires licensees to acquire and retain all interests in lands necessary for project purposes to comply with Article 5.

In any event, conditions imposed by FERC in hydropower licenses categorically cannot constitute takings. "In order to gain [the] rights [afforded by a license,] [the licensee] must accept the license upon such terms as Congress has determined should be imposed in the public interest. It is not a taking for the Government to withhold a benefit it is not contractually or constitutionally obliged to confer." *Portland Gen. Elec. Co. v. FPC*, 328 F.2d 165, 173 (9th Cir. 1964) (citations omitted).

28

The Authority has been resisting the 2018 Complaint before FERC and this Court since it was filed; has been litigating its responsibility for flooding before FERC for years; and has been losing related disputes in the Oklahoma courts for decades.[2] It cannot seriously assert a "reasonable expectation[]," Authority Br. 56, to be absolved of responsibility for the Project's effects. Being required to acquire and retain sufficient property rights to account for Project-caused flooding is neither an unexpected development nor an unjust burden; it is simply part and parcel of the privilege of holding a FERC license.

## IV.  FERC Correctly Held That The Pensacola Act Has No Effect On The 1992 License.

The Authority leads its brief with the argument that the Pensacola Act eliminates any obligation it otherwise would have to acquire rights to flooded lands. *See* Authority Br. 29-40. As FERC correctly concluded,

---

[2]     The Authority has repeatedly been held factually and legally responsible for the flooding in Oklahoma state court. *See* 22 F.4th at 1041 (citing cases); *see also Grand River Dam Auth. v. Bd. Of Educ. of Town of Wyandotte, Independent School Dist. No. 1*, 147 P.2d 1003, 1005 (Okla. 1943) (in causing upstream flooding by operating the Project at Corps direction, "the [Authority] is liable to third parties exactly as though it had performed the acts of its own volition, which in legal effect it did, for it was not required to accept the provisions of the license and construct the dam.").

that is false. Federal Power Act Section 28 provides that "no … alteration, amendment, or repeal [of the hydropower licensing chapter of the Federal Power Act] shall affect any license theretofore issued under the provisions of this chapter or the rights of any licensee thereunder." 16 U.S.C. § 822. The Pensacola Act thus does not operate as a get-out-of-jail-free card, eliminating the Authority's obligations under the 1992 License. *See* Remand Order at P 43, JA__; Remand Rehearing Order at P 41, JA__; FERC Br. 35-45.

The City agrees with the Authority on one point: This Court must focus on the actual statutory text at hand. *See* Authority Br. 29. But the Authority misunderstands the texts of *both* Section 28 of the Federal Power Act *and* the Pensacola Act.

The first question is whether Section 28 is implicated by a later law—which turns, per Section 28's text, on whether the later act is an "alternation, amendment, or repeal" of the Federal Power Act. 16 U.S.C. § 822. Assuming Section 28 *is* implicated, the second question is whether there is any reasonable way to interpret the new law and existing law harmoniously—that is, such that the new law does not "affect" any existing license or licensee. If so, that is the appropriate way to read the

30

new law. Here, it is easy to read the Pensacola Act in a way that does not affect the existing license—as FERC appropriately did in the orders below by interpreting the Pensacola Act to apply prospectively to future licenses for the Project. *See* Remand Order at P 39, JA__; Remand Rehearing Order at P 42, JA__.

### A. Section 28 generally precludes the application of new laws to alter obligations under previously issued licenses.

The Authority challenges FERC's application of Section 28 to this proceeding, but in so doing, the Authority fundamentally misunderstands what that law mandates. Section 28 generally requires interpreting any new federal law so as not to "affect" the existing rights and obligations of a FERC licensee, regardless of whether that new law expressly amends or repeals a specific provision of the Federal Power Act.

#### 1. Section 28 precludes new laws that alter, amend, or repeal any provision of the Federal Power Act from changing obligations under existing licenses.

Section 28 sets forth the ground rules for any future amendment to the Federal Power Act—namely, that such amendments should not change the rights and obligations of existing licensees. *See Montana Power Co. v. FPC*, 445 F.2d 739, 748 (D.C. Cir. 1970) (in Section 28

31

Congress "gave assurance that it would not make any amendment that 'shall affect any license theretofore issued … or the rights of any licensee thereunder'"); *see also* Remand Order at P 42 n.84, JA__ *and* Remand Rehearing Order at P 40 n.114, JA__ (both citing *Mont. Power Co.*, 445 F.2d at 748).[3]

Section 28 is crucial because it provides stability and predictability for licensees, ensuring that their rights and obligations remain intact throughout the term of their license despite any legislative changes. Congress thus aimed to protect the investments and expectations of licensees, fostering a stable regulatory environment that encourages continued development and operation within the framework of the established license terms. *Pac. Gas & Elec. Co. v. FERC*, 720 F.2d 78, 83 (D.C. Cir. 1983) (Federal Power Act "was designed to insure that the licenses granted by FERC promote secure licensee expectations"); *see also*

---

[3]    Section 28 ties this limitation to the statement that "[t]he right to alter, amend, or repeal this chapter is expressly reserved." *Id*. The City agrees with the Authority that one Congress could not preclude a future Congress from amending the Federal Power Act even if it tried to do so. *See* Authority Br. 33-34 (quoting *Dorsey v. United States*, 567 U.S. 260, 274 (2012). But Section 28's "express[] reserv[ation]" frames Congress's intended precommitment that any such amendments would be solely prospective.

Remand Order at P 40, JA__ ("[T]he legislative history indicates that Congress intended section 28 to protect reliance interests based on existing licenses, whether those interests include rights of the licensee or obligations imposed by the Commission to protect the public interest, from subsequent congressional legislation.").

> **2.    Any law that modifies a licensee's obligations under its Federal Power Act license is an "alteration, amendment, or repeal" of the Federal Power Act for purposes of Section 28.**

The Authority denies that the Pensacola Act implicates Section 28, focusing on the fact that the Pensacola Act did not directly and by its terms amend the text of the Federal Power Act. *See* Authority Br. 36-39. That is far too narrow an understanding of what triggers Section 28. Section 28 is also triggered by any new law that repeals or alters the Federal Power Act *by implication*, which is precisely what the Pensacola Act does. *See* Remand Order at P 38, JA__.

According to the Authority, "the key limiting phrase" of Section 28 is "'this chapter'"—that is, the hydropower chapter of the Federal Power Act. *See* Authority Br. 36. Unless a new law changes the actual *language* of the cross-referenced sections of the U.S. Code in some way, the Authority argues, Section 28 is not implicated. Thus, the Authority

33

claims that even a new law that "'substantively alter[s] [a] licensee's obligations'" under its existing license does not trigger Section 28 so long as that new law does not alter existing statutory text. *See* Authority Br. 37 (quoting Remand Order at P 43) (alterations the Authority's).

Section 28 is not so limited. A law that substantively alters FERC's powers, or the rights or obligations of a licensee, under the Federal Power Act *is* an amendment or repeal of the Federal Power Act. This is because legislation can effect an "alteration," "amendment," or "repeal" of an existing statute without changing the text of the existing statute.

As the Supreme Court has repeatedly explained, "[w]here provisions in … two acts are in irreconcilable conflict, the latter act to the extent of the conflict constitutes an implied repeal of the earlier one." *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936). Indeed, the Authority itself cites a recent Supreme Court case making this precise point, *Dorsey v. United States*, 567 U.S. 260 (2012) (cited at Authority Br. 34, 38). In *Dorsey,* the Supreme Court applied this principle to determine the effect of a criminal statute that, on its face, limited the effect of newer criminal statutes that "repeal" older ones "unless the repealing Act shall so expressly provide." *Id.* at 272. The Court explained that "the word

'repeal' applies when a new statute simply diminishes the penalties that the older statute set forth," even if it makes no specific reference to that older statute. *Id.*

### 3. Section 28 applies unless a new law expressly or implicitly precludes its application.

The Authority separately argues that Section 28 cannot bind future Congresses and thus has no bearing on the interpretation of the Pensacola Act. *See* Authority Br. 34-35, 38. The premise is true, but the conclusion does not follow.

Section 28 was originally enacted by the 66th Congress, in 1920. *See* Federal Water Power Act, ch. 285, pt. I, § 28, 41 Stat. 1077 (1920). Later Congresses—such as the one that enacted the Pensacola Act— could of course repeal Section 28 in its entirety. And they could provide (explicitly or implicitly) that a new law affects existing licenses *notwithstanding* Section 28. *See Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 514 (2018); FERC Br. 41.

But here the new law does *not* expressly provide that Section 28 is inapplicable. In such an instance, one must apply standard tools of statutory construction to see if there is a plausible way to give both statutes effect. "'[W]hen two statutes are capable of co-existence, it is the

duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" Remand Order at P 39 & n.76, JA__ (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)); *see also Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 381 (1996) ("The rarity with which we have discovered implied repeals is due to the relatively stringent standard for such findings, namely, that there be an 'irreconcilable conflict' between the two federal statutes at issue.") (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 468 (1982)).

To be sure, one can create hypothetical statutes that do not expressly override Section 28 but can only be interpreted in ways that "affect any license theretofore issued … or the rights of any licensee thereunder." 16 U.S.C. § 822. A law that—without referencing Section 28—specifies that a particular project licensee must do something barred by its existing license by a specific date within the term of that existing license could well be interpreted as an implicit repeal of Section 28 as applied to that new law. Even with such a law, however, it would be the obligation of FERC and the courts to *attempt* to give each law effect, and only if the new law could *only* be interpreted to interfere with existing license obligations should such an interpretation be accepted.

36

**B.    Interpreted in light of Section 28, the Pensacola Act applies only to future Project licenses.**

Applying this analysis, FERC correctly concluded that both the Pensacola Act and Section 28 can be given effect by interpreting the Pensacola Act—viewed through the lens of Section 28—as not applying to the 1992 License. *See* Remand Order at P 39 & n.78, JA__; Remand Rehearing Order at P 42, JA__. Contrary to the Authority's arguments for a more intrusive application of the Pensacola Act, FERC's harmonizing approach to the two statutes is the only one that makes sense.

**1.    FERC correctly concluded that the Pensacola Act is solely prospective.**

FERC applied the principles described above to address the interaction between Section 28 and the Pensacola Act and concluded that the Pensacola Act should be interpreted to apply only to *future* licenses for the Project. FERC was plainly correct, and the Authority's attempts to undermine each sequential step of the analysis fall flat.

*First*, FERC correctly concluded that Congress did not expressly preclude application of Section 28 in the Pensacola Act. *See* Remand Order at P 41, JA__; Remand Rehearing Order at P 43, JA__. Nowhere

does the Pensacola Act so much as refer to Section 28. In contrast, the Pensacola Act *specifically* discusses how that law should be interpreted to affect at least nine *other*, preexisting laws. *See* Pensacola Act § 7612(b)(1), (b)(2)(A), (e)(1)-(3), (5)-(8); FERC Br. 40-41. The Authority ignores the distinction between its own straw man—that FERC held Congress *could not* override Section 28, *see* Authority Br. 33—and FERC's actual holding, which was simply that that Congress *did not* override Section 28 in the Pensacola Act. Remand Order at P 39, JA__.

*Second*, the Commission reasonably concluded that the Pensacola Act, as the Authority interprets it, "alter[s], amend[s], or repeal[s]" portions of the Federal Power Act otherwise applicable to the Project, thus triggering the Section 28 prospectivity rule. *See* Remand Order at PP 42-43, JA__; Remand Rehearing Order at PP 40-41, JA__.

Indeed, the Pensacola Act *expressly* amends the Federal Power Act as it applies to the Project. It provides, for example, that "Notwithstanding section 3(2) of the Federal Power Act (16 U.S.C. 796(2)) [defining "reservations"], any Federal land within the project boundary, including any right, title, or interest in or to land held by the United States for any purpose, shall not … be considered to be … land or other

38

property of the United States for purposes of recompensing the United States for the use, occupancy, or enjoyment of the land under section 10(e)(1) of [the Federal Power Act] (16 U.S.C. 803(e)(1)).” Pensacola Act § 7612(b)(1)(B)(i). In other words, an existing provision of the Federal Power Act is explicitly repealed with respect to the Project.

The Pensacola Act, as the Authority interprets it, also impliedly repeals portions of the Federal Power Act. Federal Power Act Section 4(e), for example, gives the Commission the authority to consider *all* project purposes in crafting licenses, including flood control (a “development purpose[]”). 16 U.S.C. § 797(e); *see Wisconsin Valley Improvement Co.*, 80 FERC ¶ 61,054, at 61,162 n.13 (1997) (noting that project purposes “such as hydropower, irrigation, and flood control” are considered “developmental uses”). The Authority’s reading of the Pensacola Act would preclude such consideration.

*Third*, given the first two conclusions, the Commission appropriately analyzed whether there was any way to “harmonize” the two acts—that is, to interpret the Pensacola Act’s new rules for applying the Federal Power Act to the Project and the Section 28 prospectivity rule to give effect to each. Remand Order at P 39, JA__; Remand Rehearing

39

Order at P 42, JA__. That was its obligation: As the Supreme Court has repeatedly explained, "[w]hen confronted with two Acts of Congress allegedly touching on the same topic, [courts are] not at 'liberty to pick and choose among congressional enactments' and must instead strive 'to give effect to both.'" *Epic*, 584 U.S. at 510 (quoting *Morton*, 417 U.S. at 551). Thus, "[a] party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing 'a clearly expressed congressional intention' that such a result should follow." *Id.* (quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 533 (1995)).

*Fourth*, applying those principles, the Commission correctly interpreted the Pensacola Act not to apply to the Project's existing license, but to apply instead to the new licensing proceeding that was already under way at the time Congress passed the Pensacola Act. Doing so allows the Pensacola Act and Section 28 to "be read harmoniously." Remand Rehearing Order at P 42, JA__. FERC's reading gives effect *both* to the new rules in the Pensacola Act *and* the Section 28 rule precluding new laws from affecting existing licenses. *See* Remand Order at PP 39-41, JA__ ("the most reasonable reading of the two statutory texts"

40

requires lending weight to the "clear congressional intent to preclude the modification of existing licenses, and the Commission's authority to enforce those licenses, by subsequent legislation like the Pensacola Act"); Remand Rehearing Order at P 42, JA__; FERC Br. 40-44.

> **2.    The Authority's counterarguments have no merit.**

The Authority disputes this straightforward analysis, but its arguments are unavailing.

The Authority first focuses on the text of the Pensacola Act, claiming that it is "plain." *See* Authority Br. 30-32. But FERC reasonably concluded to the contrary. *See* Remand Order at P 37 & n.70, JA__ (The Pensacola Act invokes the term "project boundary," but "does not specify what the project boundary encompasses."); Remand Rehearing Order at P 43, JA__; FERC Br. 38. This aligns with this Court's conclusion that "the crucial language … is ambiguous." 22 F.4th at 1043. In particular, the Court held that "[i]t is unclear … whether the [Pensacola Act] strips FERC of authority to enforce the existing license or that FERC's authority to impose new conditions on future licenses is limited." *Id.*

The Authority next focuses on legislative history and purpose, making numerous unsubstantiated assertions about the intent of the

Pensacola Act. *See* Authority Br. 32 ("Congress intended to prohibit FERC from exercising authority over the lands at issue in this dispute without [the Authority's] express consent"); *id.* at 32-33, 35. But relicensing of the Project was already active and contentious at the time of the Pensacola Act's passage, and none of the Authority's arguments suggest that Congress intended to trump the Section 28 rule governing the existing license. If Congress had so intended, it was perfectly capable of achieving that result by simply providing that Section 28 does not apply, or by specifying that the Pensacola Act applied to the Authority's 1992 License. It did neither.

The Authority's invocation of various canons of statutory construction fares no better. The principle that "laws take effect immediately upon their enactment unless Congress clearly directs otherwise," Authority Br. 34, is true but irrelevant. Here, the Pensacola Act *did* take effect immediately. Under FERC's interpretation, the Pensacola Act immediately limited FERC's power with respect to any new license for the Project.

Similarly, this case does not implicate the canon that specific statutes trump general ones. Authority Br. 29, 35. That canon only aids

resolution of irreconcilable statutory conflicts. *See Morton*, 417 U.S. at 550-551. Here, FERC reasonably interpreted the two laws not to be irreconcilable. *See* Remand Rehearing Order at P 42, JA__ (applying *Morton* and dismissing the Authority's arguments because "these canons only apply where two acts are inconsistent"); Remand Order at P 39 n.78, JA__.

Finally, the Authority points to other federal laws, *see* Authority Br. 37-38, arguing that these demonstrate that laws that alter a project license do not implicate Section 28. These laws prove no such thing. *See* FERC Br. 41-42.

The Authority relies, for example, on a law extending time to commence construction on the American Falls Reservoir Project. Authority Br. 37 (citing Extension of Hydroelectric Project—American Falls Reservoir, Pub. L. No. 113-177, 128 Stat. 1911 (2014)). But that law addressed a project whose license the Commission had already terminated for failure to commence construction. *See American Falls Reservoir District No. 2*, 128 FERC ¶ 61,125 (2009). Thus, when Congress acted there was no active license for the project at issue, and therefore nothing for Section 28 to apply to.

43

The Authority also cites legislation in which it claims Congress has "chang[ed] project boundaries." Authority Br. 37 (citing Swan Lake Hydroelectric Project Boundary Correction Act, Pub. L. No. 115-200, 132 Stat. 1527 (2018)). But that act does no such thing—it does not even apply to FERC. Instead, it directs the Secretary of Interior, in consultation with the Secretary of Agriculture, to survey a tract of federal land within a project's boundary and convey that land to the licensee.

Finally, the Authority points to the other deadline-extending acts that did apply to projects with existing licenses. But these all contained unambiguous timelines, specifying, for example, that the license must allow for commencement of construction within "3 consecutive 2-year periods from the date of the expiration of the extension originally issued by [FERC]." Pub. L. No. 111-60, 123 Stat. 1995 (2009). Unlike the Pensacola Act, the specific dates in that provision mean it can *only* apply to the existing license—the kind of irreconcilable conflict that necessarily repeals Section 28 by implication.

There is no dispute that Congress sometimes enacts project-specific legislation that trumps Section 28. But none of the Authority's cited laws

suggest that FERC may ignore Section 28 in analyzing the applicability of a new law that affects an existing project license.

* * * * *

FERC thus appropriately harmonized Section 28 and the Pensacola Act, concluding that the latter law applies only to any new license issued for the Project.

## CONCLUSION

This Court should find that FERC has satisfied this Court's mandate on remand, affirm FERC's well-considered conclusions, and deny the Authority's Petitions for Review.

Respectfully submitted,

/s/ David M. Gossett

Craig Gannett                          David M. Gossett
Walker Stanovsky                        *Counsel of Record*
DAVIS WRIGHT TREMAINE LLP                Shannon E. O'Neil
920 Fifth Avenue                        DAVIS WRIGHT TREMAINE LLP
Suite 3300                              1301 K Street, NW
Seattle, WA 98104                       Suite 500 East
craiggannett@dwt.com                    Washington, DC 20005
walkerstanovsky@dwt.com                 (202) 973-4200
                                        davidgossett@dwt.com
                                        shannononeil@dwt.com

January 10, 2025

45

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) and this Court's order of July 26, 2024, because it contains 8942 words, excluding the parts of the brief exempted by Circuit Rule 26(a)(1), as determined by the word-counting feature of Microsoft Word.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared using Microsoft Word in 14-point Century Schoolbook, a proportionally spaced typeface.

<u>/s/ David M. Gossett</u>
David M. Gossett

January 10, 2025

## CERTIFICATE OF SERVICE

I hereby certify under Circuit Rule 25(c) that on this 10th day of January, 2025, I electronically filed the foregoing Brief with the Court using the CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ David M. Gossett
David M. Gossett
